## No. 10-3964

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

GEORGE H. RYAN SR.,

*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

---

On appeal from the U.S. District Court for the
Northern District of Illinois, No. 10-cv-5512
Hon. Rebecca R. Pallmeyer, Judge, Presiding

---

**BRIEF AND REQUIRED SHORT APPENDIX OF PETITIONER-APPELLANT**

---

**ORAL ARGUMENT REQUESTED**

DAN K. WEBB
JAMES R. THOMPSON, JR.
GREGORY J. MIARECKI
MATTHEW R. CARTER
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

ALBERT W. ALSCHULER
4123 North Claremont Avenue
Chicago, Illinois 60618
(773) 267-5884
a-alschuler@law.northwestern.edu

ANDREA D. LYON
DePaul University College of Law,
   Legal Clinic
1 E. Jackson Blvd.
Chicago, Illinois 60604
(312) 362-8402
alyon1@depaul.edu

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **10-3964**

Short Caption: **George H. Ryan Sr. v. United States of America**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
 **George H. Ryan Sr.**

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 **Winston & Strawn LLP**

(3)  If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and
        **N/A**

   ii)  List any publicly held company that owns 10% or more of the party's or amicus' stock:
        **N/A**

Attorney's Signature: _____  Date: _____

Attorney's Printed Name: **Albert W. Alschuler (Counsel of Record)**
Address:            **4123 N. Claremont Ave.**
                    **Chicago, IL  60618**


Phone Number:       **(773) 267-5884**
Fax Number:         **(312) 503-5950**
E-Mail Address:     **a-alschuler@law.northwestern.edu**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **10-3964**

Short Caption: **George H. Ryan Sr. v. United States of America**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
 **George H. Ryan Sr.**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
**Winston & Strawn LLP**

(3)     If the party or amicus is a corporation:

   i)     Identify all its parent corporations, if any; and
          **N/A**

   ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:
          **N/A**

Attorney's Signature: _____     Date: _____

Attorney's Printed Name: **Andrea D. Lyon**
Address:            **DePaul University College of Law, Legal Clinic**
                    **1 East Jackson Blvd.**
                    **Chicago, IL  60604**

Phone Number:       **(312) 362-8402**
Fax Number:         **(312) 362-6918**
E-Mail Address:     **alyon1@depaul.edu**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **10-3964**

Short Caption: **George H. Ryan Sr. v. United States of America**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
**George H. Ryan Sr.**

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
**Winston & Strawn LLP**

(3)    If the party or amicus is a corporation:

        i)    Identify all its parent corporations, if any; and
**N/A**

        ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:
**N/A**

Attorney's Signature: _____    Date: _____

Attorney's Printed Name: **Dan K. Webb**
Address:    **Winston & Strawn LLP**
    **35 West Wacker Drive**
    **Chicago, IL  60601**

Phone Number:    **(312) 558-5600**
Fax Number:    **(312) 558-5700**
E-Mail Address:    **dwebb@winston.com**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **10-3964**

Short Caption: **George H. Ryan Sr. v. United States of America**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
     **George H. Ryan Sr.**

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
     **Winston & Strawn LLP**

(3)   If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and
          **N/A**

    ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:
          **N/A**

Attorney's Signature: _____     Date: _____

Attorney's Printed Name: **James R. Thompson**
Address:          **Winston & Strawn LLP**
                  **35 West Wacker Drive**
                  **Chicago, IL  60601**

Phone Number:          **(312) 558-5600**
Fax Number:          **(312) 558-5700**
E-Mail Address:          **jthompson@winston.com**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **10-3964**

Short Caption: **George H. Ryan Sr. v. United States of America**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
  **George H. Ryan Sr.**

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
  **Winston & Strawn LLP**

(3)  If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and
    **N/A**

  ii)  List any publicly held company that owns 10% or more of the party's or amicus' stock:
    **N/A**

Attorney's Signature: _____  Date: _____

Attorney's Printed Name: **Gregory J. Miarecki**
Address:  **Winston & Strawn LLP**
      **35 West Wacker Drive**
      **Chicago, IL  60601**

Phone Number:  **(312) 558-5600**
Fax Number:  **(312) 558-5700**
E-Mail Address:  **gmiarecki@winston.com**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __**10-3964**_____

Short Caption: __**George H. Ryan Sr. v. United States of America**_____

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):
__**George H. Ryan Sr.**_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
__**Winston & Strawn LLP**_____

(3)   If the party or amicus is a corporation:

   i)    Identify all its parent corporations, if any; and
         __**N/A**_____

   ii)   List any publicly held company that owns 10% or more of the party's or amicus' stock:
         __**N/A**_____
         _____

Attorney's Signature: _____   Date: _____

Attorney's Printed Name: __**Matthew R. Carter**_____
Address:          __**Winston & Strawn LLP**_____
                  __**35 West Wacker Drive**_____
                  __**Chicago, IL  60601**_____
                  _____

Phone Number:     __**(312) 558-5600**_____
Fax Number:       __**(312) 558-5700**_____
E-Mail Address:   __**mcarter@winston.com**_____

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION ...................................................................1

ISSUES PRESENTED ..........................................................................................1

STATEMENT OF THE CASE ............................................................................2

STATEMENT OF FACTS ...................................................................................2

SUMMARY OF THE ARGUMENT ..................................................................9

ARGUMENT........................................................................................................13

    I.    THE DISTRICT COURT'S ERRORS IN INSTRUCTING THE JURY
        WERE NOT HARMLESS. ........................................................................13

        A.    The Standard of Review:  This Court Should Adhere to the
            "Harmless Beyond a Reasonable Doubt" Standard of *Lanier
            v. United States*. ..............................................................................13

        B.    Groundwork:  Defining Bribes and Conflicts of Interest. .................15

            1.    The Central Element of Bribery is a *Quid Pro Quo*
                Exchange. ...................................................................................15

            2.    A Conflicting Interest is Any Interest Other than the
                Public Interest that Might Affect an Official Decision...........20

        C.    Ryan Might Have Been Convicted of Honest Services Fraud
            for Favoring Friends in Awarding Contracts *or* for Accepting
            Improper Financial Benefits *or* for Failing to Disclose
            Legitimate Contributions and Gifts.....................................................23

            1.    The Indictment .........................................................................23

            2.    The Instructions.........................................................................24

            3.    The Government's Argument ...................................................30

        D.    The District Court's Pecuniary Fraud Theory Was Not
            Presented to the Jury, Replicates the "Undisclosed Conflicts"
            Standard that *Skilling* Disapproved, and Does Not Render
            the Instructional Errors Harmless. .....................................................33

i

1. The District Court's Pecuniary Fraud Theory Was Not Presented to the Jury. ................................................................33

2. The District Court's Pecuniary Fraud Theory Resurrects the Undisclosed Conflicts Theory of Honest Services Fraud...................................................................36

II. THE DISTRICT COURT'S "FINANCIAL BENEFITS" INSTRUCTIONS DID NOT REQUIRE THE JURY TO FIND BRIBES OR KICKBACKS. ..........................................................38

A. Standard of Review.........................................................38

B. Introduction. ...................................................................39

C. The Instructions Erroneously Declared that a Campaign Contribution May be Treated as a Bribe Without an Explicit *Quid Pro Quo*. ...............................................................40

D. The Instructions Erroneously Invited Conviction for Accepting a Benefit with Knowledge of the Benefactor's Intent to Influence the Recipient and also Erroneously Treated Gratuities as Well as Bribes as Honest Services Fraud.................................................................................43

1. Benefits Intended to Influence ..................................44

2. Benefits Intended to Reward ....................................45

III. THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH MAIL FRAUD OR RACKETEERING UNDER THE SKILLING STANDARD.................................................................................48

A. Standard of Review.........................................................48

B. Introduction: Bribery Without Identifiable Bribes. ...........................49

C. The Government Failed to Show that the Benefits Provided by Klein Were Bribes. .....................................................50

D. The Government Failed to Show that the Benefits Provided by Warner Were Bribes. ....................................................52

IV.    THE JURY HEARD HIGHLY PREJUDICIAL EVIDENCE
RENDERED INADMISSIBLE BY SKILLING. ................................................53

    A.    Standard of Review...................................................................................53

    B.    Much of the Admitted Evidence was Irrelevant and
Prejudicial................................................................................................54

CONCLUSION ...........................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Almonacid v. United States,*
    476 F.3d 518 (7th Cir. 2007) .................................................................54

*Bateman v. United States,*
    875 F.2d 1304 (7th Cir. 1989) ...............................................................39

*Black v. United States,*
    130 S. Ct. 2963 (June 24, 2010).............................................................5

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993)...............................................................13, 14, 15

*Chiarella v. United States,*
    445 U.S. 222 (1980).............................................................................36

*Citizens United v. FEC,*
    130 S. Ct. 876 (2010)..........................................................................42

*Evans v. United States,*
    504 U.S. 255 (1992)..................................................................... passim

*Jackson v. Virginia,*
    443 U.S. 307 (1979)............................................................................49

*Kotteakos v. United States,*
    328 U.S. 750 (1946)……………………………………………………….13

*Lanier v. United States,*
    220 F.3d 833 (7th Cir. 2000) ................................................13, 14, 15

*Major v. Benton,*
    647 F.2d 110 (10th Cir. 1981) ..............................................................29

*McCormick v. United States,*
    500 U.S. 257 (1991).................................................................... passim

*McNally v. United States,*
    483 U.S. 350 (1987)............................................................................34

*Messenger v. Anderson,*
    225 U.S. 436 (1912)............................................................................29

*Moore v. United States*,
    865 F.2d 149 (7th Cir. 1989) ................................................................34

*Neder v. United States*,
    527 U.S. 1 (1999) ..................................................................................34

*O'Neal v. McAninch*,
    513 U.S. 432 (1995) ........................................................................14, 15

*Piper v. DPFA, Inc.*,
    No 09 CV 1220, 2010 U.S. Dist. LEXIS 72820 (N.D. Ill. 7/20/2010) ..................................34

*Ryan v. United States*,
    No. 10 C 5512, 2010 U.S. Dist. LEXIS 134912 (N.D. Ill. 12/21/2010) ........................ passim

*Skilling v. United States*,
    130 S. Ct. 2896 (2010) ................................................................... passim

*Sullivan v. Louisiana*,
    508 U.S. 275 (1993) ..............................................................................36

*Sun-Diamond Growers v. United States*,
    526 U.S. 398 (1999) ....................................................................18, 46, 48

*Thompson v. United States*,
    546 A.2d 414 (D.C. 1988) .....................................................................56

*United States v. Abbey*,
    560 F.3d 513 (6th Cir. 2009) ...............................................................41

*United States v. Agostino*,
    132 F.3d 1183 (7th Cir. 1997) .............................................................48

*United States v. Allen*,
    10 F.3d 405 (7th Cir. 1993) ............................................................19, 42

*United States v. Antico*,
    275 F.3d 245 (3d Cir. 2001) ................................................................41

*United States v. Arthur*,
    544 F.2d 730 (4th Cir. 1976) ...............................................................19

*United States v. Beasley*,
    809 F.2d 1273 (7th Cir. 1987) .............................................................56

*United States v. Bloom*,
    149 F.3d 649 (7th Cir. 1998) ........................................................ passim

*United States v. Bonito*,
   57 F.3d 167 (2d Cir. 1995)................................................................48

*United States v. Cappas*,
   29 F.3d 1187 (7th Cir. 1994) ...........................................................15

*United States v. Ciesiolka*,
   614 F.3d 347 (7th Cir. 2010) .....................................................55, 56

*United States v. Darif*,
   446 F.3d 701 (7th Cir. 2006) ...........................................................39

*United States v. Ford*,
   435 F.3d 204 (2d Cir. 2006)..............................................................46

*United States v. Ganim*,
   510 F.3d 134 (2d Cir. 2007).......................................................passim

*United States v. Giles*,
   246 F.3d 966 (7th Cir. 2001) ...........................................................42

*United States v. Gorny*,
   732 F.2d 597 (7th Cir. 1984) .....................................................45, 46

*United States v. Holmes*,
   93 F.3d 289 (7th Cir. 1996) .............................................................15

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir. 1998) ..............................................16, 17, 47

*United States v. Johnson*,
   621 F.2d 1073 (10th Cir. 1980) .......................................................20

*United States v. Kemp*,
   500 F.3d 257 (3d Cir. 2007)..................................................16, 17, 19

*United States v. Kincaid-Chauncey*,
   556 F.3d 923 (9th Cir. 2009) ....................................................16, 41

*United States v. Leahy*,
   464 F.3d 773 (7th Cir. 2006) ...........................................................35

*United States v. Macari*,
   453 F.3d 926 (7th Cir. 2006) ...........................................................49

*United States v. Medina*,
   755 F.2d 1269 (7th Cir. 1985) .........................................................36

*United States v. Medley*,
913 F.2d 1248 (7th Cir. 1990) .........................................................48

*United States v. Muldoon*,
931 F.2d 282 (4th Cir. 1991) .........................................................47

*United States v. Owens*,
424 F.3d 649 (7th Cir. 2005) .....................................................54, 58

*United States v. Peterson*,
236 F.3d 848 (7th Cir. 2001) .........................................................36

*United States v. Rogers*,
587 F.3d 816 (7th Cir. 2009) .........................................................54

*United States v. Smith*,
103 F.3d 531 (7th Cir. 1996) ...........................................................2

*United States v. Sorich*,
523 F.3d 702 (7th Cir. 2008) … .................................................…26

*United States v. Strand*,
574 F.2d 993 (9th Cir. 1978) .........................................................47

*United States v. Walls*,
225 F.3d 858 (7th Cir. 2000) .........................................................15

*United States v. Warner*,
498 F.3d 666 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2500 (2008)........................2, 9, 28, 29

*United States v. Watson*,
171 F.3d 695 (D.C. Cir. 1999) .......................................................15

*United States v. Whitfield*,
590 F.3d 325 (5th Cir. 2009) .....................................................19, 51

*Waldemar v. United States*,
106 F.3d 729 (7th Cir. 1996) .........................................................39

*White v. United States*,
371 F.3d 900 (7th Cir. 2004) .........................................................29

*Yates v. United States*,
354 U.S. 298 (1957)) .......................................................................13

## STATUTES

18 U.S.C. § 201(c)(1)(a) .................................................................18

18 U.S.C. § 666...................................................................................................46, 47, 48

18 U.S.C. § 1341................................................................................................................18

18 U.S.C. § 1346..................................................................................................................1

28 U.S.C. § 2253..................................................................................................................1

28 U.S.C. § 2255........................................................................................................ passim

28 U.S.C. § 2255(d)..............................................................................................................1

**OTHER AUTHORITIES**

Fed.R.Evid. 404(b)......................................................................................................55, 56

George Brown, *Stealth Statute—Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666*, 73 Notre Dame L. Rev. 247 (1998).................................................47

Melville M. Bigelow, *The Law of Fraud* 1 (1877) ......................................................34

*Ryan Confident He Will Be Exonerated at Upcoming Trial*, Chicago Sun-Times, July 22, 2005..................................................................................................................3

William W. Landes and Richard A. Posner, *The Independent Judiciary in an Interest Group Perspective,* 18 J.L. & Econ. 875, 877 (1975) ............................................22

**INTRODUCTION**

*Skilling v. United States*, 130 S. Ct. 2896 (2010), dramatically altered the scope of the honest services fraud statute, 18 U.S.C. § 1346. The Supreme Court saved this statute from a "vagueness shoal" by holding that it "covers only bribery and kickback schemes." *Id.* at 2907. The principal issue in this case is whether the district court properly ruled that its acknowledged errors in instructing the jury and admitting evidence in a pre-*Skilling* trial were harmless.

**STATEMENT OF JURISDICTION**

On August 31, 2010, Petitioner-Appellant George H. Ryan Sr. filed in the United States District Court for the Northern District of Illinois a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence of imprisonment. The court denied Ryan's motion on December 21, 2010. A-000001-58. It granted a certificate of appealability the next day. A-000059. On December 27, 2010, Ryan filed a timely notice of appeal. A-000060. This Court has jurisdiction pursuant to 28 U.S.C. § 2255(d) and 28 U.S.C. § 2253.

**ISSUES PRESENTED**

1.    Whether the district court erroneously determined that the jury could not have convicted Ryan of failing to disclose conflicts of interest or of violating state laws without also finding that he took bribes.

2.    Whether the district court erroneously determined that the jury could not have convicted Ryan of failing to disclose conflicts of interest or of violating state laws without also finding that he fraudulently deprived the state of property.

1

3.      Whether the district court erroneously ruled that its instructions concerning the improper receipt of financial benefits encompassed only bribes.

4.      Whether the evidence was sufficient to establish bribery.

5.      Whether Ryan was prejudiced by the non-bribery evidence admitted at his trial.

## STATEMENT OF THE CASE

On April 17, 2006, a jury found Ryan, a former Illinois Secretary of State and Governor, and his co-defendant Lawrence Warner guilty of a RICO conspiracy and seven counts of mail fraud.  The jury convicted Ryan separately of two more mail fraud charges, false statements, and various tax offenses.  A-000427.[1]  The district court set aside the jury's convictions on two mail fraud charges but entered judgment on the remaining counts.  A-000429.  It sentenced Ryan to 78 months imprisonment and 12 months of supervised release.  A-000186.

This Court upheld Ryan's convictions.  *United States v. Warner*, 498 F.3d 666 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2500 (2008).  Ryan filed his Section 2255 motion on August 31, 2010, and the district court denied it on December 21.  A-000001.  On December 27, Ryan filed a timely notice of appeal.  A-000060.

## STATEMENT OF FACTS

Before trial, Ryan told the press, "[T]hey haven't got one witness that said they gave me a corrupt dollar."  *Ryan Confident He Will Be Exonerated at Upcoming Trial*,

---

[1] Ryan does not challenge his false statements and tax convictions, but vacating his mail fraud and RICO convictions would require a redetermination of the sentences imposed for these offenses.  *United States v. Smith*, 103 F.3d 531, 533, 535 (7th Cir. 1996).

Chicago Sun-Times, July 22, 2005 (A-000184).  The government clipped the news stories and attached them to a *Motion for Pretrial Ruling on Jury Instructions Related to Mail Fraud Allegations*.  A-000163-67.  The motion argued that it would be "clearly *improper*…for the defense to argue or suggest to the jury that 'corrupt dollars' for contracts or other specific quid pro quo evidence is a *prerequisite* to a finding of guilt on the particular mail fraud charges here."  A-000157 (emphasis in the original).  It argued that "[o]ther circuits… have upheld public corruption prosecutions rooted in…the failure of a public official to disclose a financial interest or relationship affected by his official actions."  A-000158.

Ryan's response declared, "A *Quid Pro Quo* Is Required Where Mail Fraud Charges Are Predicated on the Receipt of a Campaign Contribution," and "A *Quid Pro Quo* Is Required Where Federal Criminal Charges Are Predicated on the Receipt of a Gift."  A-000175-82.

The district court largely accepted the government's position, *see* A-000006, and the words "bribe," "kickback," and "*quid pro quo*" do not appear in the jury instructions. Instead, the instructions mark four separate paths to conviction for honest services fraud.  A-000028, A-000030-31.

First, the court gave the jury a general standard derived from *United States v. Bloom*, 149 F.3d 649, 656-57 (7th Cir. 1998): "Where a public official or employee misuses his official position or material nonpublic information he obtained in it for private gain for himself or another, then that official or employee has defrauded the public of his

honest services if the other elements of the mail fraud offense have been met." A-000421.

Second, the jury was told that an undisclosed conflict of interest required conviction:

> A public official or employee has a duty to disclose material information to a public employer.  If an official or employee conceals or knowingly fails to disclose a material personal or financial interest, also known as a conflict of interest, in a matter over which he has decision-making power, then that official or employee deprives the public of its right to the official's or employee's honest services if the other elements of the mail fraud offense are met.

A-000420.  The instructions defined "materiality" as having "the natural tendency to influence or [being] capable of influencing [a] decision."  *Id*.

Third, a series of instructions directed conviction for the improper receipt of "personal and financial benefits."  Among other things, they declared it unlawful for a public official to receive a benefit "intended to influence or reward [his] exercise of office" or to accept a benefit "with the…understanding that it was given to influence his decisionmaking."  A-000420.  They also declared that the jury could "imply" that campaign contributions had been given in exchange for official acts "from [the parties'] words and ongoing conduct."  A-000421.

Finally, the court stated, "I instruct you that the following state laws were among the laws applicable to state officials…."  A-000421.  It then noted an Illinois constitutional provision "that public funds, property, or credit shall be used only for public purposes," a statutory prohibition of acting "in excess of lawful authority," a prohibition of soliciting or knowingly accepting "for the performance of any act a fee or

4

reward which [an official] knows is not authorized by law," a statute requiring an

official to file an annual statement of economic interests, another statute prohibiting the

acceptance of gifts from lobbyists and other "prohibited sources," and a statute

forbidding the use of public funds in political campaigns.  A-000421.  The court added:

> Again, not every instance of misconduct or violation of a state statute
> by a public official or employee constitutes a mail fraud violation.
> Where a public official or employee misuses his official position or
> material nonpublic information he obtained in it for private gain for
> himself or another, then that official or employee has defrauded the
> public of his honest services if the other elements of the mail fraud
> offense have been met.

A-000421.

The district court recognized that three of the four paths to conviction marked by

its instructions were no longer viable after *Skilling*.  In *Black v. United States*, 130 S. Ct.

2963 (2010), a case decided the same day as *Skilling*, the Supreme Court reversed a

conviction because the trial court had instructed the jury in accordance with *Bloom*.  *Id.*

at 2964, 2968.  In *Skilling* itself, the Court emphatically rejected the Government's

argument that honest services fraud included undisclosed conflicts of interest.  130 S.

Ct. at 2932-33.  The Supreme Court also held that courts must give the terms "bribe"

and "kickback" the same meaning they have in federal statutes and added, "[O]ur

construction of § 1345 'establish[es] a uniform national standard.'"  *Id.* at 2933.  This

language made plain that honest services convictions cannot be predicated on

violations of state law.

Although the district court recognized that its *Bloom* instruction, its conflict-of-

interest instructions, and its state-law instructions were erroneous, A-000012-13, A-

000019-20, it held that its financial benefits instructions adequately conveyed federal bribery standards. A-000015-19. The court then concluded that "in returning its verdict, the jury must have found those elements that would support a conviction under the still-valid honest services bribery theory." A-000006, A-000022-41. Alternatively, it held that the jury could not have convicted Ryan on any of the four honest services fraud theories without also finding that he committed pecuniary fraud. A-000041-51.

The government devoted months of Ryan's trial to presenting evidence that had nothing to do with bribes or kickbacks. The jury heard that Ryan accepted gifts in excess of a self-imposed $50 limit, A-000384; that he accepted an undisclosed consulting fee from the Phil Gramm presidential campaign, A-000383; that he discharged and reassigned employees of the Secretary of State's Inspector General's office in order to limit their investigative activities, A-000398; that he allowed government employees to work on his political campaigns, A-000397; that he allowed state property to be used in his campaigns, A-000406; and that he revealed to a friend where a new prison would be built, enabling the friend to profit as a lobbyist. A-000395. The district court held that some of this evidence was properly received under the "intent" exception to the rule against propensity evidence, that some should have been received only on the tax charges, and that some should not have been received at all. The court then concluded that its erroneous receipt of evidence was harmless. A-000052-57.

Other evidence indicated that Ryan awarded government benefits to friends who had done favors for him and his family. The government described this evidence as

showing an "undisclosed flow of benefits," *see*, *e.g.*, A-000407, and the district court

concluded that the jury could not have convicted Ryan of honest services fraud without

finding that accepting benefits from his friends violated the standards set forth in its

financial benefits instructions.  The benefits were accordingly bribes.  *See*, *e.g.*, A-000022-

29, A-000034-35.

Particularly significant were the benefits Ryan received from Warner and Harry

Klein, for after the district court set aside two of the jury's mail fraud verdicts, the only

remaining mail fraud counts alleged mailings in furtherance of one lease benefitting

Klein (Count 6) and several leases and contracts benefitting Warner (Counts 2-5 and 7-

8).[2]

The only benefits Ryan received from Klein were annual one-week vacations at

his home in Jamaica.  A-000372-74.  In 1997, four years after the vacations began, Ryan

took part in a decision by the Secretary of State's office to lease a property Klein owned

in South Holland, Illinois.  Count 6 alleged a mailing in furtherance of this lease.  The

government's principal witness, Scott Fawell, testified that Ryan purported to pay for

his vacations by giving Klein a check for $1,000 and taking back $1,000 in cash, but no

evidence suggested a more disreputable explanation of this conduct than the one Fawell

provided:  Because Klein owned currency exchanges regulated in part by Ryan's office,

---

[2] The government charged that all of Ryan's alleged misconduct was part of a single fraudulent scheme.  Nevertheless, each mail fraud count alleged a mailing in furtherance of a specified part of this scheme, and most aspects of the scheme were not mentioned in any count.  Unless the conduct specified in a particular count was in fact fraudulent, the alleged mailing was no more in furtherance of the overall scheme than was Ryan's payment by mail of his dentist's bill.  As noted above, the district court set aside verdicts on two of the mail fraud counts because the government failed to prove that the alleged mailings furthered fraudulent conduct.

Ryan sought to conceal a conflict of interest. A-000367.    Like every other prosecution witness, Fawell testified that he never saw Ryan accept any benefit from anyone to influence or affect his official judgments, nor did he see any indication that Ryan had done so. A-000368.

Warner hosted two fundraisers for Ryan's campaigns—one raising $75,000 and the other $175,000. A-000386; A-000387-88. In addition, Warner, an insurance agent, adjusted Ryan's insurance claim without a fee after Ryan's apartment flooded on Christmas Day. A-000384. The other benefits allegedly provided by Warner all went to people other than Ryan himself. Warner waived an insurance adjustment fee for a Ryan son-in-law, shared lobbying fees with Donald Udstuen and Ron Swanson, invested in two businesses owed by Ryan family members, lent money to a Ryan son-in-law, and paid for the band at the wedding of one of Ryan's daughters. A-000409-10; A-000411.[3] Counts 2, 4, 5, and 7 alleged mailings in furtherance of contracts awarded to Warner's lobbying clients, and Counts 3 and 8 alleged mailings in furtherance of leases of property in which Warner had interests.

Despite the improper evidence and instructions it heard, the jury had difficulty reaching a verdict. After it had deliberated for eight days, the court replaced two jurors who had given false answers on jury questionnaires. One of these jurors was later revealed to be pro-defense. *See* A-000424, A-000423, A-000425-26. The reconstituted jury then deliberated for ten days before reaching a verdict. *See United States v. Warner*,

---

[3] The district court alluded to "circumstantial evidence that Ryan received cash from Warner and others," but it recognized that the jury was not required to credit this evidence. A-000031.

8

498 F.3d 666, 675-77 (7th Cir. 2007).  Despite the length of the deliberations, the jury did not appear to examine the evidence and parse the instructions with great care.  It convicted on all counts, including two on which the district court later held the evidence insufficient.  On Count 9, the jury convicted Ryan of steering a contract to Warner, although the district court concluded that *no* evidence indicated that he had done so.  A-000461.  On Count 10, the jurors convicted Ryan for disclosing the location of a new prison to a friend, although the disclosure appeared to be inadvertent, the friend was immediately advised that the information was confidential, and the government offered no evidence that Ryan knew of his friend's improper use of this information to profit as a lobbyist.   A-000462-63.

## SUMMARY OF THE ARGUMENT

The district court recognized that three of its instructions concerning honest services fraud were erroneous.  It nevertheless held its instructional errors harmless because, on the facts of this case, the jury could not have grounded a conviction on any of the invalid instructions without also finding Ryan guilty under instructions forbidding the improper receipt of personal or financial benefits.  The court concluded that this set of instructions criminalized only benefits that would qualify as bribes under federal standards.

Two fallacies pervaded the court's analysis.  First, it assumed that if the jury convicted Ryan on the basis of his relationships with Klein and Warner, it must have done so only because of the "stream of benefits" they allegedly provided.  The instructions, however, invited conviction simply for favoring these friends in the award

9

of government benefits.  The jury could have concluded that Ryan's favoritism was a misuse of his office for his friends' private gain in violation of *Bloom*.  The jury also could have found Ryan's alleged favoritism a violation of state law.   Moreover, conflicting interests need not be financial, and the jury might have found that the conflicts-of-interest instruction warranted Ryan's conviction for awarding benefits to long-time friends and political associates without revealing the nature of his relationship with them.

Second, the district court assumed that if the jury convicted Ryan on the basis of the "stream of benefits" Klein and Warner provided, it must have found that Ryan's *receipt* of these benefits was improper under the court's financial benefits instructions.  Without regard to whether the benefits were improperly received, however, the jury might have convicted Ryan simply for failing to disclose them when he made decisions advantageous to his benefactors.  The court seemed oblivious to the fact that legitimate contributions and gifts can create conflicts of interest.  These benefits can have a "natural tendency to influence [and can be] capable of influencing [a] decision."  The jury might have convicted Ryan for failing to disclose legitimate benefits.

Indeed, the jury almost certainly did convict Ryan for failing to disclose benefits without regard to whether they were bribes.  The government never urged conviction on the basis of the financial benefits instructions.  Instead, it repeatedly told the jury to convict on the basis of an "undisclosed stream of benefits."  The government not only insisted that the benefits in the stream need not be bribes; it expressly acknowledged

that the evidence did not show the defining characteristic of bribery, a *quid pro quo* exchange.

The district court held in the alternative that, on the facts of this case, the jury could not have grounded a conviction on any of the invalid instructions without also finding that Ryan defrauded the state of property—contracts, leases, and confidential information.

The court's analysis effectively resurrected the undisclosed conflicts standard rejected by *Skilling*. It declared an official guilty of stealing a benefit (not for himself but for others) whenever he awarded this benefit without revealing a material conflicting interest—that is, any interest, including friendship and legitimate gifts, that might have influenced his decision. The court's new undisclosed conflicts theory posed the same difficulties as the old one.

Counsel have not found any case prior to this one in which a civil or criminal defendant was alleged to have committed pecuniary fraud by failing to disclose a legitimate gift. Moreover, the government failed to advance this claim even in this case until after the trial was over. The jury never heard that contracts and leases were government property that could be stolen by deception or that confidential information was property. It never heard that Ryan stole a contract by declaring that a security decal on license plates was needed for public safety, that he stole two leases by failing to reveal his knowledge of Warner's ownership interests in the leased premises, or that he stole another lease by failing to disclose Klein's hospitality in Jamaica. For a court to

convict a defendant on the basis of a theory that was never presented to the jury violates his right to jury trial.

The district court premised its initial claim of harmless error—that the jury must have found Ryan guilty of taking bribes—on the proposition that its financial benefits instructions encompassed only bribes. This premise was erroneous. The Supreme Court and this Court have held that campaign contributions may not be treated as bribes in the absence of an "explicit" *quid pro quo*. The district court's instruction concerning campaign contributions, however, told the jury just the opposite: "The intent of each party can be implied from their words and ongoing conduct." The court's instructions also declared it unlawful for an official to accept a benefit with knowledge that it was given to influence his decision-making. Knowledge of a donor's intent to influence is not an agreement to *be* influenced or to provide anything in return. The financial benefits instructions also encompassed benefits intended to "reward" an official's past acts. These benefits are gratuities, not bribes.

In fact, the evidence in this case showed only that Ryan received favors from friends and sometimes awarded government benefits to these friends. It fell short of establishing bribes or kickbacks. The essence of bribery is a *quid pro quo* exchange, and the government acknowledged that its evidence did not show any *quid pro quo*.

Finally, Ryan was clearly prejudiced by the mass of non-bribery evidence presented at his trial.

# ARGUMENT

I. **THE DISTRICT COURT'S ERRORS IN INSTRUCTING THE JURY WERE NOT HARMLESS.**

   A. **The Standard of Review: This Court Should Adhere to the "Harmless Beyond a Reasonable Doubt" Standard of *Lanier v. United States*.**

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that the standard for judging the harmlessness of constitutional errors in *habeas corpus* proceedings brought by *state* prisoners differs from the standard applied on direct review.[4]  The question in *habeas* proceedings brought by state prisoners is whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* at 631 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Seven years after *Brecht*, in *Lanier v. United States*, 220 F.3d 833 (7th Cir. 2000), this Court considered what harmless error standard to apply in Section 2255 proceedings. The petitioner contended that rule should be:  "[I]t must be apparent beyond a reasonable doubt that the error did not contribute to the verdict at all."  *Id.* at 838-39. The government supported a different formulation:  "In harmless error analysis, the basic question is, 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?'"  Supplemental Br. for the United States at 2, *Lanier v. United States*, 220 F.3d 833 (7th Cir. 2000) (No. 93-2689) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).  This Court, declaring the petitioner's formulation

---

[4] *Skilling* noted that "'[c]onstitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory.'"  130 S. Ct. at 2934 (citing *Yates v. United States*, 354 U.S. 298 (1957)) (emphasis added).

"an onerous standard for the government to meet," endorsed the government's view. 220 F.3d at 839.

In this case, the government urged the district court to depart from *Lanier* and apply *Brecht*. It noted that several courts of appeals outside this circuit have extended *Brecht* to Section 2255 proceedings. A-000334-35. The district court, however, adhered to *Lanier*; the test was "whether it is beyond a reasonable doubt that a reasonable jury would have convicted Ryan of a legally valid theory on which it was property instructed." A-000009.

*Brecht* is inapposite, for it was expressly grounded on federalism concerns inapplicable to Section 2255 proceedings brought by federal prisoners:

> The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system…. We have also spoken of comity and federalism. "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."

507 U.S. at 635 (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)) (citations omitted).

Soon after *Brecht*, the Court contracted that decision. In *O'Neal v. McAninch*, 513 U.S. 432 (1995), it rejected *Brecht*'s suggestion that state prisoners must show prejudice in *habeas* proceedings. It declared that prosecutors must instead explain why errors are harmless. *Id*. at 438-39. Moreover, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'a substantial and injurious

14

effect or influence in determining the jury's verdict,' that error is not harmless.  And, the petitioner must win."  *Id*. at 436.

After *McAninch*, the distance between *Brecht* and *Lanier* is not great.  *Lanier*'s "harmless beyond a reasonable doubt" formulation remains the appropriate standard, but the district court's acknowledged errors cannot pass the *Brecht* test either.  There is more than a "grave doubt" in this case.

Under either standard, an inquiry into harmlessness is "almost the polar opposite of a sufficiency of the evidence review," and any suggestion that the evidence should be viewed in the light most favorable to the government would "flatly contradict" the required inquiry.  *United States v. Cappas*, 29 F.3d 1187, 1194 n.4 (7th Cir. 1994).  *See United States v. Walls*, 225 F.3d 858, 867 (7th Cir. 2000); *United States v. Holmes*, 93 F.3d 289, 294 (7th Cir. 1996); *United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999) (a court must ask "not whether the evidence was sufficient to convict notwithstanding the error, but rather whether the court can say that the error did not affect the jury's verdict").

**B.      Groundwork:  Defining Bribes and Conflicts of Interest.**

**1.      The Central Element of Bribery is a *Quid Pro Quo* Exchange.**

The district court analogized the kind of bribery alleged in this case to streams, flows, retainer contracts, meal plans, and open bars.  A-000011-12, A-000018, A-000034, A-000052-53.  It implied that the central issue was whether the government must "prove an explicit *quid pro quo*" or whether "[a] bribery scheme can rest on a 'stream of

benefits,' 'course of conduct,' or 'retainer' theory." A-000052-53. The court's metaphors ignored the issues Ryan presented and answered arguments he never made.

Ryan does not doubt that accepting a "retainer" with "the understanding that when the payor comes calling, the government official will do whatever is asked" is bribery. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009). He recognizes that the *quid pro quo* of a bribery transaction must be express only when the bribe consists of campaign contributions. Fact finders examining other sorts of benefits may infer the necessary agreement from an official's words and actions. *See, e.g., United States v. Ganim*, 510 F.3d 134, 143 (2d Cir. 2007) (Sotomayor, J.). He agrees that "where there is a stream of benefits given by a person to favor a public official…it need not be shown that any specific benefit was given in exchange for a specific official act." *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007). He affirms that "the intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that.'" *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998).

As virtually all of the decisions endorsing a "stream of benefits" theory of bribery have noted, however, a *quid pro quo* remains essential. There must have been an understanding—explicit or implicit—at the time some benefit was received that the recipient would take some action (or omit some action) in return. *See, e.g., Kincaid-Chauncey*, 556 F.3d at 940 n.13 ("We agree with the Third Circuit that, for a bribery theory of honest services fraud, a *quid pro quo* is required."); *Ganim*, 510 F.3d at 147 ("[R]equiring a jury to find a quid pro quo, as the governing law does, ensures that a particular payment is made in exchange for a *commitment* to perform official acts to

16

benefit the payor in the future.") (emphasis in the original); *Kemp*, 500 F.3d at 282 ("The key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action."); *Jennings*, 160 F.3d at 1014 ("Bribery requires the intent to exchange money (or gifts) for specific action (or inaction)."). A public official does not commit bribery whenever he makes a decision beneficial to someone who once did him a favor.

The Supreme Court initially articulated the *quid pro quo* requirement in *McCormick v. United States*, 500 U.S. 257 (1991). This case arose under the Hobbs Act, which had been construed by the courts of appeals to forbid any receipt of a bribe by a public official. In *McCormick*, a lobbyist delivered cash campaign contributions to a state legislator. The trial court instructed the jury that to convict they must be "convinced beyond a reasonable doubt that the payment…was made…with the expectation that such payment would influence McCormick's official conduct, and with the knowledge on the part of McCormick that they were paid to him with that expectation." 500 U.S. at 261 n.4. The Supreme Court held this instruction insufficient. It concluded that campaign contributions could be treated as bribes only when "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id*. at 273.

In *Evans v. United States*, 504 U.S. 255 (1992), the Court reiterated "the *quid pro quo* requirement of *McCormick v. United States*" and declared, "[T]he offense is complete at the time when the public official receives a payment in return for his engagement to perform specific official acts." *Id*. at 268.

17

The defendant in *Sun-Diamond Growers v. United States*, 526 U.S. 398 (1999), was a trade association that gave expensive gifts to the Secretary of Agriculture while he was considering matters of interest to the association.  The association was convicted at trial of providing an illegal gratuity—that is, of giving a thing of value to a public official "for or because of any official act performed or to be performed by such public official." 18 U.S.C. § 201(c)(1)(a).

The Supreme Court reversed.   The trial court had told the jury that the gratuities statute, "unlike the bribery statute, did not require any connection between respondent's intent and a specific official act," and this instruction was erroneous.  A gratuity, like a bribe, must be given "for or because of some particular official act."  *Id*. at 405-06.

The Court noted that there remained a significant difference between bribes and gratuities:  "[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange for* an official act.  An illegal gratuity, on the other hand, may constitute merely a reward…for a past act…."  *Id*. at 404-05 (emphasis in the original).  The Court observed that bribery is a substantially more serious crime than providing an improper gratuity.  Bribes are punishable by as much as fifteen years in prison; gratuities, by no more than two years.  *Id*. at 405.[5]

---

[5] When a prosecutor charges the giver or recipient of a bribe with honest services fraud, the maximum penalty becomes twenty years.  18 U.S.C. § 1341.  The severity of this penalty cautions against defining bribery broadly enough to encompass improper gratuities.  The *quid pro quo* requirement is crucial.

In *Skilling*, the Supreme Court cited three recent decisions by federal courts of appeals to support its statement, "As to arbitrary prosecutions, we perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape." 130 S. Ct. 2934-35. Each of these decisions recognized that bribery may consist of a "stream of benefits," and each also declared a *quid pro quo* essential. Passages from two of the decisions—*Ganim* and *Kemp*—have been quoted above. In the third, *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), the Court wrote, "[A] particular, specified act need not be identified at the time of payment to satisfy the *quid pro quo* requirement, so long as the payor and payee agreed upon a specific *type* of action to be taken in the future." *Id.* at 350 (emphasis in the original).

The existence or non-existence of a *quid pro quo* must be evaluated at the time a public official receives the benefit alleged to be a bribe. It is not enough for the official to accept a benefit without a commitment or understanding and later to approve an official action that benefits the provider. "[T]he offense is complete at the time when the public official receives a payment in return for his agreement to perform specific official acts." *Evans*, 504 U.S. at 268. *See McCormick*, 500 U.S. at 283 (Stevens, J., dissenting) ("When the petitioner took the money, he was either guilty or not guilty."). Moreover, as this Court noted in *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993), "Vague expectations of some future benefit should not be sufficient to make a payment a bribe." *See also United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976) (declaring that a gift given with a "generalized hope of ultimate benefit on the part of the donor" is not a bribe); *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980) (same)).

### 2.     A Conflicting Interest is Any Interest Other than the Public Interest that Might Affect an Official Decision.

In ordinary usage, any interest of a public official that could divert him from faithful service to the public is a conflicting interest. Although every bribe creates a conflict, not every conflict is a bribe.

The jury instructions in this case were in accord with this understanding. They declared it unlawful for an official to fail to disclose "a material personal or financial interest, also known as a conflict of interest, in a matter over which he has decision-making power," and they further declared, "A false pretense, representation, or promise is material if it has the natural tendency to influence or is capable of influencing the decision of the decision-making body to which it is addressed." A-000420.

A conflicting interest need not be financial. For example, if an official were to award a public contract to his mistress without revealing that she was his mistress, one might properly accuse him of concealing a conflict of interest. One might also make this accusation if an official awarded a contract to a long-time friend without disclosing the friendship. The government argued successfully before trial that the honest services statute required an official to disclose every "financial interest or relationship affected by his official actions." A-000158.

In addition, legitimate favors, gifts, and campaign contributions can create conflicts of interest. A benefactor, for example, might have supported a governor's political campaigns, contributed to a private fund to purchase furniture for the

Governor's Mansion, and entertained the governor at the benefactor's ranch. The governor might never have hinted that he would provide anything to his benefactor, and the benefactor might have had no thought when he provided the benefits that he would ever ask the governor for anything. The benefits might not be bribes under even the most expansive definition.

Suppose, however, that the benefactor's brother has sought a government job, and the benefactor has encouraged the governor to hire him. The benefactor's endorsement would not convert his earlier contributions and gifts into bribes. Indeed, the contributions and gifts would not retroactively become bribes even if they influenced the governor. The benefits would create a conflict of interest, however. They could have a natural tendency to influence or might be capable of influencing the governor's decision. Before *Skilling*, under the jury instructions given in this case, the governor would have had a duty to disclose them. If he hired the benefactor's brother without making this disclosure, he would be guilty of honest services fraud.

The governor, however, would not be guilty after *Skilling*. He did not scheme to obtain a bribe and never took a bribe. In *Skilling*, the Supreme Court not only rejected the government's "undisclosed self-dealing" standard; it warned Congress that approving any standard like the government's would raise serious due process concerns. 130 S. Ct. at 2933 n.44.

For people involved in public life, conflicts of interest are ubiquitous. Politics consists in part of making friends, and people who do business for the government cannot avoid contact with people who seek business with government. Cynicism about

21

the process runs deep.  William Landes and Richard Posner describe a branch of

academic study called "public choice theory"—one that has generated hundreds of

scholarly works:

> In the economists' version of the interest-group theory of government,
> legislation is supplied to groups or coalitions that outbid rival seekers
> of favorable legislation… Payments take the form of campaign
> contributions, votes, implicit promises of future favors, and
> sometimes outright bribes. In short, legislation is "sold" by the
> legislature and "bought" by the beneficiaries of the legislation.

William W. Landes and Richard A. Posner, *The Independent Judiciary in an Interest Group*

*Perspective,* 18 J.L. & Econ. 875, 877 (1975).

Even when a dedicated official considers only the public interest, some of his

decisions will benefit political supporters, people who have done favors for him, and

people who have done business with members of his family.  Skeptics may have no

doubt that corruption has occurred even when the official's motives are pure.

Moreover, people seeking favorable governmental treatment do attempt to curry

favor.  Lobbyists buy lunches, dinners, and golf outings, and interest groups contribute

to political campaigns.  When no regulation forbids it, people who may later seek

contracts, grants, leases, licenses, zoning variances, jobs, pardons, and legislation may

buy their insurance through a brokerage owned by a part-time official.  When invited to

a charity ball sponsored by an official's spouse, they may write a check.  Criminalizing

undisclosed conflicts enables prosecutors (some of whom may be ambitious and/or

responsive to politically motivated superiors) to cast their nets widely and pick their

targets.

**C.    Ryan Might Have Been Convicted of Honest Services Fraud for Favoring Friends in Awarding Contracts *or* for Accepting Improper Financial Benefits *or* for Failing to Disclose Legitimate Contributions and Gifts.**

The district court reasoned that if the jury convicted Ryan on the basis of his relationships with Warner and Klein, it must have found that the benefits provided by Warner and Klein were bribes.  In its view, the evidence suggested no other conflicting interest.  A-000022-23, A-000033, A-000035, A-000040-41.  In fact, however, the jury could have convicted Ryan simply for favoring these friends in awarding contracts and leases, and it also could have convicted him for failing to disclose legitimate benefits received from Warner and Klein.

1.    The Indictment.  The district court pointed to three paragraphs of the summary indictment given the jury to describe the fraudulent scheme the government alleged.   The court recognized that each of these paragraphs supplied an independent basis for conviction.  "Case law supports the conclusion that, unless instructed otherwise, a jury need not have found that every part of an alleged scheme existed…." A-000028.

The passages quoted by the court declare:

> 3. It was part of the scheme that defendant Ryan performed and authorized official actions to benefit the financial interests of Ryan, defendant Warner, Arthur Ronald Swanson, Harry Klein and Donald Udstuen and designated third parties including Ryan family members and Citizens for Ryan….

> 4. It was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner, Arthur Ronald Swanson and Donald Udstuen, while defendant Ryan knew that such benefits were

23

> provided with intent to influence and reward Ryan in the
> performance of official acts….
>
> 5. It was further part of the scheme that…defendants Ryan, Warner,
> Arthur Ronald Swanson, and Donald Udstuen concealed their
> financial relationships….

A-000026-27.  The court recognized that Paragraphs 3 and 5 would not satisfy *Skilling*,

but it said that "Paragraph 4…contains a description that necessarily includes the

'stream of benefits' theory of bribery described above."  *Id*.

As explained more fully in Part II.D *infra*, Paragraph 4's definition of bribery is

inadequate.  Knowing that benefits have been given with an intent to influence or

reward is not at all the same thing as agreeing to be influenced.  Under the district

court's standard, an official would commit a 20-year federal felony if he allowed a

lobbyist to take him to lunch and realized what any official who was not asleep would

realize—that the lunch was given "with intent to influence" him.  Even on the

assumption that Paragraph 4 encompassed only bribes, however, Paragraph 3 invited

Ryan's conviction for simply acting to benefit friends, and Paragraph 5 authorized his

conviction for failing to disclose the benefits he received from friends whether these

benefits were legitimate or illegitimate.

2.    The Instructions.   The district court's instructions reinforced the invitation

given by Paragraphs 3 and 5 of the summary indictment.  Unlike the standard the

government proposed and the Supreme Court rejected in *Skilling*, which would have

criminalized only failing to disclose a conflicting financial interest, *see Skilling*, 130 S. Ct.

at 2932, the conflict of interest instruction in this case invited conviction for failing to

disclose a personal *or* a financial interest.  A-000420.  If Ryan awarded contracts or
leases to confer benefits on friends without revealing his relationship with these friends,
this instruction invited his conviction of honest services fraud without more.  Finding a
bribe or anything resembling a bribe was unnecessary.

The district court's opinion indicated that the jury could not have convicted Ryan
simply for favoring friends:

> Ryan suggests that the only "private gain" he received for his
> intervention in [a transaction benefitting a client of Warner] was the
> approval of his friend.  As explained earlier, however, the jurors must
> have rejected this argument; they were specifically instructed that if
> the benefits Ryan received from Warner were merely the proceeds of a
> friendship, they could not be the basis for a conviction.

A-000033.

The instruction to which the court referred recited an exception to a provision of
Illinois law forbidding the acceptance of a gift from a prohibited source.  The court told
the jury, "[E]xcluded from this provision was anything provided on the basis of
personal friendship, unless the officer had reason to believe that the gift was provided
because of the official position of the officer and not because of friendship."  A-000421.
Ryan thus could not have been convicted under this provision for *accepting* from a
prohibited source a gift provided simply on the basis of friendship.  The instruction (1)
did not preclude Ryan's conviction under other provisions of state and federal law for
accepting a gift provided on the basis of friendship, (2) did not preclude Ryan's
conviction for *failing to disclose* a gift provided on the basis of friendship, and (3) did not
preclude Ryan's conviction for favoring friends in the award of contracts.

The district court's apparent suggestion that Ryan could have been convicted only if he received a "private gain" himself was contrary to its instructions. The court told the jury, "A participant in a scheme to defraud may be guilty even if all the benefits of the fraud accrue to others." A-000421. It also declared that "[t]he phrase 'intent to defraud' means that the acts charged were done knowingly with the intent to deceive or cheat the people of the state of Illinois in order to cause a gain of money or property to the defendants *or others*…," A-000420 (emphasis added), that "[w]here a public official or employee misuses his official position or material nonpublic information he obtained in it for private gain for himself *or another*, then that official or employee has defrauded the public of his honest services," A-000421 (emphasis added), and that "[t]he mail fraud statute can be violated whether or not there is any loss to the victim of the crime or gain to the defendants." *Id.* Under the instructions, Ryan's intent to confer benefits on Warner and Klein would have satisfied the "private gain" element of pre-*Skilling* honest services law. *See* A-000024 n.9 (citing *United States v. Sorich*, 523 F.3d 702, 709 (7th Cir. 2008) (the required gain "usually will go to the defendant, but need not")).[6]

Not only the conflicts-of-interest instruction but also the other instructions held invalid by the district court invited conviction simply for favoring friends. One of the state law provisions recited to the jury declared "that public funds, property, or credit

---

[6] The district court also noted that, in closing argument, Ryan's counsel maintained that his decisions were motivated by legitimate public interests. "The jury rejected the good faith motive. Accordingly, the jury could only have convicted him…if it believed that his conduct was a response to the stream of benefits." A-000033. The jury, however, might have rejected Ryan's claim of good faith precisely because it determined that he favored friends. It also might have rejected Ryan's claim of good faith because he failed to disclose legitimate gifts that had a "natural tendency to influence or [were] capable of influencing" him.

shall be used only for public purposes."  A-000421.  The jury could have concluded that, by conferring benefits on friends, Ryan used public property for a non-public purpose. In addition, the *Bloom* instruction declared, "Where a public official misuses his official position…for private gain for himself *or another*, then that official or employee has defrauded the public of his honest services if the other elements of the mail fraud offense have been met."  A-000421 (emphasis added).[7]

None of these instructions required the jury to find bribery or anything resembling it.  Favoring friends in awarding government benefits would have been enough.

Similarly, the state law instruction invited conviction for failing to report legitimate gifts on annual disclosure forms, and the conflicts-of-interest instruction required the disclosure of every legitimate gift that had "the natural tendency to influence or [was] capable of influencing the decision of" a public official.[8]

---

[7] Immediately after reciting this instruction, the government told the jury that it prohibited Ryan from "using his official decision-making power to steer benefits…to Larry Warner."  A-000418.

[8] The *Bloom* instruction, the conflicts-of-interest instruction, and the state law instruction all end with the words "if the other elements of the mail fraud offense have been met."  These words have caused a surprising amount of confusion.

To the jurors, the reference to the other elements of mail fraud probably seemed straightforward.  As the district court's opinion observed,

> The elements of mail or wire fraud are "(1) a scheme to defraud (entailing a material misrepresentation), (2) an intent to defraud, and (3) the use of the mails."… In addition, for an honest services mail fraud charge in the Seventh Circuit, the Government was also required to show the misuse of position for private gain.

A-000027 (quoting *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008)). A reasonable juror would have understood that the court's reference to "the other elements of mail fraud" reiterated the need to find these elements.

The government, however, interpreted the "other elements" language very differently. In its view, this language precluded the jury from convicting on the basis of conflicts of interest, state law violations, and misuse of office unless it found that the defendant could also be convicted under one of the "financial benefits" instructions—the only one that appropriately defined *quid pro quo* bribery. This instruction authorized conviction when an official accepted a benefit with the understanding that he would perform official acts in return. *See* A-000339-40, A-000343.

The government interpreted the instructions as though the court had said:

> A person commits honest services fraud if he takes a bribe. He also commits honest services fraud if he fails to disclose a conflict of interest *and takes a bribe*. In addition, this person commits honest services fraud if he violates the Illinois law against using state funds in a political campaign *and takes a bribe*. Moreover, an official commits honest services fraud if he accepts a prohibited gift from a lobbyist *and takes a bribe*. And furthermore, he commits honest services fraud if he acts in excess of his lawful authority *and takes a bribe*.

An instruction with this message could have ended after "a person commits honest services fraud if he takes a bribe" without changing its meaning. The government viewed all of the court's references to undisclosed conflicts of interest and to state law as senseless surplusage. That is not how the jury would have understood them.

Nevertheless, the government found some support for its view in a passage of this Court's opinion affirming Ryan's conviction. In *United States v. Warner*, 498 F.3d 666 (7th Cir. 2007), the Court said that Ryan had taken the conflicts-of-interest instruction out of context. This instruction declared that conflicts would violate the statute only "if the other elements of the mail fraud statute are met." Moreover, "[t]he district court explained that the government must also show that the public official allowed or accepted the conflict of interest with the understanding or intent that she would perform acts within her official capacity in return." *Id.* at 698.

The district court observed that Ryan raised a different objection to the conflicts-of-interest instruction in his Section 2255 motion than he did before *Skilling*, and it held the conflicts of interest instruction invalid despite this Court's suggestion in *Warner* that the "other elements" language imported, not the general elements of mail fraud, but a requirement of *quid pro quo* bribery. A-000019-20.

The district court seemed to invoke implicitly the second of three well-recognized exceptions to the law of the case doctrine. "Unlike *res judicata*, the [law of the case doctrine] is not an 'inexorable command,' but is to be applied with good sense." *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981). It is merely a rule of practice rather than a limit on judicial power. *See Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.). In *White v. United States*, 371 F.3d

A pervasive fallacy infected the district court's harmless error analysis. The court assumed that if the jury convicted Ryan on the basis of an "undisclosed stream of benefits," it must have found that Ryan's *receipt* of these benefits was improper under the financial benefits standards set forth in its instructions. What the court ignored was that the jury might have convicted Ryan (and, as the next section of this brief will show, almost certainly did convict him) without finding that he violated *any* of these standards. The important thing about the "undisclosed stream of benefits" was not that the benefits were improperly received but that they were undisclosed at the time Ryan made decisions benefiting the providers.[9]

---

900 (7th Cir. 2004), this Court declared the doctrine inapplicable when "'(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *Id.* at 902 (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)).

[9] The district court apparently saw no significant difference between the valid and the invalid theories it presented to the jury: "[T]he acts underlying either theory were the same—in one instance, a jury was invited to convict based on Ryan's failure to disclose the stream of benefits, and in another it was invited to convict based on the stream of benefits themselves." A-000023. But the acts underlying either theory were not the same. Receiving a benefit at one point is not the same as failing to disclose it at a later point. For purposes of this Part only, Ryan assumes that the instructions concerning the improper receipt of benefits were correct: They encompassed only bribes. But the instructions concerning the subsequent nondisclosure were incorrect: As the district court recognized (albeit inconsistently), they allowed conviction for failing to disclose benefits that were not bribes.

3.    <u>The Government's Argument</u>.   The government's closing argument repeatedly told the jury that the instructions required conviction for failing to disclose benefits that were not bribes.

The district court portrayed the government as offering alternative grounds for conviction—a "stream of benefits" bribery theory and a conflict-of-interest theory.  It complained, "The court notes that this analysis would be significantly more straightforward had the Government argued solely a bribery theory at trial…. Yet the Government insisted on arguing not only a bribery theory but also an undisclosed conflict-of-interest theory."  A-000022.  In fact, the government all but disclaimed reliance on a bribery theory.  It argued that Ryan's failure to disclose the "stream of benefits" he had received required his conviction whether or not these benefits were bribes.

At one point, the government did proclaim that Ryan "sold his office."  A-000392.  At another, it declared that the "type of corruption here" was like a meal plan or an open bar.  A-000396.  Only those two statements hinted that Ryan might have taken bribes.  Apart from those remarks, the government did not suggest that Ryan was guilty of bribery.  It never urged conviction on the basis of *any* of the financial benefits instructions.   The government mentioned the words *quid pro quo* only to say that none was needed and to acknowledge that none had been shown.

The district court saw every mention by the government of an "undisclosed stream of benefits" as "hammer[ing] on the bribery theory," but the passages it cited showed the government hammering hard on something else.  In the portion of the

district court's opinion that follows, words emphasizing Ryan's nondisclosure of

benefits are italicized:

> In its main closing argument,…the Government hammered on the
> bribery theory.  *See, e.g.*, Tr.22831 ("This was a case in which George
> Ryan steered government contracts, leases, and money to Larry
> Warner and a select few group of individuals who were also
> providing George Ryan, his family and friends various *undisclosed
> benefits*."); Tr.22836 ("George Ryan, as a public official, had a duty to
> provide honest services to the people of the state of Illinois who
> elected him.  And the evidence in this case has shown that he violated
> that duty.  He violated that duty by giving state benefits, like contracts
> and leases, to his friends—Warner, Swanson, Klein—while at the
> same time they were providing various *undisclosed financial benefits* to
> him and his family and his friends."); Tr.22956-58 ("What the
> Government's case is about is that George Ryan received these
> financial benefits for himself and steered other benefits to third
> parties, *benefits that were not disclosed to the public*…. So it's this
> *undisclosed flow of benefits* that was charged in the indictment.  It's this
> *undisclosed flow of benefits* that is in violation of the law, and it's this
> *undisclosed flow of benefits* that were proven in this case beyond a
> reasonable doubt.").

A-000029 n.12 (emphasis added).

The government emphasized Ryan's failure to disclose the benefits he had

received because it knew what the evidence had shown.  During opening statements,

Ryan's counsel announced:

> [T]here's not going to be a single witness that's going to testify that
> they gave any corrupt payments of money to George Ryan, not a
> single solitary witness.  No one is going to go on that witness stand
> and tell you that they gave George Ryan any money to influence his
> judgments as secretary of state or governor, not one single witness.

A-000366.  Counsel then cross-examined prosecution witnesses by asking such

questions as, "Were you ever aware of anybody ever giving money to George Ryan to

affect his decisions as secretary of state?," and "Did you ever observe or see George

Ryan do anything that indicated to you that he had received any money or benefit from anyone to influence or affect his judgments as secretary of state?"   Every witness answered no.   A-000368, A-000369, A-000371, A-000375, A-000379, A-000380, A-000389, A-000378, A-000377.  Of the 83 witnesses the Government called, none "testified that George Ryan took anything from anybody to perform his official acts."  A-000413.

    The government responded that no corrupt act or *quid pro quo* was necessary.   It in fact acknowledged that none had been shown:

> [I]t's important to remember that it is not necessary for us to prove a quid pro quo.  I used that term before, I think.  In other words that it was I give you this, you give me that; it doesn't have to be that sort of relationship.
>
> The defense throughout its questioning of witnesses and in opening statement has repeatedly attempted to focus you on corrupt payments of money or cash bribes, but *that's not the case we have here*.  What the Government's case is about is that George Ryan received these financial benefits for himself and steered other benefits to third parties, benefits that were not disclosed to the public….

A-000407 (emphasis added).

> Now, did Ryan have a conversation with Anthony DeSantis in which they discussed: Well, you pay me for this, and I'll give a low-digit license plate?  No, they didn't do that.  However, when Ryan had the opportunity to help DeSantis, a man who was interested in a low-digit plate, did he do it?  Yes, he did…. You don't have to have a quid-pro-quo conversation here, but there is no doubt that Ryan's actions in connection with the low digit plate arena were influenced, were influenced by his receipt of DeSantis's money.

A-000400.

> How did George Ryan reciprocate this longtime friendship [with Warner]?  Governmental business is how he did it.  $3 million worth of government business.  *Was it a quid pro quo? No, it wasn't. Have we proved a quid pro quo?  No, [we] haven't.  Have we charged a quid pro quo? No, we haven't.*  We have charged an undisclosed flow of benefits back

and forth.  And I am going to get to the instructions in a minute, folks, but that's what we have charged….  We have charged an undisclosed flow of benefits, which, under the law, is sufficient.

A-000416 (emphasis added).

Ryan's conviction marked the triumph of the "undisclosed flow of benefits" or "no *quid pro quo*" theory of honest services fraud.  From before the trial began until its end, the government proclaimed that no *quid pro quo* was necessary.  The Supreme Court has now said, "Yes it is."  Oddly, the district court concluded that the jury must have convicted on the basis of a theory that the government not only failed to emphasize but repeatedly disavowed.

**D.    The District Court's Pecuniary Fraud Theory Was Not Presented to the Jury, Replicates the "Undisclosed Conflicts" Standard that *Skilling* Disapproved, and Does Not Render the Instructional Errors Harmless.**

**1.    The District Court's Pecuniary Fraud Theory Was Not Presented to the Jury.**

The district court concluded that the jury could not have convicted Ryan on any of the honest services theories presented to it without also finding that he committed pecuniary fraud.[10]  With respect to Count 2, it said that the jury must have found that

---

[10] The court relied heavily on decisions upholding convictions in the wake of *McNally v. United States*, 483 U.S. 350 (1987).  After *McNally* invalidated the intangible rights doctrine, this Court and other courts upheld some pre-*McNally* convictions because the evidence established deprivations of property as well as the intangible right to honest services.  *E.g.*, *Moore v. United States*, 865 F.2d 149, 154 (7th Cir. 1989).  The approach taken by these decisions, however, does not survive *Neder v. United States*, 527 U.S. 1 (1999).

*Neder* applied to the word "defraud" the "well established rule of construction that '"where Congress uses terms that have accumulated settled meaning under…the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms."'"  527 U.S. at 22 (quoting authorities).  After *Neder*, demonstrating only that a breach of fiduciary duty resulted in a loss of property would not be enough to save a conviction.  It would be necessary to show in addition that the jury found all

Ryan fraudulently obtained a contract for one of Warner's clients by declaring falsely that a security mark on license plates was necessary for public safety.[11]  With respect to Counts 3 and 8, it said that the jury must have found that Ryan fraudulently obtained two leases beneficial to Warner by failing to disclose his knowledge of Warner's ownership interests in the leased premises.[12]  With respect to Counts 4 and 5, it said that the jury must have found that Ryan fraudulently obtained another contract by failing to disclose the stream of benefits he received from Warner.  With respect to Count 6, it said that the jury must have found that Ryan fraudulently obtained a lease beneficial to Klein by failing to disclose his stays at Klein's home in Jamaica.  With respect to Count 7, it said that the jury must have found that Ryan fraudulently obtained another contract by failing to disclose the benefits he had received from Warner and further that "the State's interest in the confidential information related to this contract could…be considered a property interest."  A-000048-51.

The jury, however, heard none of this.  Only two words of the 91-page indictment in this case referred to pecuniary fraud.  The indictment alleged that Ryan

---

the elements of a scheme to commit common law fraud, including deliberate misrepresentation, the materiality of this misrepresentation, an intent to induce reliance, and an intent to cause harm.  *See* Melville M. Bigelow, *The Law of Fraud* 1 (1877).  *Neder* did note that because Congress "prohibit[ed] the 'scheme to defraud,' rather than the completed crime," the government need not prove actual reliance and harm.  527 U.S. at 24-25.

[11] Statements of opinion, even if disingenuous, cannot be the basis of a fraud prosecution.  *See, e.g., Piper v. DPFA, Inc.*, No 09 CV 1220, 2010 U.S. Dist. LEXIS 72820, at *20 (N.D. Ill. 7/20/2010).

[12] The court did not indicate how or to whom Ryan might have made this disclosure or who would have cared.  Materiality is an essential element of pecuniary fraud, *see Neder* 527 U.S. at 20-25, and the court did not explain with respect to this or any other count why the jury would have been required to resolve questions of materiality in the government's favor.

participated in a scheme to defraud the people of the State of Illinois of "money, property and the intangible right of honest services." A-00081. The court's instructions on pecuniary fraud were only slightly more informative. *See* A-000419, A-000420. The government's allusions to pecuniary fraud in its closing argument consisted of one statement that giving away leases and lying about it was "stealing from the state," A-000417, one reference to "tangible things," A-000412, and one declaration that the state was "ripped off." A-000405.

Apart from the statement about leases just noted, the jury did not hear that contracts and leases were state "property" that might be stolen by deception—a legal proposition endorsed by this Court only after Ryan's trial was concluded. *See United States v. Leahy*, 464 F.3d 773, 788 (7th Cir. 2006). Neither the court nor the government ever suggested to the jury that confidential information was property. No one argued to the jury that Ryan had defrauded the state of the ADM contract by declaring that a security decal on licenses was needed for public safety, that he stole the Joliet and Bellwood leases by failing to reveal his knowledge of Warner's interests, or that he stole the South Holland lease by failing to disclose that Klein had hosted his vacations.

A court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury…." *Chiarella v. United States*, 445 U.S. 222, 236 (1980). "Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury." *McCormick*, 500 U.S. at 270 n.8. *See also United States v. Peterson*, 236 F.3d 848, 856 (7th Cir. 2001) ("Fatal to the government's appeal is that this theory was not presented to the jury, and thus,

35

cannot support its verdict."); *United States v. Medina*, 755 F.2d 1269, 1279 (7th Cir. 1985) ("We are unwilling to uphold [the] conviction on a theory that was not argued to the jury and on which it was not instructed.").

In effect, the district court entered the jury box, combed the record, and itself convicted Ryan of pecuniary fraud. It thereby violated his right to jury trial. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("[T]o hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.").

> **2.     The District Court's Pecuniary Fraud Theory Resurrects the Undisclosed Conflicts Theory of Honest Services Fraud.**

Ryan's argument in this section assumes that a public official who takes a bribe to award a contract, lease, grant, or job commits pecuniary fraud if he fails to disclose the bribe. Ryan makes this assumption not because it accurately describes the law, but because it may help to clarify some issues. An official who accepts a bribe is guilty of honest services fraud under *Skilling*, and declaring him guilty of pecuniary fraud as well does not add to his guilt. The district court's theory of pecuniary fraud makes a difference only if it justifies the conviction of someone who has not taken a bribe—that is, only if a public official's failure to disclose something other than a bribe when he awards a governmental benefit makes him guilty of pecuniary fraud. This "something else" could be called a conflict of interest.

Would an official be guilty of pecuniary fraud under the district court's theory if he awarded a contract, lease, grant, or job to a friend without disclosing the friendship?

If so, the court's theory would simply put a new label, pecuniary fraud, on a shapeless crime that, under *Skilling*, cannot be called honest services fraud—favoring friends. Would the official be guilty of pecuniary fraud under the court's theory if he gave a benefit to someone without disclosing that this person previously had given him a legitimate gift? If so, the district court would again put a new label on an ill-defined crime that the Supreme Court may believe it has abolished. The questions posed by the new undisclosed conflicts theory would be the same as those posed by the old one: How large a gift would it take—a beer, an all-day golf outing, or a check to cover the cost of the band at the official's daughter's wedding? And to whom would the official make his disclosures?

The district court provided something of an answer to the first question, one that conflated the elements of materiality and intent: The official's failure to disclose a gift would constitute fraud if it were material, and it would not be material if the official had acted in good faith. A-000049-50. Would the official then have failed to act in good faith if he was motivated in part by gratitude for the gift? Would questions of materiality, good faith, and how large is too large be left to the jury without standards?

The answers to these questions are unknown because, although fraud has been a tort for hundreds of years and mail fraud a crime for 138 of these years, no one has suggested prior to this case that anyone's failure to disclose a legitimate gift could be treated as pecuniary fraud. Indeed, as noted in the preceding section, no one advanced the suggestion in the trial of this case either.

When the Supreme Court warned Congress that an attempt to reestablish the government's undisclosed conflicts standard would present serious constitutional difficulties, it said that the government's formulation

> leaves many questions unanswered:  How direct or significant does the conflicting financial interest have to be?  To what extent does the official action have to further that interest in order to amount to fraud?  To whom should the disclosure be made and what information should it convey?  These questions and others call for particular care in attempting to formulate an adequate criminal prohibition….

*Skilling*, 130 S. Ct. at 2933 n.44.

The district court apparently sees no need to await Congress's answer.  It has switched the "inventive prosecutors welcome" sign on the statute from the honest services door to the property door.  It still swims in the pre-*Skilling* soup.  Perhaps the Supreme Court's statement was correct: "[W]e perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape."  *Id.* at 2933.  A ballooning pecuniary fraud statute may take its place.

## II.    THE DISTRICT COURT'S "FINANCIAL BENEFITS" INSTRUCTIONS DID NOT REQUIRE THE JURY TO FIND BRIBES OR KICKBACKS.

### A.    Standard of Review.

This argument concerns the accuracy of jury instructions—an issue generally appropriate for *de novo* review, *see United States v. Darif*, 446 F.3d 701, 709 (7th Cir. 2006)—and the district court and the government have agreed that *de novo* review is appropriate for the first instruction Ryan challenges.  This instruction authorizes the treatment of campaign contributions as bribes in the absence of an explicit *quid pro quo*, and Ryan has objected to it at all stages of these proceedings.

The other two instructions that Ryan challenges—one inviting conviction when an official has accepted a benefit that he knew was intended to influence him and another inviting conviction when he has accepted a benefit intended to reward his past acts—are modified versions of instructions that Ryan himself proposed after his pre-trial request for *quid pro quo* instructions was denied.  The district court accepted Ryan's argument that he could not have presented before *Skilling* objections that *Skilling* created, and it reviewed these instructions under a *de novo* standard.  It relied on two decisions of this Court, *Waldemar v. United States*, 106 F.3d 729, 731 (7th Cir. 1996) and *Bateman v. United States*, 875 F.2d 1304, 1308 (7th Cir. 1989), and also on *Skilling*, which suggested "that instructional errors in this context are subject to harmless error review without any discussion of waiver."  A-000015 n.8.  Even if the district court erred by holding *de novo* review appropriate, Ryan would be entitled to plain error review of the challenged instructions.  *Id*.

**B.     Introduction.**

Before trial, the government successfully resisted Ryan's effort to include the words *quid pro quo* in the jury instructions.  At the trial's end, it told the jury that no *quid pro quo* was necessary and that none had been shown.  The *Skilling* decision, however, worked a miraculous conversion, and the government now embraces the *quid pro quo* concept.  It now insists that the trial court's instructions would never have permitted Ryan's conviction without a *quid pro quo*.

Earlier sections of this brief showed that, even if, as the district court concluded, its financial benefits instructions encompassed only bribes, the jury might have (and

almost certainly did) convict Ryan without reference to any of these instructions.  This section demonstrates that the financial benefits instructions themselves invited conviction without proof that the benefits Ryan received were bribes under federal standards.  The instructions treated campaign contributions and other benefits separately.

C.     **The Instructions Erroneously Declared that a Campaign Contribution May be Treated as a Bribe Without an Explicit *Quid Pro Quo*.**

The district court failed to adhere to the decisions of the Supreme Court and this Court when it upheld the following instruction:  "When a person gives and a public official receives a campaign contribution knowing that it is given in exchange for a specific official act, that conduct violates the mail fraud statute if the other elements of the mail fraud offense are met.  The intent of each party can be implied from their words and ongoing conduct."  A-000421.

The district court's opinion offered this defense of its instruction:

> In *McCormick v. United States*,…the Supreme Court held that a campaign contribution could constitute extortion in a Hobbs Act case, "but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."…  A year later, the Court confirmed the *quid pro quo* requirement, but explained that "[t]he official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.  The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Evans v. United States*, 504 U.S. 255, 274…(1992) (Kennedy, J., concurring).

> The final sentence of the campaign contribution instruction in this case tracks Justice Kennedy's language in *Evans*, and therefore

accurately articulates the standard for finding a *quid pro quo* based on campaign contributions.

A-000019.

Contrary to the district court's suggestion, the Supreme Court did not abandon the *McCormick* standard in *Evans*. A concurring opinion of Justice Kennedy joined by no other justice is not an opinion of the Court.

Many lower court opinions have quoted and approved Justice Kennedy's "winks and nods" language, but they have done so only when discussing benefits other than campaign contributions. The same opinions have reiterated that a jury may not treat a campaign contribution as a bribe without finding an explicit *quid pro quo*. *E.g., United States v. Abbey*, 560 F.3d 513, 515-19 (6th Cir. 2009); *Kincaid-Chauncey*, 556 F.3d at 936-37; *Ganim*, 510 F.3d at 142-43; *United States v. Antico*, 275 F.3d 245, 256-61 (3d Cir. 2001).

This Court's decisions are no different. In *United States v. Giles*, 246 F.3d 966 (7th Cir. 2001), the Court approved Justice Kennedy's language when it spoke of benefits other than campaign contributions. *Id.* at 972. The Court noted, however, "[I]t is well-established after *McCormick*…that in order to obtain a Hobbs Act conviction based on an official's acceptance of campaign contributions, the government must show that the 'payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'" *Id.* at 971. *See also United States v. Allen*, 10 F.3d 405, 410-11 (7th Cir. 1993) (explaining in another post-*Evans* decision why the "realities of the American political system" necessitate *McCormick*'s "explicit quid pro quo" standard).

41

The district court's departure from *McCormick* would criminalize many everyday campaign contributions. *McCormick* approved the "explicit *quid pro quo*" requirement "to prevent…a radical (and absurd) change in American political life." *See Evans*, 504 U.S. at 286 (Thomas, J., dissenting). "To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." *McCormick*, 500 U.S. at 272. "It is well understood that a substantial and legitimate reason, if not the only reason,…to make a contribution to one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United v. FEC*, 130 S. Ct. 876, 910 (2010). *See also Allen*, 10 F.3d at 411 ("It would be naïve to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions.").

The district court's error was highly prejudicial with respect to six of the seven mail fraud charges of which Ryan remains convicted. These six charges alleged mailings in furtherance of leases and contracts benefitting Warner, and the most substantial of the benefits flowing from Warner to Ryan were campaign contributions. Warner's political fundraisers, raising a total of $250,000, dwarfed most of the other benefits in the government's alleged stream. A-000408. *See* Statement of Facts, pp. 6-8 *supra*.

The error in the district court's instruction concerning campaign contributions cannot be held harmless for the reason the court advanced for holding its other errors

42

harmless.  Even if it were true that the jury could not have convicted Ryan of

undisclosed conflicts without implicitly finding that he accepted benefits intended to

influence him, the jury could have convicted him on the basis of Warner's political

contributions without finding an explicit *quid pro quo*.  The record in fact contains no

evidence of an explicit *quid pro quo*.[13]

> D.    **The Instructions Erroneously Invited Conviction for Accepting a Benefit with Knowledge of the Benefactor's Intent to Influence the Recipient and also Erroneously Treated Gratuities as Well as Bribes as Honest Services Fraud.**

The instructions concerning benefits other than campaign contributions offered a

bewildering variety of standards.  One of them declared:

> The law does not require that the Government identify a specific
> official act given in exchange for personal and financial benefits
> received by the public official so long as the Government proves
> beyond a reasonable doubt that the public official accepted the
> personal and financial benefits with the understanding that the public
> official would perform or not perform acts in his official capacity in
> return.

A-000420.  If this instruction had stood alone, Ryan would have had no objection to it.

A second instruction announced:

> A public official's receipt of personal or financial benefits of the
> receipt of benefits by the public official's family, friends, employees,
> or associates does not, standing alone, violate the mail fraud statute
> even if the individual providing the personal or financial benefits has

---

[13] The district court noted that "*Evans* and *McCormick* were both settled law at the time this case went to the jury, and nothing in *Skilling* has unsettled them."  A-000019.  That statement is correct, but it would be incorrect to say that *Skilling* changed nothing.  Far from unsettling *Evans* and *McCormick*, *Skilling* made clear that the standards they established for bribery prosecutions apply in honest services prosecutions as well.  During the instructions conference in this case, the government resisted "instructing essentially a bribery, a McCormick type bribery instruction onto the mail fraud statute."  The government argued that simply failing to disclose a campaign contribution would violate the mail fraud statute, and the court agreed.  A-000390.

business with the state.  Instead, that receipt violates the law only if the benefit was received with the public official's understanding that it was given to influence his decision-making.

A-000420.

A third declared:

Similarly, the providing of personal or financial benefits by a private citizen to or for the benefit of a public official or to and for the benefit of a public official's family, friends, employees, or associates, does not, standing alone, violate the mail fraud statute even if the private citizen does business with the state, so long as the personal or financial benefits were not intended to influence or reward the public official's exercise of office.

 A-000420.  Ryan objects to the second and third instructions—the second because an official's understanding that a benefit was given to influence him is not an agreement to *be* influenced or to provide anything in return, and the third because a benefit intended to "reward" an official's exercise of office is a gratuity, not a bribe.

These two instructions echo an allegation of the indictment summary noted earlier:  "[I]t was further part of the scheme that defendant Ryan…received personal and financial benefits…while defendant Ryan knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts."  *See* Part I.C.1 *supra*.  This formulation and the one presented by the challenged instructions go too far.  An official who allows a lobbyist to buy him lunch typically "receive[s a benefit] with the…understanding that it was given to influence his decision-making," but the official's knowledge of the lobbyist's motives does not make him a bribe-taker.

1.    <u>Benefits Intended to Influence</u>.  The district court cited only one precedent for the proposition that knowledge of the other person's motives is enough.  Declaring

44

that "[t]he case law…defeats Ryan's interpretation," it repeated an instruction quoted

by this Court in *United States v. Gorny*, 732 F.2d 597 (7th Cir. 1984).  A-000018.

*Gorny* recited this instruction without approving or commenting on it.  The Court

simply noted that the defendant had never challenged it.  The instruction read, "The

crime [of bribery] is completed when the property or personal advantage is accepted by

the public employee knowing it was offered with the intent that he act favorably to the

person offering the property or personal advantage when necessary."  732 F.2d at 600.

*Gorny* preceded by seven years the Supreme Court's first articulation of the *quid*

*pro quo* requirement in *McCormick*.  Knowing that a benefactor wants something is a far

cry from agreeing to provide a *quid* for his *quo*.

A more apt precedent is *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), in which

the Second Circuit reversed a conviction because an instruction "appear[ed] to have

told the jury that the 'corruptly' requirement was fully satisfied by the recipient's

knowledge of the donor's intent and omitted any reference to the recipient's intent in

accepting the thing of value."  *Id*. at 211.   The Court declared, "[A] jury should be

clearly instructed that it is the recipient's intent to make good on the bargain, not

simply her awareness of the donor's intent that is essential to establishing guilt…."  *Id*.

at 213.  It added, "[A] recipient's knowledge of a donor's intent to influence is

insufficient to support conviction.  The recipient must take the proffered thing of value

'intending to be influenced.'"  *Id*. at 214 n.5.

2.     <u>Benefits Intended to Reward</u>.  In ordinary usage, "financial

benefits…intended to…reward [a] public official's exercise of office" are gratuities, not

bribes.  These benefits are provided without a *quid pro quo*.  The Supreme Court has

insisted on maintaining this critical distinction between bribes and gratuities, noting

that giving or receiving a bribe is a much more serious crime.  *Sun-Diamond Growers*,

526 U.S. at 404-05.  When *Skilling* spoke of bribes, it did not mean gratuities; the

Supreme Court knows the difference.

The district court observed, however, that the word "reward" is used in one of

the federal statutes cited in *Skilling*, 18 U.S.C. § 666.  It said that its own instruction was

"virtually identical."  A-000017.  The language of the instruction, however, did not

match that of the statute.  In the statute, the word "reward" is modified by the word

"corruptly," and in the instruction, it was not.  If Section 666 is in fact confined to bribes

(a questionable proposition), only the word "corruptly" confines it.

Without resolving the issue, the Fourth Circuit indicated in *Jennings*, 160 F.3d at

1015 n.4, that Section 666 prohibits only bribes.  It suggested that the word "corruptly,"

borrowed from another federal bribery statute, gives the word "reward" a meaning

other than its ordinary one.  The Court noted a House report indicating that Congress

added the word "corruptly" in 1966 "to clarify that §666…prohibits only bribes."  *Id.*

(citing H.R. Rep. No. 99-335, at 5, 6 nn.24, 25).

Courts frequently do construe the word "corruptly" to refer to an actor's intent

"to receive some benefit in return for payment."  *See, e.g., United States v. Muldoon*, 931

F.2d 282, 287 (4th Cir. 1991); *United States v. Strand*, 574 F.2d 993, 995 (9th Cir. 1978)

(declaring that the term "corrupt intent" incorporates an element of *quid pro quo*

bribery).  *See also* George Brown, *Stealth Statute – Corruption, the Spending Power, and the*

*Rise of 18 U.S.C. § 666*, 73 Notre Dame L. Rev. 247, 308-10 (1998) (arguing that, because Section 666 requires a "corrupt intent," it prohibits only bribes).

If § 666 uses the words "corruptly" and "reward" together in a distinctive way to refer to *quid pro quo* bribes (a usage that presumably must be explained to a jury), this statute would not justify an instruction using the unmodified word "reward" in its ordinary way to refer to gratuities.

Other courts, including this Court, read Section 666 to outlaw gratuities as well as bribes. *See United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990) (declaring that bribes and gratuities "are both illegal under different parts of the statute"); *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997); *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995). If the *Skilling* court had this construction of Section 666 in mind when it declared that the honest service statute's "prohibition on bribes and kickbacks draws content…from federal statutes proscribing…similar crimes," 130 S. Ct. at 2933, it presumably meant to refer only to the portion of Section 666 proscribing bribes, not the portion proscribing gratuities. The Court certainly did not mean to obliterate the distinction between bribes and gratuities that *Sun-Diamond Growers* had carefully drawn.

The district court suggested that its inclusion of the word "reward" would "capture instances where the benefit arrives after the act." A-000017. The word was unnecessary for this purpose, however, and "reward" is not commonly used to describe an agreed-upon payment for a service already rendered. One would not say that he "rewarded" a restaurant for a meal by paying the check. He might, however, "reward"

the waiter for his service with a generous tip.  The word "reward" in the financial benefits instructions plainly referred to gratuities rather than bribes, and *Skilling* plainly limits the honest services statute to bribes rather than gratuities.[14]

Like the error in the campaign contributions instruction, the errors in the other financial benefits instructions cannot be held harmless for the reason the district court advanced for holding its acknowledged errors harmless.  A determination that the jury could not have found Ryan guilty of undisclosed conflicts without finding him guilty of improperly receiving benefits would not save his conviction if the improperly received benefits might not have been bribes.

## III.  THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH MAIL FRAUD OR RACKETEERING UNDER THE *SKILLING* STANDARD.

### A.  Standard of Review.

The sufficiency of the evidence is subject to *de novo* review.  Effectively reversing the presumptions applicable in harmless error review, the Court must consider the evidence in the light most favorable to the government and draw all reasonable inferences in its favor.  *See United States v. Macari*, 453 F.3d 926, 936 (7th Cir. 2006).  Evidence is insufficient to support a conviction if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).

---

[14] In closing argument, the government stressed that Warner paid for the band at the wedding of Ryan's daughter Jeanette only five days after one of Warner's lobbying clients received a contract.  A-000411.  The speculation that Warner was motivated by this contract rather than by affection for Jeanette and her parents was unsupported, but the government plainly saw no more need to distinguish between bribes and gratuities than it did to distinguish between bribes and legitimate gifts.

**B.     Introduction: Bribery Without Identifiable Bribes.**

The preceding sections of this brief assumed *arguendo* that a reasonable juror could have inferred bribery from the "stream of benefits" evidence recited in the Statement of Facts.  If that assumption were correct, the appropriate remedy for the district court's instructional errors would be a new trial.  In fact, however, the government's evidence indicated only that Ryan received favors from friends and sometimes awarded government benefits to these friends.  It fell far short of establishing bribes or kickbacks, and no retrial should be allowed. [15]

As Part I.B.1 *supra* demonstrated, the existence or non-existence of a *quid pro quo* must be evaluated as of the time a public official received the benefit alleged to be a bribe.  Neither the government nor the district court, however, has ever indicated what commitment or promise—explicit or implicit—Ryan made to any benefactor at the time any benefit was received.

The district court said of the asserted stream of benefits, "The jury need not have believed every one of these incidents occurred or that every incident had a corrupt purpose."  A-000031.  The jury must have believed that some incident had a corrupt purpose, however, and neither the government nor the district court has pointed to any that did.  Instead, the government and the district court have sought to substitute vapors emanating from the stream for the *quid pro quo* requirement.  They have imagined that the jury could have found bribery without finding bribes.  Captivating

---

[15] This Part shows that Ryan may not be retried on a theory of honest services fraud.  Unless a pecuniary fraud conviction can be grounded on a failure to disclose legitimate gifts, a determination that the evidence is insufficient to establish bribery should preclude Ryan's retrial on a theory of pecuniary fraud as well.  *See* Part I.D.2 *supra*.

metaphors have convinced them that a vague sense of reciprocity suffices. *But see Ganim*, 510 F.3d at 147 ("[R]equiring a jury to find a quid pro quo, as the governing law does, ensures that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future.") (emphasis in original).

The only mail fraud counts that remain standing allege mailings in furtherance of one lease benefiting Klein and several leases and contracts benefitting Warner. This Court must consider these counts individually and set the verdicts aside unless a reasonable juror could have found that the benefits provided by Klein and Warner were bribes.

### C.   The Government Failed to Show that the Benefits Provided by Klein Were Bribes.

Ryan first vacationed at Klein's home in Jamaica in 1993. The government presented no evidence of any commitment, explicit or implicit, at the time of his trip. It also presented no evidence that Ryan and Klein's understanding changed in subsequent years. The *quo* alleged in Count 6—a government lease benefiting Klein—came four years after the initial alleged *quid*.[16]

---

[16] Two years after the initial alleged *quid*, and two years before the alleged *quo*, Ryan approved a rate increase that benefited Klein and every other currency exchange owner in Illinois. It had been more than ten years since the last increase. A-000382-83. When the Second Circuit approved the "stream of benefits" theory of bribery, it said, "'[I]t is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence.'" *Ganim*, 510 F.3d at 144 (quotation omitted). When the Fifth Circuit approved the same theory, it declared, "[A] particular, specified act need not be identified at the time of payment to satisfy the *quid pro quo* requirement, so long as the payor and payee agreed upon a specific *type* of action to be taken in the future." *United States v. Whitfield*, 590 F.3d 325, 350 (5th Cir. 2009) (emphasis in the original). What "kind of influence," then, did Ryan agree to exert when he accepted Klein's hospitality? What was the "specific type of action to be taken in the future" upon which he and Klein agreed? Was it leasing property? Increasing currency

The jury might have found that Ryan concealed Klein's hospitality by giving him checks and taking cash back. This conduct does not evidence bribery, for it can be readily explained by other hypotheses. The witness who described the concealment, Scott Fawell, testified that what Ryan sought to conceal was a conflict of interest arising from Klein's ownership of currency exchanges, not an agreement to provide a benefit in exchange for Ryan's vacations. A-000367.

Klein testified:

> [D]id you allow Mr. Ryan and his wife to stay as guests in your Jamaican home because you wanted to affect or influence any decision George Ryan ever made as Secretary of State?
>
> Answer: No, sir.
>
> Did that thought ever even enter your mind?
>
> Answer: No, sir.
>
> Ever once?
>
> Answer: No, sir.
>
> Did you ever have any conversations with George Ryan at any time in which you indicated or told him that you wanted or expected anything from him as Secretary of State as a result of the fact that he was a guest in your Jamaican home?
>
> Answer: No, sir.
>
> Did that ever happen at any time, ever?
>
> Answer: No, sir.
>
> At the time that George Ryan began, at the time he began to vacation as your guest in your Jamaican home, were you aware of any issues or

---

exchange rates? Awarding low-digit license plates? Inviting Klein to the inaugural ball if Ryan ran for governor and won? A general sense of gratitude does not satisfy the *quid pro quo* requirement.

matters pending before the Secretary of State's office that could have
any impact or effect on you that you knew of?

Answer: No, sir.

A-000376.  The government never argued to the jury that Klein, its witness, should be

disbelieved.

Although the government never charged Klein with a crime, consider whether it

could have.  Could a businessman be convicted of bribery or honest services fraud

simply because a public official who had been his house guest later made an official

decision benefitting him?  If Ryan's stays at Klein's home were bribes, Klein was a

guilty of this crime as Ryan.

> **D.    The Government Failed to Show that the Benefits Provided by Warner
> Were Bribes.**

The only significant benefits that Warner provided to Ryan himself were political

contributions.  Only proof of an explicit *quid pro quo* could have supported a finding

that these contributions were bribes, *see* Part II.C *supra*, and the government presented

none.

Moreover, the evidence offered no basis for inferring an agreement at the time

Warner provided any benefit to a Ryan associate or member of Ryan's family.  The

government has never answered the question the law makes critical:   What

commitment or promise did Ryan make to Warner at the time Warner waived an

insurance fee for a Ryan son-in-law, shared lobbying fees with Udstuen and Swanson,

invested in Ryan's son's cigar business, or paid for the band at Ryan's daughter's

wedding?

Or rather the government has provided only one answer.  It has acknowledged

that there was no commitment or promise.  Its argument to the jury bears repetition:

> How did George Ryan reciprocate this longtime friendship [with Warner]? Governmental business is how he did it. $3 million worth of government business. *Was it a quid pro quo? No, it wasn't. Have we proved a quid pro quo? No, [we] haven't. Have we charged a quid pro quo? No, we haven't.* We have charged an undisclosed flow of benefits back and forth. And I am going to get to the instructions in a minute, folks, but that's what we have charged… We have charged an undisclosed flow of benefits, which, under the law, is sufficient….

A-000416 (emphasis added).

The government was correct.  There was no *quid pro quo*.  The evidence was

therefore insufficient to support Ryan's mail fraud and RICO convictions.

## IV.  THE JURY HEARD HIGHLY PREJUDICIAL EVIDENCE RENDERED INADMISSIBLE BY *SKILLING*.

### A.    Standard of Review.

This Court ordinarily reviews a district court's interpretation of the rules of

evidence *de novo* and its decision to admit evidence for abuse of discretion.  *United States*

*v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009).  Nevertheless, a determination that evidence

was relevant in a trial conducted before *Skilling* should be afforded no deference when

the question is whether this evidence remains relevant after *Skilling*.  Before *Skilling*, the

court judged admissibility under an erroneous legal standard.  *See, e.g.*, *Almonacid v.*

*United States*, 476 F.3d 518, 521 (7th Cir. 2007) ("[A]n error of law is, by definition, an

abuse of discretion.").  Similarly, this Court should afford no deference to the district

court's review under *Skilling* of its pre-*Skilling* evidentiary rulings.  The situation does

not differ from one in which an appellate court (say, the Supreme Court) reviews the rulings on evidentiary questions of another appellate court (say, this Court).

Errors in the receipt of evidence warrant a new trial when "in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Owens*, 424 F.3d 649, 656 (7th Cir. 2005) (quoting *United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1998)).

### B.    Much of the Admitted Evidence was Irrelevant and Prejudicial.

Although the district court concluded that the jury could not have convicted Ryan of anything without finding that he took bribes, much of the evidence heard by the jury had nothing to do with bribery. The district court placed this non-bribery evidence into three categories.

First, the court recognized that some evidence should not have been received. Proof that Ryan allowed government employees to work on his campaigns and allowed government property to be used in his campaigns fell into this category. Although the government devoted many weeks of the trial to this damaging evidence, the district court held that its receipt was harmless. A-000056-57.

Second, the court held that some non-bribery evidence would be admissible even after *Skilling* by virtue of the "intent" exception to the rule against propensity evidence. *See* Fed.R.Evid. 404(b). Evidence that Ryan awarded low-digit license plates to campaign contributors, that he revealed to a friend where a new prison would be built, and that he accepted gifts in excess of the $50 limit established by state regulations fell into this category. A-000054-56. Proof that Ryan accepted gifts worth more than $50,

for example, showed that he "intended to conceal or misrepresent his relationships with those receiving state business."  A-000054.

In this circuit, when a trial court admits evidence pursuant to an exception to Rule 404(b), it must explain why a "four-factor test for introducing evidence of prior acts…[is] satisfied."  *United States v. Ciesiolka*, 614 F.3d 347, 350 (7th Cir. 2010).  The court must explain (1) why the exception applies, (2) why "the prior act is similar enough and close enough in time to be relevant to the matter at issue," (3) why the evidence is "sufficient to support a jury finding that the defendant committed the similar act," and (4) why the evidence has "probative value that is not substantially outweighed by the danger of unfair prejudice."  *Id*. at 356-57.  The district court's opinion offers no indication that it applied this test, that it examined whether the non-bribery evidence was similar to the bribery evidence and close to it in time, or even that it weighed the prejudicial effect of this evidence against its probative value.  Any court that invoked a Rule 404(b) exception to admit evidence at trial with no more explanation than the district court's opinion provided would be reversed.  *See id*. at 355-59; *United States v. Beasley*, 809 F.2d 1273 (7th Cir. 1987).

Moreover, when the violation of a regulation forbidding the acceptance of a $51 gift is admissible to prove that someone intended to take a bribe, nothing is left of the rule against propensity evidence.  The district court's ruling fulfills the prophesy of *Thompson v. United States,* 546 A.2d 414, 420 (D.C. 1988):  "The intent exception has the capacity to emasculate the other crimes rule."  *See also Beasley*, 809 F.2d at 1279 ("The list of exceptions in Rule 404(b), if mechanically applied, would overwhelm the central

principle.  Almost *any* bad act evidence simultaneously condemns by besmirching character and by showing one or more of 'motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident'….") (emphasis in original).

Third, the district court held that some non-bribery evidence, although inadmissible to prove honest services fraud, was admissible to prove tax charges unaffected by *Skilling*.  Evidence that Ryan concealed a consulting fee paid by the Phil Gramm presidential campaign and that he discharged and reassigned employees of the Inspector General's Office fell into this category.  A-000054-55.  The observation that non-bribery evidence was admissible to prove charges other than mail fraud, however, did not respond to Ryan's argument that this evidence was inadmissible on the mail fraud charges.

Ryan noted that, if highly prejudicial evidence had been held admissible only by virtue of the tax charges, he could have sought a severance of these charges and, at a minimum, could have obtained a limiting instruction.  The court replied, "Nothing in *Skilling* alters the analysis with respect to the evidence of the Gramm campaign payments.  Had Ryan believed the Gramm matter supported a severance or a limiting instruction, he could have asked for such rulings at trial."  A-000054-55.  It then said that the same analysis applied to evidence concerning the reassignment of Inspector General's Office employees.  A-000055.

If Ryan had sought a severance of the tax charges or a limiting instruction at his trial, however, his request would have been denied.  Concealment of the Gramm consulting fee and reassignment of the Inspector General's Office employees were

alleged to be components of a sprawling, all-encompassing pre-*Skilling* scheme of honest services fraud. At the time of the trial, proof of this alleged misconduct was clearly admissible to establish the scheme the government had alleged. The government in fact relied on this evidence in its closing argument concerning honest services. *See* A-000415, A-000398, A-000404, A-000414. Only *Skilling* made this prejudicial evidence inadmissible and supplied a reason for the defendant to seek a severance or a limiting instruction and for the court to grant his request.

For months, the jury heard non-bribery evidence that it would not have heard (or at least would have been instructed not to consider) in judging post-*Skilling* allegations of honest services fraud. All of this evidence was designed to portray Ryan in the worst possible light. There is no doubt that, "in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive'" had this mass of evidence been excluded. *See Owens*, 424 F.3d at 656.

Only an epic change in the law could have brought before this Court a trial so riddled with evidentiary error. No ordinary trial error could have matched it. Ryan is entitled to a new trial at which this evidence will not be heard.

## <u>CONCLUSION</u>

Because the evidence was insufficient to support Ryan's mail fraud and RICO convictions under the standards established by *Skilling*, these convictions must be set aside. In any event, the instructions invited conviction for conduct that is not criminal, and there is every reason to believe the jury accepted the invitation. The district court's harmless error analysis was deeply flawed, and Ryan is entitled to a new trial.

Respectfully submitted,

GEORGE H. RYAN SR.


By:_____

DAN K. WEBB                              ALBERT W. ALSCHULER
JAMES R. THOMPSON, JR.                   4123 North Claremont Avenue
GREGORY J. MIARECKI                      Chicago, Illinois 60618
MATTHEW R. CARTER                        (773) 267-5884
WINSTON & STRAWN LLP                     a-alschuler@law.northwestern.edu
35 West Wacker Drive
Chicago, Illinois 60601                  ANDREA D. LYON
(312) 558-5600                           DePaul University College of Law,
                                            Legal Clinic
                                         1 E. Jackson Blvd.
                                         Chicago, Illinois 60604
                                         (312) 362-8402
                                         Alyon1@depaul.edu

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

I, Matthew R. Carter, certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as enlarged by Court order, *(See* 2/4/11 Order, Dkt. 18), as it contains 16,674 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as qualified by Circuit Rule 32(b), as it has been prepared by using Microsoft Word in a proportionally spaced typeface, Book Antiqua, with a 12-point font in the text and an 11-point font in the footnotes.

Dated:  February 11, 2011

_____
Matthew R. Carter
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
(312) 558-5600

*Counsel For Petitioner-Appellant*

## **CERTIFICATE OF COMPLIANCE WITH CIR. R. 31**

Pursuant to Circuit Rule 31(e), Matthew R. Carter, attorney for Petitioner-

Appellant, hereby certifies on February 11, 2011, that, along with the paper copy of this

Brief, a digital searchable version of the Brief was provided on a disc.  The undersigned

counsel further certifies that the appendix materials required by Circuit Rules 30(a) and

30(b) are not all available in searchable digital format.


Dated:  February 11, 2011                     _____

                                                              Matthew R. Carter
                                                              WINSTON & STRAWN LLP
       35 West Wacker Drive
       Chicago, IL  60601
       (312) 558-5600

       *Counsel For Petitioner-Appellant*

## **CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)**

Pursuant to Circuit Rule 30(d), the undersigned counsel hereby certifies

that all materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix.


Dated:  February 11, 2011

                                        _____

Matthew R. Carter
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
(312) 558-5600

*Counsel For Petitioner-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew R. Carter, an attorney, hereby certify that I have this day caused an

original and fifteen copies (and a digital version via the Court's electronic filing system)

of the Brief and Required Short Appendix of Petitioner-Appellant, as well as ten copies

of the Separate Appendix, to be served on the Clerk of the Court. Additionally, I hereby

certify that I have this day caused three copies (and a digital version on disk) of the

Brief and Required Short Appendix of Petitioner-Appellant, as well as one copy of the

Separate Appendix, to be served on the following:

*Counsel of Record for the United States of America*

Marc Krickbaum
Office of the United States Attorney
Northern District of Illinois
5th Floor
219 S. Dearborn St.
Chicago, IL 60604


Dated:  February 11, 2011                    _____

                                             Matthew R. Carter

# APPENDIX

## TABLE OF CONTENTS

### Attached to Brief

| Document | Page |
|---|---|
| Order denying Ryan's § 2255 motion (12/21/10) | A-000001 |
| Certificate of Appealability (12/22/10) | A-000059 |
| Notice of appeal (12/27/10) | A-000060 |

### Located in Separate Appendix

| Document | Page |
|---|---|
| Indictment (12/17/03) | A-000063 |
| United States' Motion for Pretrial Ruling on Jury Instructions Related to Mail Fraud Allegations (8/31/05) | A-000155 |
| Ryan's Response to United States' Motion for Pretrial Ruling on Jury Instructions Related to Mail Fraud Allegations (9/15/05) | A-000168 |
| Judgment (9/6/06) | A-000186 |
| Final decision from Seventh Circuit on initial appeal (11/2/07) | A-000203 |
| Petition to Supreme Court for Certiorari | A-000285 |
| Government Response to Defendant's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (10/7/10) | A-000322 |
| Excerpts from Transcript of Proceedings, pp. 2562 | A-000366 |
| Excerpts from Transcript of Proceedings, pp. 2844 | A-000367 |
| Excerpts from Transcript of Proceedings, pp. 3758-59 | A-000368 |
| Excerpts from Transcript of Proceedings, pp. 6922-24 | A-000369 |
| Excerpts from Transcript of Proceedings, pp. 7316-17 | A-000371 |

| | |
|---|---|
| Excerpts from Transcript of Proceedings, pp. 9421-31 | A-000372 |
| Excerpts from Transcript of Proceedings, pp. 9520-21 | A-000375 |
| Excerpts from Transcript of Proceedings, pp. 9552 | A-000376 |
| Excerpts from Transcript of Proceedings, pp. 10622-23 | A-000377 |
| Excerpts from Transcript of Proceedings, pp. 10728-29 | A-000378 |
| Excerpts from Transcript of Proceedings, pp. 11773-74 | A-000379 |
| Excerpts from Transcript of Proceedings, pp. 13499-502 | A-000380 |
| Excerpts from Transcript of Proceedings, pp. 13511-15 | A-000382 |
| Excerpts from Transcript of Proceedings, pp. 15517-19 | A-000384 |
| Excerpts from Transcript of Proceedings, pp. 15735-36 | A-000386 |
| Excerpts from Transcript of Proceedings, pp. 15744-45 | A-000387 |
| Excerpts from Transcript of Proceedings, pp. 15992 | A-000389 |
| Excerpts from Transcript of Proceedings, pp. 22462-3 | A-000390 |
| Excerpts from Transcript of Proceedings, pp. 22831 | A-000391 |
| Excerpts from Transcript of Proceedings, pp. 22836 | A-000392 |
| Excerpts from Transcript of Proceedings, pp. 22843-44 | A-000393 |
| Excerpts from Transcript of Proceedings, pp. 22850-52 | A-000395 |
| Excerpts from Transcript of Proceedings, pp. 22861-63 | A-000397 |
| Excerpts from Transcript of Proceedings, pp. 22865-91 | A-000398 |
| Excerpts from Transcript of Proceedings, pp. 22914 | A-000405 |
| Excerpts from Transcript of Proceedings, pp. 22941 | A-000406 |
| Excerpts from Transcript of Proceedings, pp. 22956-59 | A-000407 |
| Excerpts from Transcript of Proceedings, pp. 22962-63 | A-000409 |

| | |
|---|---|
| Excerpts from Transcript of Proceedings, pp. 22968-69 | A-000411 |
| Excerpts from Transcript of Proceedings, pp. 23097 | A-000412 |
| Excerpts from Transcript of Proceedings, pp. 23149 | A-000413 |
| Excerpts from Transcript of Proceedings, pp. 23697 | A-000414 |
| Excerpts from Transcript of Proceedings, pp. 23744 | A-000415 |
| Excerpts from Transcript of Proceedings, pp. 23764 | A-000416 |
| Excerpts from Transcript of Proceedings, pp. 23771 | A-000417 |
| Excerpts from Transcript of Proceedings, pp. 23773-74 | A-000418 |
| Excerpts from Transcript of Proceedings, pp. 23902-13 | A-000419 |
| Excerpts from Transcript of Proceedings, pp. 23982 | A-000423 |
| Excerpts from Transcript of Proceedings, pp. 24022 | A-000424 |
| Excerpts from Transcript of Proceedings, pp. 24074-6 | A-000425 |
| Excerpts from Transcript of Proceedings, pp. 25422-23 | A-000427 |
| Transcript of Proceedings, Sept. 6, 2006 | A-000429 |
| United States v. Warner, 2005 U.S. Dist. LEXIS 21367 (N.D. Ill. 9/23/05) | A-000430 |
| United States v. Warner, 2006 U.S. Dist. LEXIS 64085 (N.D. Ill. 9/7/06) | A-000445 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE H. RYAN, SR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 5512 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

In April 2006, George H. Ryan, Sr., once Governor of Illinois, was convicted of racketeering, mail fraud, making false statements to the FBI, and tax violations. This court sentenced him to a prison term of 78 months, a sentence he is now serving. Ryan's conviction was affirmed by a divided Seventh Circuit and, after that court denied rehearing *en banc*, the Supreme Court denied *certiorari*. Earlier this year, however, the Supreme Court decided *Skilling v. United States*, 130 S. Ct. 2896 (2010), which imposed limits on the scope of the "honest services" mail fraud theory under which Ryan was convicted. In the wake of *Skilling*, Mr. Ryan has filed a petition pursuant to 28 U.S.C. § 2255. He urges that his mail fraud and RICO convictions must be overturned, and has asked the court to vacate, set aside, or correct his sentence to reflect the interpretation of the mail fraud statute articulated in *Skilling*. Ryan also asks the court to release him on bail pending the ultimate resolution of this motion. For the reasons described herein, the court denies Ryan's motion to vacate, set aside, or correct his sentence, and denies Ryan's motion to set bail.

<u>BACKGROUND</u>

On April 17, 2006, following a six-month trial, a jury convicted George Ryan of conspiring to use the resources of the State of Illinois for his personal and financial benefit in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); devising a scheme to defraud the people of the State of Illinois and the State of Illinois of money, property, and the right to his honest services, in violation of the federal mail fraud statute, 18 U.S.C. §§ 1341,

1346; making false statements to the FBI, 18 U.S.C. § 1001(a)(2); obstructing the Internal Revenue

Service, 26 U.S.C. § 7212(a); and filing materially false tax returns, 26 U.S.C. § 7206(1).  *See*

*United States v. Warner*, No. 02-cr-506, 2006 WL 2583722, at *1 (N.D. Ill. Sept. 7, 2006).  The court

set aside that verdict with respect to two mail fraud counts, *id.* at *12, but otherwise upheld the

jury's determinations.  Ryan's co-Defendant, Lawrence Warner, was convicted on related counts.

On September 11, 2006, the court sentenced Ryan to 78 months on the racketeering count, 60

months on the mail fraud and false statement counts, and 36 months on the tax fraud counts, all

to run concurrently.  (Order [888] at 2.)[1]  The court also sentenced Ryan to one year of supervised

release.  (*Id.*)  The Seventh Circuit upheld Ryan's conviction on appeal.  *United States v. Warner*,

507 F.3d 508 (7th Cir. 2007), *cert. denied*, 553 U.S. 1064 (2008).  Ryan began serving his sentence

in November 2007, and has served approximately 36 months.  (Order [984].)  Because the facts

of this case have been discussed at length in the court's previous opinions and in the Seventh

Circuit,[2] the court will not repeat them here.

    In June 2010, the Supreme Court decided *Skilling v. United States*, 130 S. Ct. 2896 (2010).

Vacating the conviction of Jeffrey Skilling on charges that grew out of the Enron collapse, the

Supreme Court held there that "honest services" mail fraud encompasses only "paradigmatic cases

of bribes and kickbacks."  130 S. Ct. at 2933.  Ryan brought this petition on August 31, 2010,

pursuant to 28 U.S.C. § 2255, which allows a federal prisoner to "move the court which imposed

---

[1]    All docket entries and trial references with the exception of the transcript of the oral argument on this motion and the docket entries on the instant motions refer to Ryan's original case, No. 02-cr-506.

[2]    This case has generated numerous written opinions.  *See United States v. Warner*, 292 F. Supp. 2d 1051 (N.D. Ill. 2003); *United States v. Warner*, No. 02-cr-506, 2004 WL 144125 (N.D. Ill. Jan. 16, 2004); *United States v. Warner*, No. 02-cr-506, 2004 WL 1794476 (N.D. Ill. Aug. 11, 2004); *United States v. Warner*, 396 F. Supp. 2d 924 (N.D. Ill. 2005); *United States v. Warner*, No. 02-cr-506, 2005 WL 2367769 (N.D. Ill. Sept. 23, 2005); *United States v. Warner*, No. 02-cr-506, 2005 WL 2756222 (N.D. Ill. Oct. 21, 2005); *United States v. Warner*, No. 02-cr-506, 2006 WL 2583722 (N.D. Ill. Sept. 7, 2006), *aff'd*, 498 F.3d 666 (7th Cir. 2007), *reh'g en banc denied*, 506 F.3d 517 (7th Cir. 2007), *motion to stay denied*, 507 F.3d 508 (7th Cir. 2007), *cert. denied*, 553 U.S. 1064 (2008); *United States v. Warner*, No. 02-cr-506, 2006 WL 2931903 (N.D. Ill. Oct. 13, 2006).

the sentence to vacate, set aside or correct the sentence" if his sentence "was imposed in violation

of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A § 2255 petition must be

filed within one year of "the date on which the right asserted was initially recognized by the

Supreme Court, if that right has been newly recognized and made retroactively applicable to cases

on collateral review." 28 U.S.C. § 2255(f)(3). The Government agrees that the decision in *Skilling*

re-sets the clock for filing of Ryan's post-conviction petition "because it 'narrow[s] the scope of a

criminal statute by interpreting its terms,' and therefore announces a new substantive rule of

criminal law." (Response Br. at 11 n.5, quoting *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004)).

## DISCUSSION

Ryan advances two grounds in support for his motion to vacate or set aside his mail fraud

and RICO convictions. First, he urges that *Skilling* undermines the jury instructions: "Because the

court's jury instructions were erroneous under *Skilling* and the error was not harmless, Ryan's

conviction and Sentence are unlawful." (Mot. to Vacate ¶ 14.) Second, Ryan urges that under the

standard established in *Skilling*, the evidence is "insufficient to support Ryan's mail fraud and RICO

convictions . . . ." (*Id.*) Because his conviction should be vacated, Ryan urges, he should be

released immediately and admitted to bail. (Mot. to Set Bail ¶ 2.)

*Skilling* is unquestionably relevant here and warrants examination of Ryan's conviction.

That said, it is important to note that Skilling's appeal to the Supreme Court presented substantially

different circumstances from those in Ryan's case. Skilling had been charged with "conspiring to

defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially

inflating its stock price." *Skilling*, 130 S. Ct. at 2934. Skilling was prosecuted for these acts,

characterized as depriving his private employer and its shareholders of the intangible right to his

honest services, and the Supreme Court "acknowledge[d] that Skilling's vagueness challenge has

force." *Id.* at 2929. George Ryan, on the other hand, held statewide elected office, and as more

fully described below, the conduct for which he was convicted—steering contracts, leases, and

other governmental benefits in exchange for private gain—was well-recognized before his conviction as conduct that falls into the "solid core" of honest services fraud. Such conduct was identified by the Court in *Skilling* as the proper target of § 1346. *Id.* at 2930-31.

In response to Skilling's argument that the statute is void for vagueness, the Supreme Court acknowledged that due process requires any "'penal statute [to] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 2927-28 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Ryan's current challenge does not rest on vagueness grounds, and the court believes that, in the language of *Skilling*, Ryan clearly understood "what conduct was prohibited" and could not have been surprised that he was subject to prosecution. Ryan's efforts to conceal his conduct from public scrutiny themselves demonstrate he knew it was improper. Indeed, long before George Ryan and his associates wrote this chapter in Illinois's distressing history of public corruption, one of Ryan's predecessors as Governor, Otto Kerner, was prosecuted under this same theory by an earlier United States Attorney.[3] On direct appeal in this case, the Seventh Circuit acknowledged that the statute could be challenged if Defendants Ryan and Warner "could not have known that the conduct underlying their convictions could be considered 'depriv[ing] another of the intangible right of honest services.'" *United States v. Warner*, 498 F.3d 666, 697 (7th Cir. 2007) (quoting 18 U.S.C. § 1346). As applied in this case, the Court of Appeals concluded, the statute is not unconstitutionally vague—a conclusion that drew no comment from the dissenting judge.

Four years ago, in writing about Ryan's prosecution, Professor Alschuler (who was not then one of Ryan's lawyers) asserted that "the mail fraud and RICO statutes unfairly stack the deck" in large part because the Government was allowed to present "every allegation of criminal and

---

[3]    Professor Alschuler, now one of Ryan's attorneys, characterized the prosecution of Otto Kerner in 1973 as one of the trailblazing honest services prosecutions. Albert W. Alschuler, *The Mail Fraud & RICO Racket: Thoughts on the Trial of George Ryan*, 9 GREEN BAG 2D 113, 114 (2006).

non-criminal misconduct by Ryan and Warner that prosecutors have collected," and if "some of the dirt they have thrown at the wall has stuck, [the jury] is likely to find the defendants guilty of the principal charges against them." 9 GREEN BAG 2D at 113. At oral argument on the motions before this court, Alschuler argued again that "[a]ll of this evidence went into one churning cauldron." (Oral Arg. at 5.) *Skilling*, however, did not invalidate the honest services mail fraud statute, nor did it invalidate RICO. *Skilling* limited prosecutions under these statutes to bribery and kickback schemes—the very theory of prosecution under which Ryan was convicted. *Skilling* emphasized that when Congress reinstated the honest services mail fraud statute after it was invalidated by *McNally v. United States*, 483 U.S. 350 (1987), the focus was on "core" or "paradigmatic" cases involving kickback or bribery schemes. The *Skilling* Court made several references to *Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941), as an example of the paradigmatic case that would survive its ruling. *Skilling*, 130 S. Ct. at 2926, 2931. Notably, our own Court of Appeals[4] relied on *Shushan* when it upheld Otto Kerner's conviction, quoting this language:

> No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud. . . . A scheme to get a public contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public.

*United States v. Isaacs*, 493 F.2d 1124, 1150 (7th Cir. 1974) (quoting *Shushan v. United States*, 117 F.2d 115 (5th Cir. 1941)). The Seventh Circuit then observed that "this is precisely what occurred here. The citizens of Illinois were defrauded of Kerner's honest and faithful services as governor." 493 F.2d at 1151. Ryan's prosecution, like Kerner's before it, targeted conduct that remains at the core of honest services fraud.

While *Skilling* did not comment directly on Ryan's case, it came close. In a particularly relevant section, the Court noted that "the honest-services doctrine had its genesis in prosecutions

---

[4] While the case was decided by a Seventh Circuit panel, all of the judges were sitting by designation from other circuits because Kerner served on the Seventh Circuit after leaving the Governor's office.

A-000005

involving bribery allegations."  130 S. Ct. at 2931 (citations omitted).  That section cites *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008), for its language that these prosecutions constitute "most [of the] honest services cases. . . ."  *Sorich* itself, in the section cited in *Skilling* states:

> Broadly speaking, honest services fraud cases come in two types.  In the first, an employer is defrauded of its employee's honest services by the employee or another. . . . In the second and more common type of case, the citizenry is defrauded of its right to the honest services of a public servant, again, by that servant or by someone else.  For instance, in *United States v. Warner,* 498 F.3d 666 (7th Cir. 2007), the Illinois Secretary of State [Ryan] channeled state contracts and leases to a friend in return for paid vacations.  In both examples above, and in most honest services cases, the defendant violates a fiduciary duty in return for cash-kickbacks, bribes, or other payments.

523 F.3d at 707.  The Seventh Circuit and the Supreme Court have, thus, acknowledged that this case presents the paradigmatic type of case undisturbed by *Skilling*.  This does not end our inquiry, of course, because neither court grappled with the details presented here.  It does, however, suggest that in many cases,[5] and in Ryan's case, *Skilling* was not the sea change that Ryan urges.

Ryan's case warrants more examination because, rather than relying solely on a bribery theory, the Government chose also to present Ryan's mail fraud and RICO charges under a conflict-of-interest theory—the very same theory invalidated in *Skilling*.  The result of this course of action is addressed below; for now, what matters is whether, in returning its verdict, the jury must have found those elements that would support a conviction under the still-valid honest services bribery theory.  Further, the court must determine whether the instructions it gave the jury on the conflict-of-interest and related theories could have violated Ryan's substantial rights.  As Ryan's attorneys argued repeatedly at trial, the conduct for which he and Warner were convicted does not

---

[5]    The Seventh Circuit has already upheld two convictions challenged based on *Skilling* with little discussion.  *See United States v. Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010) ("This was clearly a kickback scheme, so § 1346–even as pared down by *Skilling*–applies to Cantrell."); *United States v. Lupton*, 620 F.3d 790, 803 n.3 (7th Cir. 2010) ("Lupton's scheme constitutes not a mere failure to disclose a conflict of interest . . . but rather the 'paradigmatic kickback fact pattern' . . . that remains within the ambit of § 1346.") (citation and quotation omitted); *id.* at 805 ("Lupton's conduct . . . placed him squarely within even the recently narrowed parameters of § 1346.").

A-000006

fall into a plain-vanilla bribery fact pattern in which a suitcase of cash is exchanged for an official action.  But *Skilling* does not say that it must.  The method by which Ryan's co-schemers compensated him for official action requires a searching examination after *Skilling*, but as explained here, the conclusion that his conduct violates the law survives *Skilling*.

This court's analysis begins by considering the jury instructions to determine whether they are incorrect, based on the holding in *Skilling*.  If so, the court next examines whether the error was nevertheless harmless.  The court proceeds to address the Government's contention that, even if the honest services charge in this case exceeds what is permissible after *Skilling*, the jury would nevertheless necessarily have convicted Ryan of pecuniary fraud.  The court briefly examines Ryan's challenge to the sufficiency of the evidence; an in-depth examination is unnecessary because the harmless error standard requires more than the sufficiency-of-the-evidence test.  Finally, the court determines whether evidence introduced at trial would be barred in a post-*Skilling* honest services prosecution, and whether the introduction of that evidence prejudiced Ryan and requires that his conviction be vacated.

I.      **Harmless Error Review of Honest Services Mail Fraud Charges**

As noted, Ryan challenges the instructions given to the jury in this case.  He argues that they improperly presented a theory of honest services fraud that is no longer valid after *Skilling*.  He contends, further, that error in the instructions was not harmless and that the court must accordingly vacate Ryan's conviction on the mail fraud and RICO counts.

A.      **Standard of Review**

Error in jury instructions does not automatically require that a conviction be vacated.  As the *Skilling* Court explained, where a jury returns a general verdict that may rest on a legally invalid theory, the conviction may be upheld under a harmless-error analysis.  130 S. Ct. at 2934.  Harmless error review means that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a).  *Skilling* cited *Hedgpeth v. Pulido*,

129 S. Ct. 530, 531 (2008), where the Court instructed that "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth*, 555 U.S. 57, 129 S. Ct. 530, 531 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)), cited in *Skilling*, 130 S. Ct. at 2934 n.46.  That standard, the Court made clear, applies on direct review of a conviction as well as on collateral review.  *Id.* at 2834 n.46.

Ryan draws a further distinction; he argues that the *Brecht* harmless error standard does not apply because this case does not involve collateral review of a state-court proceeding, but rather post-conviction review of a federal proceeding.  He contends that "[t]he federalism concerns that prompted *Brecht* are absent in Section 2255 proceedings brought by federal prisoners." (Pet.'s Br. at 26.)  Ryan argues for application of the standard articulated by the Seventh Circuit in *Lanier v. United States*, 220 F.3d 833, 839 (7th Cir. 2000): that the conviction should be overturned unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."  *Id.* at 839.  The Government argues that *Lanier* "applied the heightened standard without analysis" and notes that no Circuit has applied a less deferential standard for Section 2255 motions after specifically considering the standard of review issue.  (Response Br. at 13-14 n. 7.)  This court notes that *Lanier* cited *Neder v. United States*, 527 U.S. 1 (1999), where the Court explained that when an element of the offense was omitted from the jury instructions, the reviewing court "asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element," and if the answer is "no," the error is harmless.  527 U.S. at 19.

In two recent cases, the Seventh Circuit has used a harmless error test to uphold convictions challenged as inconsistent with *Skilling*. *Black v. United States*, 130 S. Ct. 2963 (2010), a companion case to *Skilling*, was remanded for a determination of whether the convictions of Conrad Black and his co-defendants for honest-services fraud could be upheld under an alternative theory of "money-property fraud."  On remand, the Seventh Circuit noted that a bribery or kickback

8

scheme "was not proved here," but observed that the defendants' convictions could nevertheless be upheld "if it is not open to reasonable doubt that a reasonable jury would have convicted [Black] of pecuniary fraud . . . ." *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010), *reh'g en banc denied*, No. 08 CR 727 [117] (7th Cir. Dec. 17, 2010).  In *United States v. Cantrell*, 617 F.3d 919 (7th Cir. 2010), the Seventh Circuit upheld an honest services conviction on direct appeal without articulating a standard of review because the charged conduct "was clearly a kickback scheme," so the honest services statute applied, even as narrowed by *Skilling*.  *Id.* at 921.

*Black* is directly on point.  This court reviews the conviction under a harmless error standard and asks whether it is beyond a reasonable doubt that a reasonable jury[6] would have convicted Ryan of a legally valid theory on which it was properly instructed.

**B.    *Skilling* Standard**

Before addressing the propriety of the instructions in this case, the court pauses to review the theory of honest services fraud post-*Skilling*.  The defendant in *Skilling* was charged with "conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price." 130 S. Ct. at 2934.  As a result, the Government alleged, Skilling profited from the sale of Enron stock to the tune of $89 million.  No allegation of any bribery or side payments was made, however, and the Court concluded that Skilling's conduct could not constitute honest services fraud.  Because the indictment alleged not only honest services fraud, but also pecuniary fraud and securities fraud, the Court remanded the case for a determination of

---

[6]        In addition to inquiring as to what a "reasonable jury" would have found, the court also takes into account the actual findings of the jury in this case to the extent they demonstrate what the jury must have believed.  *See Black*, 625 F.3d at 393 (noting that had the jury believed failure to disclose fees constituted honest-services fraud it would have convicted on all counts; since it did not, it must have believed that the conduct at issue constituted pecuniary fraud or it would not have convicted); *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("Harmless-error review looks, we have said, to the basis on which 'the jury *actually rested* its verdict.' . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.") (citation omitted; emphasis in original).

whether the verdict would survive harmless error analysis.  *Id.* at n.46.

Skilling asked the Supreme Court to strike down § 1346 on vagueness grounds, but the Court chose instead to limit its scope.  "Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague."  *Id.* at 2933.  The Court did not offer a specific definition of the types of bribery and kickback schemes prohibited by the honest services statute, but instead noted that the "prohibition on bribes and kickbacks draws content not only from the pre-*McNally* case law, but also from federal statutes proscribing–and defining–similar crimes."  *Id.* The court pointed to several federal statutes defining bribery and kickback schemes (18 U.S.C. §§ 201(b), 666(a)(2); and 41 U.S.C. § 52(2)) and identified several cases that define bribery in the context of honest services fraud.  This court relies on these sources for a definition of honest services bribery that survives post-*Skilling*.

First, one of the cited statutes, 18 U.S.C. § 201(b), explains in part that the elements of bribery are satisfied when an individual

> directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . with intent . . . to influence any official act; or . . . to induce such public official . . . to do or omit to do any act in violation of the lawful duty of such official . . . .

The elements are also satisfied when a public official

> directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act . . . [or] being induced to do or omit to do any act in violation of the official duty of such official or person . . . .

18 U.S.C. § 201(b)(1)(A)-(C), (2)(A)-(C).  Likewise, 18 U.S.C. § 666, explains that bribery occurs whenever an individual

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent . . . of a State . . . in connection with any business, transaction, or series of transactions of such organization, government, or agency . . . .

18 U.S.C. § 666(a)(2).

10

As the case law cited by the Supreme Court reflects, a showing of bribery need not include direct *quid pro quo* exchange; two of the three cases cited by the Court as examples of honest services bribery rest on a "stream of benefits" bribery theory.  In a Third Circuit decision upholding a conviction for public corruption, the court approved jury instructions that explained, "where there is a stream of benefits given by a person to favor a public official, . . . it need not be shown that any specific benefit was given in exchange for a specific official act.  If you find beyond a reasonable doubt that a person gave an official a stream of benefits in implicit exchange for one or more official acts, you may conclude that a bribery has occurred."  *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007), cited in *Skilling*, 130 S. Ct. at 2934.  The *Kemp* court re-stated this theory to explain that, "[w]hile the form and number of gifts may vary, the gifts still constitute a bribe as long as the essential intent–a specific intent to give or receive something of value in exchange for an official act–exists."  *Kemp*, 500 F.3d at 282 (emphasis omitted).

Similarly, in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), cited in *Skilling*, 130 S. Ct. at 2934, the Fifth Circuit upheld an honest services bribery conviction under a "stream of benefits" theory.  The jury charge required that jurors find "a corrupt agreement for [defendant] to provide the particular judge with things of value specifically with the intent to influence the action or judgment of the judge on any question, matter, cause or proceeding which may be then or thereafter pending subject to the judge's action or judgment."  590 F.3d at 353.  The court noted that the government did not need to prove the parties had a specific case in mind when the exchange took place, and specifically dismissed the contention that the instruction should have required the jurors to find a "*quid pro quo*": "Despite the district court's failure to include the actual phrase *quid pro quo* in the jury charge, in the instant context the instructions sufficiently conveyed the 'essential idea of give-and-take.'"  *Id.* (citing *United States v. Kincaid-Chauncey*, 556 F. 3d 923, 943 (9th Cir. 2009)).

The "stream of benefits" theory has been a viable basis for convictions on bribery and

A-000011

extortion charges for some time, and has sometimes been referred to as supporting such charges under a "course of conduct" or "retainer" theory. *See, e.g.*, *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("The quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor.") (internal quotation and citation omitted); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (honest services bribery can be established if "the government official has been put on 'retainer'—that is, that the government official has received payments or other items of value with the understanding that when the payor comes calling, the government official will do whatever is asked.").

C.     **The Jury Instructions**

Ryan contends that the jury instructions in this case were flawed in five different respects: (1) He asserts the instructions are flawed by their reliance on the *Bloom* standard, *see United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), which was rejected in *Black*; (2) he claims the jury was instructed that the prohibition on accepting bribes or kickbacks was just one violation that could support an honest services conviction, while *Skilling* established that it is the only violation that can support such a conviction; (3) he urges that the instructions do not adequately express the requirement of a showing of *quid pro quo* exchange; (4) Ryan asserts that the instructions permitted a conviction on the basis of a conflict of interest, a showing insufficient after *Skilling*; and (5) he argues that the instructions permitted a conviction on the basis of state-law violations, also not sufficient after *Skilling*. (Pet.'s Br. at 21.) The Government urges that there was no error because the instructions, read as a whole, did require the jury to find that Ryan took bribes or kickbacks in order to convict him.

An instructional error can occur in a variety of ways—including, for example, an instruction on an invalid alternative theory of guilt, or an instruction that omits or erroneously describes an element of the offense. *United States v. Marcus*, 130 S. Ct. 2159, 2165 (2010). Even if an

instructional error has occurred as to some element of the charge, reversal is required "only if the instructions, 'viewed as a whole, misguide the jury to the litigant's prejudice.'"  *United States v. Palivos*, 486 F.3d 250, 257 (7th Cir. 2007) (describing harmless error analysis, and citing *United States v. Souffront*, 338 F.3d 809, 834 (7th Cir. 2003)).

### 1.    The *Bloom* Standard

Ryan's first challenge to the instructions is their incorporation of what he refers to as the *Bloom* standard.[7]  The instruction at issue stated:

> Where a public official misuses his official position or material nonpublic information he obtained in it for private gain for himself or another, then that official or employee has defrauded the public of his honest services if the other elements of the mail fraud offense have been met.

(Tr. 23911.)

The trial judge gave a similar instruction in *Black*: she instructed the jury that "a person commits honest-services fraud if he 'misuse[s] his position for private gain for himself and/or a co-schemer' and 'knowingly and intentionally breache[s] his duty of loyalty.'"  *Black*, 130 S. Ct. at 2967. The Supreme Court concluded that these instructions were flawed because the "scheme to defraud alleged [in *Black*] did not involve any bribes or kickbacks," *id.* at 2968 n.7, and accordingly remanded for a determination of whether the instructional error was harmless.  The *Black* Court did not consider or address what instruction would have been appropriate if the scheme to defraud *had* rested on a bribery or kickback theory.

On direct appeal in this case, the Seventh Circuit noted that the conflict-of-interest instruction challenged by Ryan included language requiring the jury to find not only a conflict of interest but also to find that "the other elements of the mail fraud statute are met."  *United States v.*

---

[7]     This instruction derives from *United States v. Bloom*, 149 F.3d 649, 656-57 (7th Cir. 1998), in which the Seventh Circuit held that the mere breach of a fiduciary duty did not constitute honest-services fraud, and that "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain."  *Id.*

*Warner*, 498 F.3d 666, 698 (7th Cir. 2007).  The Seventh Circuit was satisfied that the addition of this requirement meant that the government was required to prove "that the public official allowed or accepted the conflict of interest with the understanding or intent that she would perform acts within her official capacity in return."  *Id.*  That same language is included as part of the *Bloom* instruction that Ryan challenges in the pending motion.  The instruction did not limit the prohibited conduct to bribery or kickback schemes, however, and could also be interpreted as an instruction that a scheme of self-dealing itself violates the law—no longer a valid theory of honest services fraud post-*Skilling.*  The court concludes the instruction was in error.  No self-dealing offense was actually charged, however, and whether this error is harmless or not will be considered below.

### 2.    Duty Not to Accept Bribes or Kickbacks Was Non-Exclusive

Ryan next argues that the instructions were flawed because they explained that the duty not to accept bribes or kickbacks was only one of the duties whose violation could lead to an honest services conviction, while *Skilling* makes clear that a bribery or kickback scheme is the only scheme sufficient to support an honest services fraud conviction.  (Pet.'s Br. at 21.)  The instruction at issue explained that a public official has a duty not to accept "personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return."  (Instructions at 85; Tr. 23906.)  Ryan also urges that the "structure" of the instructions was flawed because they "made the acceptance of a bribe or kickback only one path to conviction rather than the only one."  (Pet.'s Br. at 22.)

Ryan is correct that, post-*Skilling*, an honest services fraud conviction does require a bribery or kickback scheme.  As the court reads the challenged instruction, however, nothing in it suggests such a scheme is not a required path to conviction.  In fact, this instruction taken alone suggests that a bribe *is* required for conviction.  The instruction requires that "the government prove[] beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in

14

return" (Instructions at 85; Tr. 23906)—an instruction indistinguishable from a bribery instruction.

The court finds no error in the language of this instruction; whether a flaw in the overall "structure"

of the instructions requires reversal will be addressed as part of the harmless error analysis.

### 3.    The Failure to Require a *Quid Pro Quo*[8]

---

[8]    The Government argues that Ryan has waived or forfeited his challenges to three of the instructions in this section. (Response Br. at 19 n.12.)  First, the Government argues that Ryan himself proposed the instructions he now challenges as improperly omitting a *quid pro quo* requirement and thus has waived any challenges to them.  *See* discussion *infra*.  "The right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue."  *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996).  *See also United States v. Yu Tian Li*, 615 F.3d 752, 757 (7th Cir. 2010) ("Having proposed a jury instruction virtually identical to the instruction actually used by the district court, [the defendant] cannot now contest that instruction.").

As the record shows, Ryan's attorneys did propose these two instructions (Def.'s Second Supp. to Proposed Jury Instructions [703] at F, G), and did not object when they were modified (Tr. 22459, 22465) to correspond to instructions related to the Illinois bribery statute, to which Ryan also did not object.  (Tr. 22434-40; 22442-43.)  Ryan nevertheless argues that his objection was preserved because he originally sought a campaign contribution instruction that did require an explicit *quid pro quo*.  (Reply Br. at 9 n.5.)  The Government has not raised a waiver argument with respect to the campaign contribution instruction, however.  And Ryan's argument that he "sought instructions that would come within hailing distance of the standard he favored while respecting the Court's ruling" is not consistent with the record: During the instructions conference, Ryan's lawyers did pose multiple objections to the campaign contributions instructions despite the court's earlier rulings (Tr. 22275-22288; 22446-22449; 22461), but made none with respect to the instructions at issue here.

Ryan further argues that he "could not have presented at trial the objection he now offers to the 'financial benefits' instructions" because *Skilling* had not been decided.  (Reply Br. at 9 n.5.)  This argument has traction.  *See Waldemar v. United States,* 106 F.3d 729, 731 (7th Cir. 1996) (a defendant who fails to raise a claim at trial may not proffer it as grounds for collateral attack without good cause; but good cause exists where "intractable federal precedent" in effect at the time of trial would have rendered his objection futile); *Bateman v. United States*, 875 F.2d 1304, 1308 (7th Cir. 1989) (§ 2255 petition not barred by procedural default because *McNally* "did indeed represent the type of startling break with past practices so as to excuse procedural default on collateral attack of a conviction.").  In any event, even if Ryan had waived his objections to these instructions, the court would still review them for plain error.  FED. R. CRIM. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").  Moreover, the Supreme Court suggested in *Skilling* that instructional errors in this context are subject to harmless error review without any discussion of waiver.  Because the harmless error review is more favorable to Ryan than plain error review would be, the court need not also engage in plain error review.

The Government also argues that Ryan has procedurally defaulted on any challenge to the instruction explaining that the receipt of benefits to "ensure favorable official action when necessary" can be sufficient to establish honest services fraud (Instructions at 86; Tr. 23906),

(continued...)

Ryan's next objection challenges the instruction examined above (Instructions at 85; Tr. 23906), as well as the instruction on campaign contributions. Ryan argues that the "personal and financial benefits" instruction is flawed in two respects: first, that it does not require jurors find an "exchange" sufficient to meet the *quid pro quo* requirement; and second, that the latter half of the instruction might encompass gratuities as well as bribes. Ryan next argues that the campaign contribution instruction is in error because it does not require an explicit *quid pro quo*. In its entirety, the instruction on "personal and financial benefits" reads:

> The law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the public official accepted the personal and financial benefits with the understanding that the public official would perform or not perform acts in his official capacity in return.

> Likewise, the law does not require that the government identify a specific official act given in exchange for personal and financial benefits received by the public official so long as the government proves beyond a reasonable doubt that the personal and financial benefits were given with the understanding that the public official would perform or not perform acts in his official capacity in return.

(Instructions at 85; Tr. 23905-06.) Ryan argues that this instruction improperly eliminated any *quid pro quo* requirement because it "turned on the understanding of one person—the public official—rather than on whether the two parties had agreed to an exchange." (Pet.'s Br. at 23.) The court finds this argument unpersuasive. The instruction required the public official to accept a benefit with the understanding he will perform an action in return. Such an understanding necessarily requires a second party to the exchange. The language requiring that the act be performed "in return" underscores the instruction's requirement that there be an agreed exchange.

---

[8](...continued)

because, though he objected to it, he failed to challenge it on direct appeal. The Government cites *United States v. Podhorn*, 549 F.3d 552, 558 (7th Cir. 2008), for this proposition, but that case does not discuss the effect of failing to preserve a challenge on appeal. *Podhorn* discussed the effect of failure to object during a jury instructions conference. The court declines to search for further precedent on this point because this instruction would be reviewed for plain error even absent harmless-error review, and, as discussed *infra*, the conviction withstands a challenge under either standard.

A-000016

Further, the predicate language does include the term "in exchange," and notes that while the exchange need not involve "a specific official act" it must include "acts . . . in return." This language adequately articulates the *quid pro quo* requirement.

Next, Ryan contends that the instruction explaining what provision of benefits does not violate the mail fraud statute incorrectly suggests that a gratuity might serve to violate the statute as well as a bribe. The instruction reads:

> [T]he providing of personal or financial benefits by a private citizen to and for the benefit of a public official, or to and for the benefit of a public official's family, friends, employees, or associates, does not, standing alone, violate the mail fraud statute, even if the private citizen does business with the state, so long as the personal or financial benefits were not intended to influence or reward the public official's exercise of office.

(Instructions at 87; Tr. 23907.) The Supreme Court has explained that the difference between a bribe and a gratuity is "its intent element." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (interpreting 18 U.S.C. § 201). While a bribe requires an intent to influence, or to be influenced, a gratuity "requires only that the gratuity be given or accepted 'for or because of' an official act.'" *Id.* at 405. The instruction's language limiting illegal benefits to those "intended to influence or reward the public official's exercise of office" is the language of bribery. Inclusion of the term "reward" in addition to "influence" is necessary to capture instances where the benefit arrives after the act. Ryan appears to urge that a "reward" must be understood to be a gratuity, but the word reward itself is used in one of the federal bribery statutes, 18 U.S.C. § 666, which explains that bribery occurs whenever an individual "corruptly gives, offers, or agrees to give anything of value to any person, with intent *to influence or reward* an agent . . . in connection with any business, transaction, or series of transactions of such organization, government, or agency. . . ." 18 U.S.C. § 666 (a)(2) (emphasis added). This language is virtually identical to that contained in the instruction, and the court finds no error in the instruction.

Next, Ryan challenges the instruction that permitted the jury to find the intent necessary for

17

a conviction of honest services fraud from evidence of a "benefit or benefits received by a

defendant or given by a defendant with the intent that such benefit or benefits would ensure

favorable official action when necessary . . . ."  (Instructions at 86; Tr. 23906; Pet.'s Br. at 24 n.15.)

Ryan insists such a showing is insufficient to establish intent.  Instead, he argues, "the benefit must

be conferred or received in exchange for something.  An intent to ensure favorable action when

necessary is not enough."  (Pet.'s Br. at 24 n.15.)  The case law, however, defeats Ryan's

interpretation.  In *United States v. Gorny*, 732 F.2d 597 (7th Cir. 1984), for example, the jury

instructions included an instruction similar to this one, based on the Illinois bribery statute.  The

instruction stated:

> [B]ribery occurs when property or personal advantage is accepted by a public
> employee with knowledge that it is offered with intent to influence the performance
> of any act related to his public position.  No particular act need be contemplated by
> the person offering the property or personal advantage, or by the public official to
> whom the offer is made.  The crime is completed when the property or personal
> advantage is accepted by the public employee knowing it was offered with the intent
> that he act favorably to the person offering the property or personal advantage when
> necessary.

732 F.2d at 600.  *Gorny* affirmed the conviction of a deputy commissioner on a county board of tax

appeals who received payments in cash and other advantages from attorneys who practiced before

the board.  Although Gorny did not receive payments "based on the outcome of any specific case,"

the Seventh Circuit confirmed his conviction of mail fraud and racketeering, noting that there was

evidence from which the jury could find that "these payments and other favors were conferred upon

Gorny with intent to influence him" and that Gorny received these favors with a similar intent.  *Id.*

at 600, 601.  *See also United States v. Kincaid-Chauncey*, 556 F.3d at 944 n.15  ("when the payor

comes calling, the government official will do whatever is asked.").  This instruction is clearly

consistent with the "stream of benefits" or retainer theory, and, together with the other benefits

instructions, adequately expresses the *quid pro quo* requirement.

Finally, Ryan argues that the campaign contribution instruction does not adequately explain

18

the type of *quid pro quo* required for campaign contributions to constitute bribes. For purposes of

campaign contributions, Ryan urges, the jury must find more than an implied exchange; there must

be an "explicit quid pro quo." (Pet.'s Br. at 23.) The instruction at issue states:

> When a person gives and a public official receives a campaign contribution knowing
> that it is given in exchange for a specific official act, that conduct violates the mail
> fraud statute, if the other elements of the mail fraud offense are met. The intent of
> each party can be implied from their words and ongoing conduct.

(Instructions at 88; Tr. 23908.)

Ryan is correct that a campaign contribution can be deemed a bribe only if the money is

given in return for a commitment to take (or not take) a specific action. In *McCormick v. United*

*States*, 500 U.S. 257, 273 (1991), the Supreme Court held that a campaign contribution could

constitute extortion in a Hobbs Act case, "but only if the payments are made in return for an explicit

promise or undertaking by the official to perform or not to perform an official act." *Id.* A year later,

the Court confirmed the *quid pro quo* requirement, but explained that "[t]he official and the payor

need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated

by knowing winks and nods. The inducement from the official is criminal if it is express or if it is

implied from his words and actions, so long as he intends it to be so and the payor so interprets it."

*Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring).

The final sentence of the campaign contribution instruction in this case tracks Justice

Kennedy's language in *Evans*, and therefore accurately articulates the standard for finding a *quid*

*pro quo* based on campaign contributions. Moreover, as the Government noted in oral argument,

*Evans* and *McCormick* were both settled law at the time this case went to the jury, and nothing in

*Skilling* has unsettled them.

### 4.    Conflict-of-Interest Instruction

Ryan next challenges the conflict-of-interest instruction given to the jury:

> A public official or employee has a duty to disclose material information to a public
> employer. If an official or employee conceals or knowingly fails to disclose a

19

material personal or financial interest, also known as a conflict of interest, in a matter over which he has decision-making power, then that official or employee deprives the public of its right to the official's or employee's honest services if the other elements of the mail fraud offense are met.

(Instructions at 84; Tr. 23905.)  On direct appeal in this case, the Seventh Circuit examined this instruction to determine whether it comported with the "private gain" requirement imposed by this circuit's jurisprudence (but not by some other circuits).  S*ee Skilling*, 130 S. Ct. at 2928 n.36.  The Seventh Circuit was satisfied that the instruction at issue properly required the jury to find that the defendant public official had allowed or accepted a conflict of interest for his own private gain, with the intent to perform acts in his official capacity in return.  *Warner*, 498 F.3d at 698.

The objection Ryan now presents is a different one: he notes that this instruction would permit the jury to convict him for self-dealing and other conflicted transactions that fall short of a bribery or kickback scheme.  *Skilling*'s core holding precludes such a result.  "In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases."  130 S. Ct. at 2932.  The court concludes that the conflict-of-interest instruction was in error.

### 5.     State Law Violations

Ryan contends that the instructions allowed the jury to find he committed honest services fraud based on a violation of state law that did not involve a bribery or kickback scheme.  The court's instructions did identify a number of state laws that govern the conduct of public officials, including the following:

- "Public funds, property or credit shall be used only for public purposes."

- Misconduct occurs when an official "performs an act in excess of his lawful authority" to "obtain a personal advantage for himself" or "knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law".

- A public official is required to file an annual financial disclosure statement

20

with the State of Illinois.

- "[A] public officer was prohibited from soliciting or accepting any gifts from any prohibited source or in violation of any federal or state statute, rule or regulation."

(Instructions at 89-90; Tr. 23908-23910.)  The court then explained that

[N]ot every instance of misconduct or violation of a state statute by a public official or employee constitutes a mail fraud violation.  Where a public official or employee misuses his official position (or material, non-public information he obtained in it) for private gain for himself or another, then that official or employee has defrauded the public of his honest services, if the other elements of the mail fraud offense have been met.

(Instructions at 93; Tr. 23911.)  The Seventh Circuit also examined this instruction on direct appeal, again focusing on the requirement of a showing of personal gain.  The court noted that the "cited provisions of Illinois law identified for the jury various ways in which a public official could 'misuse his fiduciary relationship,' but the instructions as a whole unambiguously required the prosecution to prove that misuse of the office was intended for personal gain."  *Warner*, 498 F.3d at 698.  *See also United States v. Segal*, 495 F.3d 826, 834 (7th Cir. 2007) (rejecting challenge to state-law instruction in honest services prosecution because "state laws are useful for defining the scope of fiduciary duties, and . . . what distinguishes a mere violation of fiduciary duty from a federal fraud case is the misuse of one's position for private gain.").

Determining the duties of office can indeed be relevant to a bribery prosecution; for example, 18 U.S.C. § 201(b) requires that one of the elements of bribery is that an official "do or omit to do any act in violation of the lawful duty of such official."  State laws are directly relevant in determining the scope of an official's lawful duty.  This court was and is satisfied that the state law instruction did not permit the jury to convict Mr. Ryan of a federal defense solely for the violations of state law.  Still, one can misuse his office for private gain without engaging in a bribery or kickback scheme.  The court thus concludes that this instruction, too, is error in the light of *Skilling*.

**D.    Harmless Error Analysis**

21

Having determined that the *Bloom* instruction, the conflict-of-interest instruction, and the state law instructions should not have been given, the court turns to the question of whether these instructional errors were harmless.  As explained previously, the relevant inquiry is whether a reasonable jury, properly instructed, must necessarily have convicted based on a proper theory.  Put another way, the court asks whether the jury necessarily found the elements of the valid theory satisfied when it chose to convict on a now-invalid theory.

The court notes that this analysis would be significantly more straightforward had the Government argued solely a bribery theory at trial.  The vast majority of post-§ 1346 and pre-*Skilling* honest services cases stem from one of two theories—bribery or self-dealing (usually in the form of an undisclosed conflict-of-interest for personal gain).  The latter theory is the one on which Mr. Skilling himself was convicted.  At first cut, this case appears to present a straightforward bribery theory—Ryan accepted benefits with the intent to be influenced in his official actions.  Yet the Government insisted on arguing not only a bribery theory but also an undisclosed conflict-of-interest theory.  During the jury instruction conference, Ryan's attorneys challenged the propriety of a conflict-of-interest instruction.  Attorney Bradley Lerman argued:

> [T]he failure to disclose financial interest [doctrine] in the Seventh Circuit, that relates to the direct interest that the public official has and fails to disclose.  If George Ryan was an owner, for example, of the Joliet property and he failed to disclose his ownership. . . . The fact pattern in this case is closer, much more analogous to the bribery fact pattern. . . . I have always assumed [ ] the theme of the government's case [was] the hidden flow of benefits between people who benefitted from George Ryan's activities.
>
> George Ryan doesn't have a personal financial interest in this case in the decisions that he was making as a public official.  The allegation is that he was receiving things of value paid to influence him from people who were benefitting from his decisions.

(Tr. 22070, 22073.)   The Government insisted that the conflict-of-interest instruction was appropriate in this case; such an instruction was relevant, for example, to Ryan's concealment on his economic interest forms of the benefits he received from Harry Klein "at the same time that he

is making official decisions that confer public benefits on Mr. Klein."  (Tr. 22068.)

The Government's conflict-of-interest theory did go to the jury—had it not, *Skilling* would have provided little upon which Ryan could base the instant petition.  But, as Ryan's attorney himself emphasized, the acts underlying either theory were the same—in one instance, a jury was invited to convict based on Ryan's failure to disclose the stream of benefits, and in another it was invited to convict based on the stream of benefits themselves.  The court declines, at this stage, to discuss whether the conflict-of-interest instruction was clear enough or necessary at all.  The question for now is whether, in order to find Ryan guilty on one theory, the jury must have found him guilty on the other, as well.  The legal characterization of the charge is irrelevant so long as the jury found beyond a reasonable doubt that Ryan had engaged in the conduct charged.

Ryan's main defense to the mail fraud charges was that, while he may have done political favors for his friends, including co-Defendant Warner, such activity does not amount to a crime.  Thus, Ryan's attorney argued in closing,

> It's a crime if George Ryan accepted benefits to perform official acts.  But it's not a crime if all George Ryan did is try to do things that sometimes benefited political supporters.  That happens . . . . No witness testified that George Ryan accepted personal or financial benefits to perform official acts.  That is so critical . . . .  Everyone wants this to be some evil thing.  Okay.  Maybe the world should work different.  Okay.  Maybe public officials should never be able to do anything to favor their supporters.  Maybe we ought to change the whole way the whole political system in America works.  Maybe we should do that.  But that's not the way it is.  And it's not a crime to help your friends.

(Tr. 23159-60, 23177, 23343.)

Ryan requested, and the jury received, numerous instructions tailored to this theory of defense.  The jury was instructed that "[a] public official's receipt of personal or financial benefits . . . does not, standing alone, violate the mail fraud statute, even if the individual providing the personal or financial benefit has business with the state."  (Instructions at 87; Tr. 23906-07.)  The jury was also told that, "[g]ood faith on the part of the defendant is inconsistent with intent to defraud, an element of the mail fraud charges."  (Instructions at 81; Tr. 23905.)  Another instruction

23

explained that a "public official may receive campaign contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange," and that campaign contributions from those who "[have] or expect[] to have business pending before the public official" do not necessarily violate the mail fraud statute. (Instructions at 88; Tr. 23907.)  Further, the court identified a number of items that a public official could properly receive without violating the law, including "anything provided on the basis of personal friendship, unless the officer had reason to believe the gift was provided because of the official position of the officer, and not because of friendship."  (Instructions at 90; Tr. 23909-10.)

As discussed below, the court is satisfied that these instructions required the jury to find that that Ryan did not act in good faith, that he acted for private gain[9], and that the "stream of benefits" flowing between Warner and Ryan were not simply the proceeds of a friendship, as Ryan argued, but were intended to influence him in his official duties.  *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008) ("We presume that the jury followed the court's instructions.").  Because such findings are sufficient to establish a bribery scheme, the court is further satisfied that the instructional errors identified above were harmless.  These conclusions are explained in greater detail below.

### 1.    Single Scheme to Defraud

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held  held the "honest services" theory of mail fraud unconstitutional.  In the wake of *McNally*, the Seventh Circuit re-

---

[9]    The Seventh Circuit explained that "the instructions as a whole unambiguously required the prosecution to prove that misuse of the office was intended for personal gain . . . ." *Warner*, 498 F.3d at 698.  The court notes that "personal gain" might be considered more limited than "private gain," although this difference is probably inconsequential.  *United States v. Sorich*, 523 F.3d 702, 709 (7th Cir. 2008) ("The semantic difference between 'private' and 'personal' gain may be insignificant, but to the extent that 'personal' connotes gain only by the defendant, it is misleading.  By 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not.").  Ryan does not dispute that, even post-*Skilling*, whatever constitutes the gain, be it personal or private, may be actually given to another so long as there is a resulting "gain" to Ryan.

24

examined a number of convictions to determine whether they remained valid. These cases provide a useful framework for examining Ryan's conviction in light of the *Skilling* decision. In one particularly instructive case, *Messinger v. United States*, 872 F.2d 217 (7th Cir. 1989), the court recognized that the honest services theory under which Messinger had been convicted was no longer valid, but examined whether Messinger might also have been convicted on a pecuniary fraud theory. The court explained that it would "examine the indictment, the evidence, and the jury instructions to see if the jury necessarily had to convict Messinger for defrauding Cook County of its property right . . . notwithstanding any intangible rights theory employed." *Id.* at 221. *See also United States v. Bonansinga*, 855 F.2d 476, 479 (7th Cir. 1988) ("[R]egardless of the language employed in his indictment, the fact remains that the evidence adduced by the government at trial unequivocally demonstrated Bonansinga's participation in conduct clearly proscribed by the mail fraud statute as construed in *McNally*."); *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir. 1987) ("[E]ven assuming these allegations were (in form at least) separate, the government could not logically prove one scheme without proving the other since the elements of the two were identical.").

The *Messinger* court undertook this analysis because in that case the jury found the existence of a single scheme to defraud, and convicted *Messinger* based on acts in furtherance of that scheme. This case presents a similar situation. In order to convict Ryan, the jury must have found the existence of a scheme to defraud, and must have found, on each of the mail fraud counts of conviction, a mailing in furtherance of that scheme. The first question is whether the jury's finding that this scheme existed necessitated a finding that it was a bribery or kickback scheme. If so, the court can end its inquiry because the jury, as in *Messinger*, would necessarily have found a violation that falls within the narrowed definition of mail fraud approved by the Supreme Court.

### a.     Did the jury necessarily find a bribery or kickback scheme?

The fact that the indictment and instructions did not exclusively track *Skilling*'s limited

A-000025

definition of honest services fraud is not fatal to this analysis.  In the post-*McNally* era, courts in this circuit routinely found that indictments that included broad intangible rights language did not necessarily exclude an alternative, valid theory.  *Messinger*, 872 F.2d at 221 ("In examining the indictment, we must look at the substance of the actions alleged, not at the language used."); *United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988) ("The presence of some language referring to an intangible rights theory is not always fatal to the indictment."); *United States v. Gottlieb*, 738 F. Supp. 1174, 1181 (N.D. Ill. 1990) ("A court must look past the indictment's legal characterization of a scheme and determine whether the 'specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute.' . . . In fact, the substantive allegations in an indictment may be cognizable under *McNally* even if the indictment is couched in 'intangible rights' language.") (quoting *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir. 1987)).

The summary indictment provided to the jury in this case[10] alleged that Ryan

> devised and intended to devise, and participated in, a scheme and artifice to defraud the people of the State of Illinois, and the State of Illinois, of money, property and the intangible right to honest services of defendant Ryan and other official and employees of the State of Illinois, by means of materially false and fraudulent pretenses, representations, promises and material omissions, and in furtherance thereof used the United States mails and other interstate carriers.

The indictment went on to further describe the scheme in three additional paragraphs labeled "Overview of Scheme," which, in addition to the language below, included specific examples of actions illustrating the components of the scheme:

> 3.    It was part of the scheme that defendant Ryan performed and authorized official actions to benefit the financial interests of Ryan, defendant Warner, Arthur Ronald Swanson, Harry Klein and Donald Udstuen and designated third parties including Ryan family members and Citizens for Ryan.
>
> . . .

---

[10]    For the purposes of this opinion, the court examines the "summary of second superseding indictment" that was provided to the jurors.  "In reviewing the indictment, the evidence, and the jury instructions, our 'inquiry is limited to a review of the case as it was presented to the jury and not how it might have been presented.'"  *Messinger*, 872 F.2d at 221 (quoting *Magnuson v. United States*, 861 F.2d 166, 168 (7th Cir. 1988)).

A-000026

4.      It was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner, Arthur Ronald Swanson and Donald Udstuen, while defendant Ryan knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts.

. . .

5.      It was further part of the scheme that . . . defendants Ryan, Warner, Arthur Ronald Swanson, and Donald Udstuen concealed their financial relationships . . .

As this court reads the indictment's language, Paragraph 5 presents a conflict-of-interest theory that, standing alone, would not satisfy *Skilling.* Paragraph 3 alleges a theory consistent with bribery, although one that does not necessarily constitute bribery in every instance. Paragraph 4, however, does contains a description that necessarily includes the "stream of benefits" theory of bribery discussed above. Thus, the indictment did present at least one theory of honest services fraud that remains valid post-*Skilling*.[11]

The elements of mail or wire fraud are "(1) a scheme to defraud (entailing a material misrepresentation), (2) an intent to defraud, and (3) the use of the mails." *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008). In addition, for an honest services mail fraud charge in the Seventh Circuit, the Government was also required to show the misuse of position for private gain. *Id.* These requirements correspond to the outline of the scheme charged in the Ryan indictment: the first paragraph speaks of the acts involved in the scheme and the object of the frauds; the

---

[11]      The parties devoted substantial attention to these three paragraphs during the jury instructions conference. Ryan argued that the "intent to influence" language must be inserted in paragraph 3. (Tr. 22761-75.) The Government argued that would be unnecessary because it would be clear from all of the instructions that the jury must find each paragraph in the "Overview of Scheme" section satisfied in order to convict. (*Id.*) The parties agreed to keep the original language of the indictment, but delete a paragraph from one of the Government's proposed instructions to the effect that the jury that must unanimously find a false representation, but that "the government is not required to prove all of them." (*Id.*) During this conference, Ryan seemed most concerned that the jurors would find the awarding of a contract sufficient to establish guilt, without any *quid pro quo*. Defendants did not raise any objection to the concealment language believing that the jurors would not be misled "because paragraph [4] has the *quid pro quo* language in it and paragraph [5] has the concealment language." (Tr. 22766.)

A-000027

second paragraph refers to the private gain reaped from the scheme; and the third paragraph describes the material misrepresentations upon which the scheme relied.  Each additional mail fraud count in the indictment then detailed the mailing requirement

        Does the fact that the jury found that a fraud scheme existed mean, therefore, that the scheme involved bribery or kickbacks?  With respect to the mail fraud charges, the jury was instructed that they were required to find that "the defendant knowingly devised or participated in the scheme to defraud or to obtain money or property by means of materially false pretenses, representations, or promises, *as charged*." (Instructions at 75; Tr. 23902) (emphasis added).  The instructions further explained that "[a] scheme to defraud is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another or to deprive the people of the State of Illinois of their intangible right to the honest services of their public officials or employees." (Instructions at 76; Tr. 23903.)  As the court reads this language, it did not on its face require the jurors to find that the charged scheme was one involving bribery.

        In addition, the jury was instructed that the mail fraud counts "charge that the defendants participated in a single scheme to defraud" and that to find the defendant guilty of a particular count, the jury must "find beyond a reasonable doubt that the proved scheme to defraud was included within the charged scheme to defraud . . . provided that all other elements of the mail fraud charge have been proved." (Instructions at 77; Tr. 23903.)  Thus, although the jury was required to find that a charged scheme to defraud existed, no language within either the indictment or the jury instructions explicitly required the jurors to find that every part of the scheme described in the indictment necessarily existed.  Case law supports the conclusion that, unless instructed otherwise, a jury need not have found that every part of an alleged scheme existed in order to find that the scheme as a whole existed.  *See United States v. Reicin*, 497 F.2d 563, 568 (7th Cir. 1974) ("The issue is whether lack of [proof of one part of a mail fraud scheme], despite the presence of the other

28

elements of the scheme as alleged in the indictment, vitiates the conviction on [one count]. We hold that it does not. '[I]n most mail fraud prosecutions, there are numerous instances of allegedly illicit conduct, all of which need not be proved to sustain a conviction.'") (quoting *Anderson v. United States*, 369 F.2d 11, 15 (8th Cir. 1966); *United States v. Toney*, 598 F.2d 1349, 1355-56 (5th Cir.1979) ("In mail fraud cases the government need not prove every allegation of fraudulent activities appearing in the indictment. It need only prove a sufficient number of fraudulent activities to support a jury inference that there was a fraudulent scheme.").

It might be possible to read the jury instructions in this case as *requiring* that the jury find the scheme to involve accepting gifts "with intent to influence" official acts. The court declines to construe the instructions this way, however, because there was no explicit instruction to this effect and because the Government, in its closing rebuttal argument,[12] suggested such a finding was not necessary. *See, e.g.*, Tr. 23771 ("[T]his is the heart of the matter. For the first ten counts of the indictment, it is the heart of the matter. It's about trust. Mr. Ryan's honest services. That's what it's about. . . . So, folks, on this honest services, on this scheme, this first element, it can be met with a conflict of interest.").

---

[12]    The court notes that the Government's closing was equivocal on this issue. Thus, in rebuttal, the Government argued that an honest services mail fraud scheme could be established simply with a showing of conflict of interest. In its main closing argument, however, the Government hammered on the bribery theory. *See, e.g.*, Tr. 22831 ("This was a case in which George Ryan steered government contracts, leases, and money to Larry Warner and a select few group of individuals who were also providing George Ryan, his family and friends with various undisclosed benefits."); Tr. 22836 ("George Ryan, as a public official, had a duty to provide honest services to the people of the state of Illinois who had elected him. And the evidence in this case has shown that he repeatedly violated that duty. He violated that duty by giving state benefits, like contracts and leases, to his friends—Warner, Swanson, Klein—while at the same time they were providing various undisclosed financial benefits to him and his family and to his friends."); Tr. 22956-58 ("What the Government's case is about is that George Ryan received these financial benefits for himself and steered other benefits to third parties, benefits that were not disclosed to the public, from the very individuals and during the very time frame that George Ryan was steering these various people profitable and lucrative leases and contracts. So it's this undisclosed flow of benefits that was charged in the indictment, it's this undisclosed flow of benefits that is in violation of the law, and it's this undisclosed flow of benefits that were proven in this case beyond a reasonable doubt.").

29

**b.      Does the conviction rest on a still-viable theory?**

Because the jury need not have found every aspect of the charged scheme, the next question is whether the findings they did make support a still-viable theory of honest services fraud. In reviewing mail fraud convictions after *McNally*, courts in this circuit looked to whether one charged theory was "easily separable" from the other. *See, e.g.*, *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir. 1988) ("Where a fraud scheme involves multiple objectives, some of which are insufficient to state an offense under *McNally*, the remaining charge or charges will be deemed sufficient to state the offense if they are 'easily separable' from the charges deemed insufficient. In such a case, those allegations which are insufficient to state an offense are mere surplusage, and do not taint the remainder of the indictment.") (citations omitted); *United States v. Folak*, 865 F.2d 110, 113 (7th Cir. 1988) ("[W]here an indictment alleges multiple schemes, some of which serve to defraud victims of property and others that deprive them of some intangible right, we have treated as surplusage any intangible rights theory of fraud that was 'easily separable' from allegations of a scheme to defraud of money or property. We have also held that where a single set of facts establishes both a scheme to defraud a victim of money or property, as well as a deprivation of some intangible right, *McNally* does not require setting aside the conviction.") (citations omitted). The Seventh Circuit undertook a similar inquiry in *Black*, when it determined that a money-property theory could be disentangled from an honest services theory, and determined that a reasonable jury would necessarily have upheld one count of conviction on a money-property theory. *Black*, 625 F.3d at 393.

The difficulty in this case arises because *Skilling* did not invalidate an entire theory of mail fraud, as *McNally* did, but rather eliminated all sub-theories of honest services fraud that do not require bribes or kickbacks. Thus, the court must separate the bribery theory on which Ryan was charged, and the jury instructed, from the invalid theories described above—including the *Bloom* theory, the conflict-of-interest theory, and the state law theories. In order to do this, the court will

30

examine the evidence presented at trial on each mail fraud count for which Ryan was convicted, and determine whether that set of facts could have supported a scheme in the indictment *other than* the bribery scheme.  In each case, if it could have, the court must determine whether a reasonable jury could have convicted based on the alternate theory but not on the bribery theory.  The evidence essentially established two "streams of benefits," one from Warner to Ryan (and his family members), and one from Harry Klein to Ryan.  Because in the case of Warner, each "stream of benefits" "quid" is allegedly tied to multiple "quos," the court will first examine the benefits alleged to have been received by Ryan from Warner as a whole, and then examine the acts alleged to have been performed in return.

2.    **Warner-related Mail Fraud Counts**

a.    **Stream of Benefits from Warner to Ryan**

In ruling on Ryan's post-trial motion, this court observed that "[t]he government introduced a great deal of evidence of Ryan's acceptance of gifts and benefits."  *Warner*, 2006 WL 2583722, at *6.  Specifically, the benefits flowing from Warner to Ryan included favorable construction and insurance benefits to Ryan's family members; investments in Ryan's son's business; and favorable financial treatment of Comguard, a business involving Ryan's brother.  *Id.*  As Ryan himself notes, Warner wrote a $3,185 check to pay for the band that played at Ryan's daughter's wedding and held two major fund-raisers for Ryan, raising a total of $250,000.[13]  (Pet.'s Br. at 19.)  The government also provided circumstantial evidence that Ryan received cash from Warner and others.  *Warner*, 2006 WL 2583722, at *6.  The jury need not have believed every one of these incidents occurred or that every incident had a corrupt purpose.  As explained below, however, the jury must have believed that in several instances Warner did provide benefits to Ryan in exchange for acts.  Moreover, Ryan's convictions on the false statement and tax charges mean that the jury

---

[13]    As noted, the jury was instructed that campaign contributions are unlawful only if given in exchange for a specific official act.

must have believed he substantially understated his income and that he had a "personal financial relationship" with Warner.

<h4>b.    Count Two</h4>

Count Two of the indictment charged that the mailing of a check from the State of Illinois to American Detail & Manufacturing Co. ("ADM") was in furtherance of the scheme to defraud.  The evidence at trial showed that Ryan intervened on Warner's behalf in order to get James Covert, head of the Secretary of State's vehicle-services division, to withdraw contract specifications that might have caused ADM to lose a valuable vehicle registration stickers contract.  At the time, ADM was Warner's client, and prior to Ryan's direct intervention, Warner represented to Covert that he had "authority to speak for Secretary Ryan" and wanted ADM to retain the contract.

In ruling on the sufficiency of the evidence in support of this count, the court noted that jurors had been instructed that if Ryan had acted in good faith—he claimed that his instructions to Covert were motivated by legitimate law-enforcement concerns—they should not convict him on this count.  The jurors convicted Ryan despite this instruction, and the court observed that "Ryan's direct intervention on Warner's behalf, and his attempt to conceal his intervention by directing Covert to withdraw the specifications quietly, amply support the jury's verdict with respect to Count Two."  *Warner*, 2006 WL 2583722, at *6.

Paragraph 3 of the summary indictment describes the Warner transaction, charging that it was part of the scheme that Ryan "performed and authorized official actions to benefit the financial interests of . . . Warner. . . .  The official actions Ryan performed and authorized included: Awarding, and authorizing the award of, contracts and leases, and intervening in governmental processes related thereto and causing contractual payments to be made to benefit the financial interests of defendant Warner."  Paragraph 4 describes the receipt of benefits by Ryan, explaining that "[i]t was further part of the scheme that defendant Ryan and certain third parties affiliated with Ryan received personal and financial benefits from defendant Warner . . . while defendant Ryan

A-000032

knew that such benefits were provided with intent to influence and reward Ryan in the performance of official acts."

In order to convict Ryan on Count Two, the jurors had to believe one of three theories: either (1) Ryan concealed a conflict-of-interest related to the ADM contract; (2) Ryan misused his office for private gain in discussing the contract with Covert; or (3) Ryan accepted benefits (bribes) from Warner in exchange for his intervention.

The first theory does not stand on its own. The only conflict of interest presented to the jury relating to ADM was Ryan's relationship with Warner and Warner's involvement in this contract. Therefore, if the jury found that Ryan concealed a conflict of interest (theory (1)), it necessarily had to find that he had misused his office for private gain (theory (2)), or that he had accepted benefits from Warner in exchange for favors relating to ADM (theory (3)). The misuse of office theory (2) might stand alone if the jury believed that Ryan decided for some illegitimate reason—unrelated to the benefits Warner provided to Ryan—to coerce Covert into withdrawing the specifications. But the only motivations Ryan had to interfere with this contract were for legitimate law-enforcement reasons, as the defense suggested, or to compensate Warner for the stream of benefits he provided, as the Government urged. The jury rejected the good faith motive. Accordingly, the jury could only have convicted him on this count if it believed that his conduct was a response to the stream of benefits. Ryan suggests that the only "private gain" he received for his intervention in this transaction was the approval of his friend. As explained earlier, however, the jurors must have rejected this argument; they were specifically instructed that if the benefits Ryan received from Warner were merely the proceeds of a friendship, they could not be the basis for a conviction. *See* I.D *supra*. The court concludes that the jury must have found Ryan accepted gifts from Warner with the intent to influence his actions.

The Government did present the awarding of contracts and leases in these terms. In closing, the Government urged:

George Ryan, as a public official, had a duty to provide honest services to the people of the state of Illinois who had elected him. And the evidence in this case has shown that he repeatedly violated that duty. He violated that duty by giving state benefits, like contracts and leases, to his friends—Warner, Swanson, Klein— while at the same time they were providing various undisclosed financial benefits to him and his family and to his friends. The benefits included free vacations, loans, gifts, campaign contributions, as well as lobbying money that Ryan assigned or directed to his buddies. In short, Ryan sold his office. He might as well have put up a 'for sale' sign on the office.

Tr. 22836. Further, the Government presented a valid "stream of benefits," "retainer," or "course of conduct" bribery theory when it explained that

this is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. The type of corruption here—that type of corruption where you give me this, I will give you that, is often referred to as a *quid pro quo*. The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals. And for Warner, Swanson, and Klein it was not a cash bar. This was an open bar during Ryan's terms as secretary of state and as governor.

Tr. 22852. While Ryan is correct that the Government also suggested Ryan could be convicted based on a conflict of interest, as explained earlier, that was not a tenable independent theory that would have supported conviction of Ryan on Count Two.

### c.    Counts Three and Eight

Counts Three and Eight both involve the steering of leases to Warner. In Count Three, the government charged that a mailing related to the State's lease of a Warner-owned building was in furtherance of the scheme. In evaluating the sufficiency of the evidence on this count, the court found that three witnesses "testified as to Ryan's (and Warner's) direct involvement. Ryan put Sherman in contact with Warner to look for a new site, and the jury could reasonably infer from Borisy's testimony that Ryan knew Warner owned the Joliet building at the time." *Warner*, 2006 WL 2583722, at * 8.

Count Eight similarly charged Ryan with mail fraud based on a mailing from the state to a company controlled by Warner, for the lease of a building in Bellwood by the office of the Secretary

34

of State. In evaluating the evidence on this count, this court pointed to "evidence from which the jury could have concluded that Ryan steered the lease to Warner, in a top-down fashion, and that the approval of his subordinate was a mere formality. Moreover, the layers of deception surrounding the transaction support the jury's finding that the Defendants acted with the requisite intent." *Id.* at *12.

The same analysis applied to Count Two applies here, and leads to the conclusion that absent good faith, the jury must have convicted Ryan on this count because he steered these leases to Warner in exchange for Warner's provision of benefits to Ryan. In other words, the lease was steered to Warner because he participated in a "stream of benefits" bribery scheme with Ryan. Ryan argues that the jury might have believed "that Ryan favored Warner in awarding leases and other business, but [that] did not indicate that Warner ever gave Ryan a bribe or a kickback." (Pet.'s Br. at 19.) The court disagrees. No reasonable jury would have believed that Ryan committed mail fraud by awarding these leases to Warner, but not believed that the lease was awarded in exchange for the benefits provided by Warner to Ryan. The jury believed that Ryan acted with the intent to defraud, and that Ryan "performed and authorized official actions" to benefit Warner's financial interests. As noted earlier, it rejected the argument that the benefits flowing from Warner to Ryan were innocent gifts from one friend to another. The evidence of benefits flowing from Warner to Ryan, and Ryan's significant involvement in the steering of these leases lead to one conclusion: that Ryan accepted the gifts from Warner with the intent to be influenced, and that these leases are the manifestation of that influence.

### d.    Count Four

Count Four charged that a check from IBM to a consulting company controlled by Ryan was mailed in furtherance of the scheme. The Government contended that Warner took advantage of information gleaned from his association with Ryan to profit through a consulting contract with IBM.

35

The court found sufficient evidence for a jury to find "that Warner's IBM proceeds were a direct result of the access to the SOS Office that Ryan gave Warner." *Warner*, 2006 WL 2583722, at *9.

This charge differs from those discussed earlier in that there is no suggestion that Ryan took any specific "action" related to the IBM contract—and the standard definition of bribery requires some sort of official action in exchange for the benefits received. A question left unanswered in *Skilling* is whether each act taken in furtherance of a bribery scheme must itself be an official act of the type that could support conviction of a bribery offense. *Skilling* spoke in terms of a bribery scheme, not in terms of specific acts of bribery. *Skilling*, 130 S. Ct. at 2931 ("The 'vast majority' of the [core] honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."); *id.* at 2931 n.42 ("Apprised that a broader reading of § 1346 could render the statute impermissibly vague, Congress, we believe, would have drawn the honest-services line, as we do now, at bribery and kickback schemes."). In a case decided one month after the *Skilling* decision, the First Circuit found (in a decision in which Justice Souter joined the panel) that a state legislator who took payments in order to arrange meetings between health insurers and his client could constitute honest services fraud on a bribery theory, even absent payment for a vote or other explicit action. The court explained that

> [l]egislators can and do convene meetings of constituents and seek to settle quarrels among them; but taking a bribe for the use of one's governmental power is a different matter and within the ambit of honest services fraud. . . . What distinguishes this aspect of the case from some others is that the bribe was not for Celona to press or oppose legislation directly through his votes; rather, the purchased use of official power was the implied threat of such action–and also the potential use of influence over legislation in committee–that Celona conveyed largely by implication through the orchestrated meetings. But the distance between this and paying outright for legislative votes is not great: both involve the misuse of office.

*United States v. Urciuoli*, 613 F.3d 11, 16-17 (1st Cir. 2010), *cert. denied*, ___S. Ct.___, 2010 WL 4052920 (Nov. 15, 2010). *See also United States v. Seminerio*, No. S1 08 Cr. 1238 (NRB), 2010 WL 3341887, at *6 n.9 (S.D.N.Y. Aug. 20, 2010) ("[T]he Second Circuit rejects the notion that

36

the 'quo' in a *quid pro quo* must be a narrowly defined official act.") (citing *United States v. Middlemiss*, 217 F.3d 112, 120 (2d. Cir. 2000); 18 U.S.C. § 201(b) (defining bribery as accepting a thing of value to induce an official "to do or omit to do any act in violation of the official duty of such official.").

Though the specific act alleged here—the provision of access to material nonpublic information in return for benefits—may not have involved an "official act" of the type that commonly constitutes a plain-vanilla bribery charge, it is certainly misuse of office within the context of an honest services bribery scheme. *Seminerio* explained that Skilling was charged with failing to disclose a personal economic interest unrelated to the receipt of any payments, whereas "the conflict of interest that Seminerio was charged with failing to disclose was his receipt of a stream of 'corrupt payments'—i.e., bribes—in connection with, and with the intent to be influenced in, his actions as an Assemblyman." *Seminerio*, 2010 WL 3341887, at *6. The same reasoning applies here—the only conflict-of-interest Ryan failed to disclose was the receipt of benefits from Warner.

### e.     Count Five

Count Five charged that a check related to the ADM and IBM contracts was mailed in furtherance of the scheme. Specifically, Warner caused a company he controlled, Omega Consulting Group, to issue a check to a company controlled by Alan Drazek, American Management Resources. The check was sent to Udstuen, who sent the check to Drazek. Drazek cashed the check, kept a portion, and sent the rest to Warner. The court noted in examining this evidence that "[t]his arrangement served no purpose other than to disguise the provenance of the proceeds." *Warner*, 2006 WL 2583722, at *9. This count, like Count Four, did not identify a specific official action, but the mailing of the check was incident to the bribery scheme, and specifically to the ADM and IBM contracts. A reasonable jury must have found that if this mailing was in furtherance of the scheme, any conflict of interest being concealed was Ryan's role in interfering

37

with the ADM contract, and misusing his office with the IBM contract, in exchange for benefits from Warner and others.

### f.    Count Seven

The Government charged in Count Seven that the mailing of a check from Viisage to a consulting firm controlled by Warner was in furtherance of the scheme to defraud.  As more fully explained in the court's ruling on Ryan's post-trial motions, regarding this count the "jury could reasonably have found that, by virtue of his relationship with Ryan, Warner obtained access to information about the digital licensing contract and secured a share of the profits for himself, and that Warner attempted to conceal his role."  *Id.* at *11.  This count, like some others, rests on the disclosure of material nonpublic information.   Even post-*Skilling*, this court is comfortable in concluding that not every action in furtherance of an honest services bribery scheme must itself adhere to the elements of a paradigmatic bribery charge.  In this instance, as part of the flow of benefits running between Ryan and Warner, Ryan allowed Warner access to information from which he was allowed to profit.  Ryan's only interest in this was his financial relationship with Warner.  No reasonable jury would have found Ryan provided Warner with access to this information and blessed his attempts to benefit from it, without also believing that Ryan did so as part of his exchange of benefits with Warner, and the jury's findings that such benefits were not merely incident to friendship supports this finding.

### g.    Ryan's Convictions  on the Warner Mail Fraud Counts Survive Harmless Error

For the reasons described above, the court finds that the instructional errors regarding the mail fraud counts related to the relationship between Ryan and Warner were harmless.  The Government demonstrated both circumstantial and direct evidence of a "stream of benefits" flowing between Ryan and Warner.  The jury received instructions that if Ryan received these benefits without the intent to be influenced, there was no criminal act.  Ryan's defense argued forcefully for

this proposition, and the jury rejected it.  The jury was also instructed that if Ryan engaged in these activities in good faith, that would defeat the intent necessary for a scheme to defraud.  The jury rejected this defense as well.

Even proceeding under a bribery theory, the Government was not required to prove that Ryan and Warner agreed on specific actions to be taken in exchange for specific benefits.  The Government only needed to prove what it argued in most instances—that Ryan and Warner were engaged in an exchange of benefits in which Warner provided Ryan with gifts and cash, and Ryan provided Warner with opportunities to profit from the State's business in the form of leases, contracts, or inside information.  Had some of the counts of conviction rested solely on the concealment of a conflict of interest, they might fail under the *Skilling* holding; but in this case, the only conflict of interest that Ryan could have concealed was the benefits he was receiving from Warner.  On this record, it is not credible that the jury believed Ryan engaged in a pattern of concealment simply because he was doing "favors" for some friends, and, as discussed above, the jury affirmatively rejected this argument.

Further, the jury found Ryan guilty on numerous false statement and tax charges, suggesting it believed that he had accepted financial benefits and lied to the IRS and FBI about them, and lied about his personal financial relationship with Warner.  While Ryan could well have had independent reasons for lying, in the context of the evidence presented, no reasonable jury that believed he concealed benefits and believed he played a role in these transactions could have believed one was not in exchange for the other.

### 3.    Harry Klein-related Mail Fraud Count

Count Six is the sole count of mail fraud related to Harry Klein.  That count charged that the mailing of a check from the State of Illinois to a company controlled by Klein was in furtherance of the mail fraud scheme.

39

Each year from 1993 to 2002, Ryan vacationed at Klein's home in Jamaica. The government demonstrated that Ryan engaged in sham transactions in which he would write a check to Klein for $1,000—purportedly in return for his accommodations in Jamaica—and then accept that same amount in a cash payment back from Klein. (Pet.'s Br. at 17; Tr. 2838-42; 2844; 9432-44.) In 1997, Ryan proposed that the Secretary of State lease a building owned by Klein for a commercial drivers' license facility. *Warner*, 2006 WL 2583722, at *10. This court found "ample evidence in the record to support the government's position that this lease was foisted on SOS staff because Ryan wanted to do his friend a favor. Ryan's personal intervention on Klein's behalf initiated the transaction, and Ryan remained involved thereafter." *Id.* Ryan now argues that this mailing was not in furtherance of a bribery scheme. He points to a separate count on which he was convicted for concealing this cash-back arrangement, and argues that he might have concealed these benefits solely because receiving gifts for more than $50 violated state law. (Pet.'s Br. at 17.) True enough, but merely concealing the cash-back arrangement would not be sufficient evidence on which the jury would have convicted Ryan for *this* mailing, which involved a payment from the State to Klein for the South Holland lease.

Ryan also argues, as the court noted, and as argued with the Warner counts, that Ryan must simply have been doing his friend a favor. The indictment, however, required the jury to find, if it believed that the receipt of money from Klein was in furtherance of the scheme, that the money must have been received with the intent to influence Ryan in the performance of his official duties—in other words, for the jury to believe that Ryan received the money in furtherance of the scheme, they must have believed he received a bribe.

Further, on this count specifically, the Government and Ryan both argued on the same terms. In its closing argument, the Government explained,

> Those $100 bills, those cash payments were corrupt payments. You see, those cash payments that Ryan received from Klein made that lodging a free gift. And during the period that George Ryan took that gift, he took official action that

> benefitted Harry Klein, both in the 1995 currency exchange increase and also in the 1997 South Holland lease. And he was doing this all while he was hiding that gift behind a sham paper trail. And Ryan knew that those payments were corrupt payments, because he never reported them. He never disclosed the free lodging that those payments accomplished. He never disclosed that free lodging on his Statement of Economic Interests. And he lied about them to the FBI, as you have heard. And he also lied about them to the public through his press spokesman.

(Tr. 23085.) Ryan argued, then as he does now, that any favor done for Klein was just that—a favor, nothing more. "It's a crime if George Ryan accepted benefits to perform official acts. But it's not a crime if all George Ryan did is try to do things that sometimes benefitted political supporters." (Tr. 23159-23160.) Ryan pointed the jury to the instruction that explained that good faith is a defense, and argued that Ryan had arranged the lease because it was in the best interests of the State. Further, Ryan reminded the jury that the receipt of personal benefits is a crime only if the benefits were received with the understanding they were given with the intent to influence official action. (Tr. 23148.) In short, the jury was presented with two different versions of these payments, and adopted the Government's view.

No reasonable jury would have believed that Ryan concealed the benefits he received from Klein, steered a lease to Klein, and accepted illegal benefits from Klein, without also believing those benefits were given with the intent to influence his official action, and that he accepted those benefits with the intent to be influenced.

### 4.     Count One (RICO)

Ryan argues that "[b]ecause his RICO conviction was predicated on the mail fraud charges, it is invalid as well." (Pet.'s Br. at 21.) Having determined that Ryan's conviction on Counts Two through Eight stand after harmless error review, the court finds that Ryan's conviction on the RICO count also stands.

### II.     Pecuniary Fraud

The Government argues that even if Ryan's conviction cannot be sustained based on an honest services bribery theory, it can be sustained on a pecuniary fraud theory. The vast majority

41

of the post-*McNally* cases found support for convictions based on this alternate theory.[14]  In

------

[14]        Since *McNally*, in nearly every case where the conviction was arguably based both on a straight fraud theory and on an honest services fraud theory, the Seventh Circuit has upheld the conviction under a theory of pecuniary fraud.  *See, e.g.*, *United States v. Ewing*, No. 95-2009, 74 F.3d 1242, at *2 n.4 (7th Cir. 1996) (defendant challenged his conviction of honest services fraud on the ground that his conduct pre-dated the statutory amendment generated by *McNally*; court held guilty plea of bribery and bid-rigging could be sustained as pecuniary fraud because "the loss suffered by [defendant's employer] was not 'incidental.' Instead, the money Ewing received as bribes flowed directly, if somewhat circuitously, from the coffers of [his employer] to Ewing."); *United States v. Catalfo*, 64 F.3d 1070, 1077 (7th Cir. 1995) (upholding conviction of options trader who made unauthorized trades under  pecuniary fraud theory because "he deprived [the firm that sponsored him] of the right to control its risk of loss, which had a real and substantial value"); *United States v. Cherif*, 943 F.2d 692, 697 (7th Cir. 1991) (upholding mail fraud conviction of a bank employee who traded on the basis of confidential information obtained from bank because "it is not idle speculation to conclude that the confidentiality of the information was commercially valuable to the bank because breaches of confidentiality could harm the bank's reputation and result in lost business . . . ."); *Frank v. United States*, 914 F.2d 828, 834 (7th Cir. 1990) (rejecting petition for § 2255 relief; fixing DUI cases could constitute pecuniary fraud where the scheme involved the theft of surrendered licenses and court records, even though only one of numerous paragraphs describing the scheme included language referencing tangible property); *Ginsburg v. United States*, 909 F.2d 982, 987 (7th Cir. 1990) (concluding, in a § 2255 case, that defendant lawyer's payment of cash bribes for fixing tax appeals constitutes pecuniary fraud because it deprived the county of its right to collect taxes from defendant's clients); *Bateman v. United States*, 875 F.2d 1304, 1309 (7th Cir. 1989) (on § 2255 review of an "honest services" conviction, denying relief because defendant's bid-rigging scheme caused his employer "to pay substantially more for equipment than it would have if Bateman had not engaged in this scheme"); *Ranke v. United States,* 873 F.2d 1033, 1040 (7th Cir. 1989) (upholding conviction based on commercial kickback scheme because defendant's employer "was induced to part with its money on the basis of the false premise . . . that [defendant] would not receive a portion of that money"); *Messinger v. United States*, 872 F.2d 217, 220 (7th Cir. 1989) (upholding conviction of defendant lawyer where judge received cash bail bond in exchange for favorable ruling because "Cook County has a property right, albeit an intangible one, in its security interest represented by the cash bail bond"); *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir. 1989) (affirming conviction of defendants who looted the assets of an insurance company and deceived regulators; the scheme to deprive the insurer of its right to defendants' honest services was the same scheme that bled the insurer of assets and permitted it to write more insurance than authorized); *United States v. Doe*, 867 F.2d 986, 989 (7th Cir. 1989) (upholding conviction for fixing tax cases because the scheme deprived the county of tax revenue); *Moore v. United States*, 865 F.2d 149, 151 (7th Cir. 1989) (rejecting § 2255 petition for bid-rigging honest services conviction because the existence of a lower-cost bid demonstrates that his public employer suffered financial loss); *United States v. Bailey*, 859 F.2d 1265, 1276 (7th Cir. 1988) (bank official who manipulated the bank's net worth to evade regulators was charged with honest services fraud, but the content of each count of conviction "alleged schemes with the potential to expose [bank's] money and property to plunder by artificially keeping [bank] in operation"); *United States v. Bonansinga*, 855 F.2d 476, 479 (7th Cir. 1988) (upholding conviction where city councilman paid for personal supplies with public funds because indictment alleged single scheme which deprived public both of honest services and pecuniary fraud); *United States v. Wellman*, 830

(continued...)

A-000042

several of these cases, the conduct at issue was similar to the conduct that Ryan was convicted of—the awarding of contracts by public officials because of bribes or kickbacks, often without any proof of a monetary loss.  For example, in *Borre v. United States*, 940 F.2d 215 (7th Cir. 1991), the court upheld the conviction of an individual who helped the mayor of Fox Lake and one of its trustees award a cable franchise in exchange for an ownership stake in that franchise.  The court found that the franchise was property, and that a "victim is defrauded of property when the victim loses control over the disposition of that property."  *Id.* at 222.  In *United States v. Keane*, 852 F.2d 199 (7th Cir. 1988), the defendant, a city councilman, had participated in a partnership that bought property from the city at below-market value using inside information and sold it at higher prices to other municipal bodies.  The fact that the scheme may not have been profitable, or may not have victimized his employer, did not undermine his conviction; "the mail fraud statute proscribes fraudulent *schemes*; it does not confine penalties to those whose schemes succeed in raking off cash."  *Id.* at 205 (emphasis in original).

These holdings are directly relevant in this case because in *McNally*, the Supreme Court struck down entirely the theory of honest services mail fraud, leaving only pecuniary fraud to support a conviction.  Thus, in each case decided in the interim between *McNally* and the date on which Congress reinstated the honest services fraud theory, the court asked whether the honest services fraud conviction required the conclusion that the defendant had committed pecuniary fraud as well.  Asking that same question post-*Skilling*, the Seventh Circuit recently upheld one of the fraud counts against Conrad Black based on a $600,000 payment that the court found had no plausible explanation, and therefore must have constituted pecuniary fraud.  *United States v. Black*, 625 F.3d at 393.  Though the court has concluded that the instructional error was harmless, a

---

(...continued)
F.2d 1453, 1462 (7th Cir. 1987) (affirming conviction of honest services fraud under a pecuniary fraud theory where "the substance of the charge was that Wellman facilitated the sale of the [chemical] tanks by falsely representing that they were in compliance with the regulations.").

finding that Ryan's mail fraud conviction necessarily constitutes pecuniary fraud would be an alternate basis for upholding the conviction.

Ryan argues that this pecuniary fraud theory was never presented to the jury, and thus may not be a basis for upholding the verdict. (Reply Br. at 27.) The indictment itself, however, did state that the scheme charged was one "to defraud the people of the State of Illinois, and the State of Illinois, of *money*, *property*, and the intangible right to honest services" (emphasis added). The instructions also referred to a pecuniary fraud theory, explaining that the first element of the mail fraud charge was that "the defendant knowingly devised or participated in the scheme to defraud or to obtain money or property. . . ." (Instructions at 75; Tr. 23902.) The instructions, too, explained that "the phrase 'intent to defraud' means that the acts charged were done knowingly with the intent to deceive or cheat the people of the State of Illinois in order to cause a gain of money or property to the defendants or others, or the potential loss of money or property to another." (Instructions at 80; Tr. 23904-05.) Finally, the record defeats Ryan's assertion that the Government failed to present the pecuniary fraud theory to the jury. *See, e.g.* (Tr. 23771 ("So, folks, there is two different types of schemes. There is one that's for money or property. That is when you are given state business for leases and you are lying about it. You are giving away property. When you are given—when you are stealing from the state, people's resources, that's property. That's money. You can't do that and lie about it, and there is a mailing in furtherance of it. That's money or property.")). This theory was indeed presented to the jury.

Ryan points to two post-*Skilling* cases that, he says, bar the Government from arguing that Ryan would have been convicted of pecuniary fraud. The first case cited by Ryan involved an honest services conviction based on a scheme wherein former Newark Mayor Sharpe James assisted Tamika Riley, a woman with whom he had an intimate relationship, in acquiring city-owned properties at prices significantly below their market value. *United States v. Riley*, 621 F.3d 312, 318 (3d Cir. 2010). The court explained that, "*[i]n the context of this case, where the fraudulent act is*

44

*the non-disclosure of a conflict of interest*, it would demean the judicial process to attempt to put

the genie back in the bottle by essentially rewriting the charge to the jury on Count 5 and assuming

the jury made distinctions the Government did not bring out in its summation." *Id.* at 324 (emphasis

added). Ryan omits the emphasized portion in his brief, but it demonstrates why the reasoning of

this case is inapplicable.

The other case Ryan emphasizes is also inapposite. The scheme to defraud there involved

a state employee who set up a dummy company with another individual to which he arranged

payments to be made for work completed by others and sold to the state at an inflated price. Br.

in Opp'n to Writ of Cert., *United States v. Hereimi*, No. 09-1035, at *2 (U.S. filed May 17, 2010).

The Ninth Circuit found the case was clearly tried only under a conflict-of-interest theory not

involving bribery, and a pecuniary fraud theory was never presented. *United States v. Hereimi*, No.

08-30468, 2010 WL 3735898 (9th Cir. Sept. 23, 2010).

### A.      Loss Standard

Much of Ryan's argument against a finding of pecuniary fraud is based on the Government's

failure to present evidence of a provable loss as a result of the scheme. (Reply Br. at 30-31.)

Seventh Circuit precedent, however, does not require that there be a provable loss in such cases.[15]

The wire and mail fraud "statutes do not require the government to prove either

contemplated harm to the victim or any loss." In *United States v. Leahy,* 464 F.3d 773 (7th Cir.

2006), the defendants postured as minority businesses in order to obtain city contracts they would

otherwise not have won. The court rejected their argument that their scheme could not constitute

pecuniary fraud because the city paid no more for the services defendants provided than it would

---

[15]      In an earlier opinion addressing a similar argument from Ryan's co-Defendant, the court explained that in a bid-rigging scheme, loss is often inherent: "A vendor paying bribes to Warner for the privilege of doing business with the State presumably could have reduced the price it charged the State by the same amount it was willing to pay Warner. Thus, to the extent a vendor's price factored in payments made to Warner on the side, the State overpaid for that vendor's services." *United States v. Warner,* 292 F. Supp. 2d 1051, 1064 (N.D. Ill. 2003).

A-000045

have paid a legitimate contractor.  The scheme at issue, the Seventh Circuit observed, "precisely and directly targeted Chicago's coffers and its position as a contracting party. . . . [The] object was money, plain and simple, taken under false pretenses from the city in its role as a purchaser of services.").  *See also United States v. Sorich*, 523 F.3d 702, 705 (7th Cir. 2008) (finding a scheme that "doled out thousands of city civil service jobs based on political patronage and nepotism" could constitute pecuniary fraud).  Numerous recent cases have upheld this theory, finding that no proof of actual or contemplated loss is necessary.  *See, e.g., United States v. Azteca Supply Co.,* No. 10 CR 80, 2010 WL 3940717, at *3-4 (N.D. Ill. Oct. 6, 2010) (finding pecuniary fraud in circumstances similar to *Leahy* despite the fact that the lowest bidder received the contracts, observing that "a jury is entitled to find that by depriving a governmental entity of a 'fundamental basis of [its] bargain,' a defendant can deprive that entity of a property right") (citation omitted); *United States v. Fenzl*, ___F. Supp. 2d ___, 2010 WL 3236774, at *2 (N.D. Ill. Aug. 16, 2010) ("As the law stands, the government does not need to establish pecuniary harm or economic loss as an element of the alleged offenses."); *United States v. Villazan*, No. 05 CR 792, 2007 WL 541950, at *5 (N.D. Ill. Feb. 15, 2007) ("Cook County's right to control its own spending is not a regulatory interest but a property right.").

Ryan cites *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), in which the court reversed the conviction of a sports agent for mail fraud based on his signing contracts with college athletes in violation of NCAA rules.  The Government there alleged that the mailings of scholarship checks to these athletes were in furtherance of the scheme, but the court found they could not be because the universities "were not out of pocket to Walters."  *Id.* at 1224 (emphasis omitted).  As the Seventh Circuit explained in *Sorich*, this holding "was not a requirement that the defendant receive the money or property, but rather a way of illustrating a deeper problem with the case.  The scholarship money that the university sent the athletes was incidental, rather than the target of the scheme."  523 F.3d at 713.  In this case, in contrast, the awarding of contracts and leases was the

46

subject of the mailings and the object of the scheme.  The Supreme Court reversed a mail fraud conviction in *Cleveland v. United States*, 531 U.S. 12 (2000), based on the fraudulent receipt of a video poker license, finding that interest to be regulatory, and holding "that § 1341 does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands."[16]  *Id.* at 20.  In the case before this court, in contrast, Ryan and Warner were convicted of a scheme that deprived the state of the power to control how its money was spent—the type of deprivation deemed sufficient to support a pecuniary fraud prosecution by other courts that have distinguished *Cleveland*.  *See, e.g., United States v. Sorich*, 427 F. Supp. 2d 820, 828 (N.D. Ill. 2006), *aff'd* 523 F.3d 702, *reh'g en banc denied*, 531 F.3d 501 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1308 (2009).

Several of the charges against Ryan also involved the misappropriation or disclosure of nonpublic information.  In a case decided shortly after *McNally*, the Supreme Court decided that the *Wall Street Journal* had a property interest in the content of one of its columns, which was kept confidential prior to publication.  "Confidential business information has long been recognized as property," the Court observed.  *Carpenter v. United States*, 484 U.S. 19, 26 (1987).  *See also United States v. Cherif*, 943 F.2d 692, 695 (7th Cir. 1991) (holding that a scheme involving receipt

---

[16]    The Seventh Circuit did hold in a number of additional instances that convictions did not survive review after *McNally* where the Government had not proved deprivation of a property interest. *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir. 1989) (holding that city not deprived of property because "[a]ccepting bribes to issue licenses did not deprive Chicago of property; it fattened the City's treasury by $50 (the license fee) for each extra license issued."); *United States v. Gimbel*, 830 F.2d 621, 626 (7th Cir. 1987) (reversing conviction after *McNally* for scheme where attorney caused bank to fail to disclose structured currency transactions because "conceal[ing] information from the Treasury Department which, if disclosed, might have resulted in the Department assessing tax deficiencies" did not result in deprivation of a property right); *United States v. Holzer*, 840 F.2d 1343, 1348 (7th Cir. 1988) (vacating conviction of judge for bribery scheme because "Holzer is not accused of having diverted to his own pocket money intended for his employer; the State of Illinois does not sell justice.").

47

of confidential business information held by bank, for purpose of trading stocks on such information, resulted in deprivation of a property right).

### B.  Count Two

Count Two involved Ryan's interference with proposed changes to specifications for vehicle registration stickers that might have resulted in Warner's client, ADM, losing its contract to manufacture those stickers for the Secretary of State.  The Government argues that "Ryan caused the state to continue to pay ADM for a contract based on specifications that the relevant state official no longer believed were in the state's best interest."  (Response Br. at 38.)  Ryan argues that the only false representation made by Ryan regarding this contract was that the security mark was necessary for public safety, and that "the Government presented no evidence that Ryan did not believe what he said."  (Reply Br. at 32.)

The jury was instructed that good faith was a defense to every count—that "[g]ood faith on the part of the defendant is inconsistent with intent to defraud."  (Instructions at 81; Tr. 23905.)  Had the jury believed that Ryan made representations about the ADM contract in good faith—in other words, that he genuinely believed the specifications needed to be changed—it would not have convicted him under either a pecuniary fraud or an honest services theory.  The court concludes that the jury must have believed that these statements were made with the intent to defraud, and in that case, no reasonable jury that convicted Ryan on this count of honest services fraud would have failed to convict him of pecuniary fraud.

### C.  Counts Three and Eight

Count Three involves the State's lease of a building in Joliet owned by Warner, and Count Eight involves the State's lease of a building in Bellwood owned by Warner.  At trial, the Government presented ample evidence that Ryan steered the leases to Warner, and, again, the jury necessarily rejected any good faith defense.  Ryan argues that the only misrepresentation or

nondisclosure involved in these leases was Warner's, and that Ryan "bore no responsibility for Warner's nondisclosures."  (Reply Br. at 33.)

The jury, however, convicted Ryan on Count Twelve, which Ryan does not now challenge, of making false statements to the FBI concerning the Joliet lease.  The jury found that Ryan lied when he said he never had any discussions with Warner about the lease and did not know that Warner would have profited from the lease.  This suggests, at least as to the Joliet lease, that at a minimum, Ryan failed to disclose Warner's interest in the property.

Further, the jury could not have convicted Ryan on either of these counts without believing that Ryan and Warner intended to defraud the State of either property or honest services.  To convict Ryan of honest services fraud, the jury must have found that, at the least, that Ryan failed to disclose his conflict of interest—i.e., that Warner stood to profit from the leases and that Ryan had a personal financial relationship with Warner (as the jury also concluded in Count Twelve).  This requires the conclusion that the jury must have believed Ryan made material misrepresentations or nondisclosures regarding these leases, and that Ryan was guilty of pecuniary fraud on these counts.

Ryan further argues that he cannot be responsible for Warner's nondisclosures under a theory of conspiracy because "[t]he only conspiracy in which Ryan and Warner allegedly participated . . . was a conspiracy to conduct the affairs of an enterprise through a pattern of pre-*Skilling* honest services fraud." (Reply Br. at 33.)  Ryan's responsibility for his own nondisclosures suffices to satisfy that element of the mail fraud charge here, for reasons explained earlier, the conspiracy conclusion that the jury reached is not undermined by *Skilling*.

### D.    Counts Four and Five

Counts Four and Five grow out of the award of a mainframe computer to contract to IBM, which at the time was a client of Warner's.  The evidence at trial established that Ryan allowed Warner and Udstuen to choose the individual who would serve as director of the SOS department

49

that bid on the mainframe, essentially allowing them to fix the contract.  Again, at a minimum, the jury found that Ryan failed to disclose a conflict of interest concerning this episode when they determined that he had deprived the State of its right to honest services.  The only conflict of interest that Ryan could have failed to disclose, based on the evidence at trial, was that he was engaged in an exchange of benefits with Warner.

Ryan argues that the only material nondisclosure related to the IBM contract was the receipt of gifts from Warner that were unrelated to any specific action on this contract.  Ryan asks whether "an official [could] be convicted of money/property fraud if he approved a contract without revealing that a beneficiary of this contract once took his aunt to dinner?"  (Reply Br. at 34.)  The answer, of course, is that if the jury found that the official acted in good faith in awarding the contract, then the incidental receipt of a gift to or from a relative would be immaterial.  In this case, however, the jury found Ryan did not act in good faith, and it must have found, at least, that  that Ryan concealed a conflict related to this transaction, a finding necessary either for either for honest services fraud or pecuniary fraud.  The jury must have found Ryan guilty of pecuniary fraud.

Ryan urges that the contract may well have been awarded to IBM regardless of his or Warner's conduct; as explained earlier, however, the lack of actual or contemplated loss does not defeat a verdict of pecuniary fraud.  Ryan and Warner perverted the bidding process by concealing their conflicts of interest and therefore denied the State of its power to control how its money is spent—and that is sufficient for a conviction of pecuniary fraud.

E.     Count Six

In Count Six, the Government charged Ryan with mail fraud related to the award of a lease in South Holland to Harry Klein.  As described earlier, the evidence supported a finding that Ryan steered the lease to Klein in exchange for free stays at Klein's home in Jamaica.  These stays involved a sham cash-back transaction wherein Ryan would write a check to Klein, and Klein would pay Ryan back in cash.

50

Ryan's only argument regarding this transaction is that "the award of a contract or lease to the provider of a gift should not be sufficient in itself to establish a fraudulent deprivation of property." (Reply Br. at 35.) Ryan is correct that if that is all that the evidence shows, it is insufficient. Again, however, the jury found at the least that Ryan concealed a conflict of interest; and the only such conflict of interest that Ryan would have concealed was the stream of benefits that he had received from Klein before the lease was awarded. Such a finding establishes the intent to defraud under either an honest services theory or a pecuniary fraud theory. In addition, the jury found in Count Eleven that Ryan made false statements to the FBI when he said he paid his own expenses in Jamaica, and that he did not take part in, or know the details of, the South Holland lease. Based on these findings, the jury must have convicted Ryan of pecuniary fraud on this count.

### F.       Count Seven

Analysis of Ryan's conviction on Count Seven follows much the same pattern. Count Seven related to the awarding of a state contract to Viisage, a company that Warner worked for as an unregistered lobbyist. Ryan's alleged nondisclosure in the awarding of this contract was the stream of benefits Warner had provided him, and Warner's failure to register as a lobbyist for Viisage. At a minimum, the jury found that Ryan failed to disclose a conflict of interest related to that contract, a conflict that must have consisted of the exchange of benefits with Warner. Though this contract also might have been awarded regardless of Warner and Ryan's interference, these nondisclosures and the absence of good faith suffice to establish pecuniary fraud, and because the jurors believed that Ryan concealed his interest in this transaction, they also must have believed that Ryan was guilty of pecuniary fraud. Finally, the State's interest in the confidential information related to this contract could also be considered a property interest.

### III.     Sufficiency of the Evidence

51

Ryan argues that the evidence produced at trial was insufficient to support his convictions under the *Skilling* standard, which requires that the honest services scheme involve bribes or kickbacks. "No rational jury could have found Ryan guilty of mail fraud or racketeering in light of the holding in *Skilling*. . . . None of [the] evidence remotely suggested a scheme to obtain bribes or kickbacks." (Pet.'s Br. at 15-16.)

### A.      Standard of Review

In reviewing a § 2255 petition for sufficiency of the evidence, the court "review[s] evidence and draw[s] all reasonable inferences from it in a light most favorable to the government. . . ." *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992). To determine whether the evidence is sufficient to support the conviction, "we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the government, defer to the jury's credibility determinations, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008) (quotation omitted).

Because the court has already engaged in harmless-error analysis, much of Ryan's argument regarding the sufficiency of the evidence has been addressed. "[D]etermining whether an evidentiary error is harmless necessarily requires some weighing of the sufficiency of the evidence." *Fuesting v. Zimmer, Inc.*, 448 F.3d 936, 939 (7th Cir. 2006). The court's brief consideration of the sufficiency argument follows.

### B.      The Evidence Was Sufficient to Establish A Bribery Scheme

Ryan's main argument relating to the sufficiency of the evidence is that his activities, even taken in the light most favorable to the government, fail to establish a bribery scheme of the type required for conviction by *Skilling*. As discussed above, *Skilling* imposed limits on the theory of honest services mail fraud, but it did not impose a requirement that the government prove an explicit *quid pro quo*. A bribery scheme can rest on a "stream of benefits," "course of conduct," or

52

"retainer" theory of bribery. As the jury was instructed in this case, whether benefits or gifts were given with the intent to influence Ryan's exercise of office can be inferred from the evidence presented. In evaluating Ryan's post-trial sufficiency argument, this court observed that "[t]he government introduced a great deal of evidence of Ryan's acceptance of gifts and benefits." *Warner*, 2006 WL 2583722, at *6. The court need not repeat every charge examined in the harmless-error analysis it has just engaged in, for the evidence that Ryan took official actions favorable to Warner and Warner reciprocated with a stream of benefits is sufficient to establish bribery under *Skilling*. The evidence that Harry Klein paid for Ryan's stays at his home in Jamaica, and that Ryan performed acts favorable to Klein, was also sufficient to establish a bribery scheme that included the award of the South Holland lease charged in Count Six.

Because the standard for harmless-error review is more demanding than the standard in a sufficiency-of-the-evidence inquiry, Ryan's challenge to the sufficiency of the evidence of a bribery scheme necessarily fails. And, as explained earlier, the evidence is sufficient for a finding of pecuniary fraud, as well.

**IV.    Ryan Was Not Prejudiced By Non-Bribery-Related Evidence**

Finally, Ryan argues that he was prejudiced by the admission of evidence that would not have been admissible in a post-*Skilling* honest services fraud prosecution. (Pet.'s Br. at 15; Reply Br. at 36-37.) "The Government charged Ryan with a wide-ranging scheme to defraud that extended over twelve years and with a RICO conspiracy predicated upon the alleged mail fraud scheme. Most of the conduct alleged to be part of the scheme cannot remotely be characterized as bribes or kickbacks. Evidence of this conduct would be inadmissible in a post-*Skilling* mail fraud trial and would be highly prejudicial in a trial of legitimate mail fraud charges." (Pet.'s Br. at 15.)

Ryan does not suggest a standard that should govern the court's review on this issue, although he appears to agree that *United States v. Owens*, 424 F.3d 649 (7th Cir. 2005) applies. *Owens* states that "[t]he test for harmless error is whether, in the mind of the average juror, the

53

prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded."  *Id.* at 656 (citing *United State v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1988)).

Ryan identifies six specific pieces of evidence that, he claims, are inadmissible post-*Skilling*. The court addresses this evidence in turn.

### A.    Gifts in Excess of $50

Ryan contends that evidence he accepted gifts in excess of the $50 limit established by State regulations and Ryan's own personal policy would now be inadmissible.  (Pet.'s Br. at 15.) The Government argues this evidence would be admissible to show his intent to defraud, and was therefore relevant to the mail fraud counts as well as to the false statement counts.  (Response Br. at 42.)

The state law and personal reporting requirements are clearly relevant to Ryan's intent to defraud, and would therefore be admissible under either a bribery or pecuniary fraud theory.  In each case, the evidence that Ryan failed to disclose gifts when required to do so is probative of whether he intended to conceal or misrepresent his relationships with those receiving state business.  Whether this evidence would have been admissible solely on the false statement charges is a closer case, but since the evidence would have been admissible regardless, the court declines to reach that question.

### B.    Consulting Fee from Phil Gramm

Ryan next argues that evidence he accepted a consulting fee from the presidential campaign of Senator Phil Gramm and did not report that fee should not have been admitted.  The Government noted that this conduct was specifically at issue in one of the tax counts: Count Eighteen charged Ryan with concealing payments from the Gramm campaign and failing to report them on his tax returns.  Ryan responds that if these payments were admissible only on the tax charge, he could have sought a severance of the trial on those charges or, absent severance, could have asked for a limiting instruction with respect to this evidence.  (Reply Br. at 36.)  Nothing in

54

*Skilling* alters the analysis with respect to the evidence of the Gramm campaign payments. Had Ryan believed the Gramm matter supported a severance or a limiting instruction, he could have asked for such rulings at trial. This issue is not appropriate for § 2255 review.

### C.    Discharge and Reassignment of SOS Employees

Ryan argues that evidence of the discharge and reassignment of SOS Inspector General employees in order to stifle an investigation into wrongdoing was inadmissible. (Pet.'s Br. at 15.) The Government argues that this evidence was relevant to establishing his intent to use money from the Citizens for Ryan campaign for his personal use, and his failure to pay taxes on that money. (Response Br. at 42.) In fact, Count Eighteen does include a charge that Ryan used Citizens for Ryan money for personal purposes and failed to disclose it. Ryan makes the same severance and instruction arguments here, and for the reasons already stated, those arguments are unavailing.

### D.    Low-Number License Plates

Ryan contends that evidence he allowed Warner to assign low-digit license plates to friends should not have been admitted. (Pet.'s Br. at 15.) The Government responds that this evidence was relevant as it was part of the alleged scheme to defraud, and would be part of that scheme under either an honest services bribery theory or a pecuniary fraud theory. (Response Br. at 42.) This evidence, the Government contends, "made it more believable that SOS employees recognized Warner's clout and acceded to his demands about state contracts and leases." (*Id.*) Ryan cites FED. R. EVID. 404(b) in reply, which explains that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b) does, however, permit the introduction of such acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). Warner's access to and sway within the Secretary of State's office is clearly admissible and relevant to the charged conduct under this standard.

55

In any event, the court believes the license plate evidence remains relevant to honest services and pecuniary fraud, as well as to the RICO charge. The awarding of low-digit license plates was part of the charged scheme outlined in the summary indictment, and as the court noted earlier, "low-digit license plates appear to have a cachet in Illinois. In the court's view, awarding such items of value to specific campaign contributors is not comparable to generally supporting legislation favored by them." *Warner*, 2005 WL 2367769, at *3. To the extent that low-digit license plates have value, that value belongs to the State, not to Warner and Ryan or their friends. This objection is overruled.

### E.    Revealing Information About Grayville Prison

Ryan argues that in a post-*Skilling* prosecution, evidence that he leaked information to Swanson concerning the location of the Grayville prison would not have been admitted. (Pet.'s Br. at 15.) The Government responds that this information was admissible "to prove the flow of benefits between Ryan and Swanson" and that this conduct was directly charged in Count Ten. (Response Br. at 42-43.) Ryan again replies with a 404(b) objection.

The evidence at issue related directly to a charged count and certainly would have been admitted; *Skilling* does not require the conclusion that this count would have been dismissed pretrial. In any event, the evidence at issue related only to a discrete occurrence, and although it did not portray Ryan in a positive light, the court is confident the Grayville Prison evidence was not unfairly prejudicial. This objection, too, is overruled.

### F.    Use of Government Employees and Supplies for Campaign Purposes

Finally, Ryan argues that evidence he allowed government employees to work on his campaign and allowed property belonging to the Secretary of State's office to be used for his campaign should not have been admitted. (Pet.'s Br. at 15-16.) The Government argues that this evidence was relevant to show how Ryan "used false pretenses, including false time sheets, to obtain state money and property." (Response Br. at 43.)

56

The court agrees with Ryan that this evidence would not be admissible, post-*Skilling*, to prove honest services fraud, as it alleges the very type of self-dealing that *Skilling* found could no longer supports a conviction under this theory.  The evidence might have been relevant to a pecuniary fraud theory, but Ryan accurately points out there was no "mailing in furtherance of this alleged misconduct."  (Pet.'s Br. at 16 n.11.)

Nonetheless, in a trial involving a complex scheme to defraud, dozens of witnesses, multiple counts, and spanning many months, the court is not persuaded that the prosecution's case would have been "significantly less persuasive" if this evidence were excluded.  Nothing in the record of Ryan's petition suggests this evidence constituted a significant or particularly persuasive part of the Government's case.  Therefore, the court concludes the admission of this evidence constituted harmless error.

**V.    Motion to Set Bail**

Ryan has also moved to set bail pending the resolution of his § 2255 motion.  (Mot. to Set Bail [8].)  Ryan submits a number of factors for the court's consideration on this motion, including, most recently, the sad news that his wife of more than fifty years is suffering from a terminal illness. The Ryans' advanced years and their obvious devotion to one another were significant to the court at sentencing and remain so, and the court recognizes that Mr. Ryan poses no risk of recidivism nor danger, were he to be released.

In deciding a motion for release of an individual who has been convicted and sentenced, however, the most relevant factor must not be his or her personal circumstances, but instead the likelihood his § 2255 motion will succeed.  Although § 2255 itself does not explicitly provide for setting bail pending the resolution of a petition, the Seventh Circuit has explained that "there is abundant authority that federal district judges in habeas corpus and section 2255 proceedings have inherent power to admit applicants to bail pending the decision of their cases, but a power to be exercised very sparingly."  *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985).  The

57

Government and Ryan disagree on the standard for setting bail, and Ryan admits that "[t]he standard for granting bail in this case is unclear." (Mem. in Supp. of Mot. to Set Bail at 2.)

This court takes no pleasure in depriving any defendant of his or her liberty. The court has had the painful duty to take such action in circumstances more compelling than these—where a young defendant with little education or resources is the sole support of small children, or is the only caregiver for a disabled relative, for example. Any sensitive judge realizes that a lengthy prison term effectively robs the convicted person of what we all value most: months and years with loved ones, some of whom will no longer be there when the sentence has been served. Mr. Ryan, like other convicted persons, undoubtedly wishes it were otherwise. His conduct has exacted a stiff penalty not only for himself but also for his family.

The court need not dwell on the appropriate standard for release of a convicted prisoner. In today's ruling, Ryan's § 2255 petition is dismissed on the merits and his conviction is upheld on all counts. Under any legitimate standard, this context is not appropriate for the "very sparing" exercise of the court's power to set bail. Ryan's motion for release is denied.

## CONCLUSION

For the reasons stated herein, Ryan's motion to vacate, set aside, or correct his sentence [1] is denied. Ryan's motion to set bail [8] is also denied.

ENTER:

_____

Dated: December 21, 2010

REBECCA R. PALLMEYER
United States District Judge

A-000058

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 5512 | **DATE** | 12/22/2010 |
| **CASE TITLE** | George H. Ryan, Sr vs. United States of America | | |

**DOCKET ENTRY TEXT**

In *Skilling v. United States*, 130 S. Ct.2896 (2010), the Supreme Court concluded that the law prohibiting "honest services" mail fraud must be limited to bribery and kickback schemes. Petitioner urges that his 2006 conviction for honest services mail fraud must be overturned. This court has concluded that the wrongdoing that the government proved at trial falls within the limits imposed by *Skilling* and that any error in the instructions was harmless. In the alternative, the conviction may be upheld because the evidence established pecuniary fraud. The court concludes, however, that Petitioner has made a substantial showing of the denial of due process and therefore grants his petition for a certificate of appealability.

Notices mailed by Judicial staff.

| | Courtroom Deputy Initials: | ETV |
|---|---|---|

10C5512 George H. Ryan, Sr vs. United States of America

Page 1 of 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10-CV-05512 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| GEORGE H. RYAN, SR., No. 16627-424 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT GEORGE H. RYAN'S NOTICE OF APPEAL

Notice is hereby given that Defendant George H. Ryan appeals to the United States Court of Appeals for the Seventh Circuit from the Court's Memorandum Opinion and Order dated December 21, 2010 and entered that same day denying Defendant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  (Docket Nos. 34 and 35.)  The district court granted a Certificate of Appealability for its Opinion and Order on December 22, 2010. (Docket No. 36.)

DATED:        December 27, 2010                    Respectfully submitted,


                                                   ___/s/__Albert W. Alschuler____
                                                   Attorney for Defendant


DAN K. WEBB                          ALBERT W. ALSCHULER
JAMES R. THOMPSON, JR.               4123 North Claremont Avenue
GREGORY J. MIARECKI                  Chicago, Illinois 60618
MATTHEW R. CARTER                    (773) 267-5884
GREGORY M. BASSI                     a-alschuler@law.northwestern.edu
KARL A. LEONARD
WINSTON & STRAWN LLP                 ANDREA D. LYON
35 West Wacker Drive                 DePaul University College of Law, Legal
Chicago, Illinois 60601              Clinic
(312) 558-5600                       1 E. Jackson Blvd.
                                     Chicago, Illinois 60604
                                     (312) 362-8402
                                     Alyon1@depaul.edu

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendant George H. Ryan, Sr., hereby certifies that on December 27, 2010, he caused the foregoing Notice of Appeal to be electronically filed with the Clerk of the Court for the Northern District of Illinois using the ECF System, which will send notification to counsel of record.

DATED:        December 27, 2010                    Respectfully submitted,

                                                    ___/s/___Albert W. Alschuler___
                                                    Attorney for Defendant

DAN K. WEBB                          ALBERT W. ALSCHULER
JAMES R. THOMPSON, JR.               4123 North Claremont Avenue
GREGORY J. MIARECKI                  Chicago, Illinois 60618
MATTHEW R. CARTER                    (773) 267-5884
GREGORY M. BASSI                     a-alschuler@law.northwestern.edu
KARL A. LEONARD
WINSTON & STRAWN LLP                 ANDREA D. LYON
35 West Wacker Drive                 DePaul University College of Law, Legal Clinic
Chicago, Illinois 60601              1 E. Jackson Blvd.
(312) 558-5600                       Chicago, Illinois 60604
                                     (312) 362-8402
                                     Alyon1@depaul.edu